**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF VIRGINIA**
**DANVILLE DIVISION**

CLERKS OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED

JUN 25 2025

LAURA A. AUSTIN, CLERK
BY: s/ H. MCDONALD
DEPUTY CLERK

| | |
|---|---|
| DONNA BURTON, on behalf of herself and all others similarly situated, | |
| Plaintiff, | Case No. 4:25CV00033 |
| v. | **CLASS ACTION COMPLAINT** |
| URW COMMUNITY FEDERAL CREDIT UNION, | **JURY DEMAND** |
| Defendant. | |

## CLASS ACTION COMPLAINT

Plaintiff Donna Burton ("Plaintiff"), on behalf of herself and all persons similarly situated,

brings this Class Action Complaint against Defendant URW Community Federal Credit Union

("Defendant" or "URW"), and alleges as follows:

### INTRODUCTION

1.      This case concerns Defendant's unlawful business practice of assessing $25

overdraft fees ("OD Fees") on (1) debit card transactions authorized on sufficient funds and (2)

ATM and one-time debit card transactions.

2.      These practices breach promises made in Defendant's adhesion contract, which

includes the Contract (attached hereto as **Ex. A**) and the Overdraft Services and Fees Notice

(attached hereto as **Ex. B**) (collectively, the "Contract").

3.      Plaintiff and other Defendant customers have been injured by Defendant's improper

fee maximization practices. Plaintiff, individually, and on behalf of the classes of individuals

preliminarily defined below, brings claims for Defendant's breach of contract, including breach

for the duty of good faith and fair dealing, and violations of the Electronic Fund Transfers Act

1

(Regulation E) 12 C.F.R. § 1005 *et seq*. (authority derived from 15 U.S.C. § 1693 *et seq*.)).

## PARTIES

4.      Plaintiff is a citizen of Virginia and a resident of Danville, Virginia. Plaintiff has had a checking account with Defendant at all times hereto.

5.      Defendant URW Community Federal Credit Union is a credit union with more than $225 million in assets. Defendant maintains its headquarters and principal place of business in this District in Danville, VA. Defendant is engaged in the business of providing retail banking services to consumers, including Plaintiff and members of this Classes, in this District.

## JURISDICTION AND VENUE

6.      This Court has original jurisdiction under 28 U.S.C. §§ 1331 because this case involves a federal question as Plaintiff alleges violations of the Electronic Fund Transfers Act (Regulation E) 12 C.F.R. § 1005 *et seq*. (authority derived from 15 U.S.C. § 1693 *et seq*.)).

7.      Furthermore, this Court has supplemental jurisdiction over Plaintiff's claim for breach of contract, including breach of the duty of good faith and fair dealing, because it is so related to Plaintiff's claim for violations of the Electronic Fund Transfers Act (Regulation E) that it forms part of the same case or controversy under Article III of the United States Constitution.

8.      This Court has personal jurisdiction over the Defendant because it resides in, regularly conducts and/or solicits business in, engages in other persistent courses of conduct in, and/or derives substantial revenue from products and/or services provided to persons in this District and in Virginia.

9.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District—where

Defendant maintains its headquarters and where Plaintiff conducts banking business with Defendant.

## BACKGROUND FACTS

10.    Overdraft fees and insufficient funds fees ("NSF Fees") are among the primary fee generators for financial institutions. In 2021, the largest financial institutions in America charged customers almost $11 billion in overdraft fees. Customers who carried an average balance of less than $350 paid 84 percent of these fees. *Why Poverty Persists in America*, N.Y. TIMES (Mar. 9, 2023), https://tinyurl.com/26jcrfcm.

11.    Unfortunately, the customers who are assessed these fees are the most vulnerable customers. Younger, lower-income, and non-white accountholders are among those who were more likely to be assessed overdraft fees. *Overdrawn: Consumer Experiences with Overdraft*, PEW CHARITABLE TRUSTS 8 (June 2014), https://bit.ly/3ksKD0I.

12.    Because of this, industry leaders like Capital One and Citi stopped assessing OD and NSF Fees entirely. *See* Hugh Son, *Capital One to Drop Overdraft Fees for All Retail Banking Customers*, NBC NEWS (Dec. 1, 2021), https://nbcnews.to/3DKSu2R; *Banking with No Overdraft Fees*, CAPITAL ONE, https://tinyurl.com/4x7ffjvf (last accessed July 10, 2023); Matt Egan, *Citi is the First Mega Bank to Kill Overdraft Fees*, CNN BUS. (Feb. 24, 2022), https://tinyurl.com/48859b3x. Smaller institutions have followed suit and likewise stopped charging OD and NSF Fees. *See, e.g.*, *You Should Never Pay Overdraft Fees Again*, ALLIANT CREDIT UNION, https://tinyurl.com/2h9fasas (last accessed July 24, 2023); *No Overdraft Fees. More Overdraft Coverage*, ALLY BANK, https://www.ally.com/overdraft/ (last accessed July 24, 2023).

13.    Federal regulators have also taken action. For example, the Consumer Financial Protection Bureau ("CFPB") ordered Regions Bank to pay $141 million to reimburse consumers

for OD Fees on debit card transactions authorized on sufficient funds, noting such fees result from "counter-intuitive, complex processes" and finding them to be "unfair" and "abusive" in violation of federal law. Consent Order, *In the Matter of: Regions Bank*, No. 2022-CFPB-0008 ¶¶ 4, 32, 34, 38 (Sept. 28, 2022) (Dkt. 1), https://bit.ly/3vGDdyx.

14.    The Federal Reserve has likewise found that OD Fees on debit card transactions authorized on sufficient funds is an "unfair or deceptive" in violation of federal law and advised financial institutions to "[r]efrain from assessing unfair overdraft fees on POS transactions when they post to consumers' accounts with insufficient available funds after having authorized those transactions based on sufficient available funds." *Consumer Compliance Supervision Bulletin: Highlights of Current Issues in Federal Reserve Board Consumer Compliance Supervision*, Fed. Reserve Bd. 12, 13 (July 2018), https://tinyurl.com/44dvnd65.

15.    In line with this industry trend, the New York Attorney General recently asked other industry leading banks to end the assessment of all OD Fees by the summer of 2022. *NY Attorney General asks banks to end overdraft fees*, Elizabeth Dilts Marshall, Reuters (April 6, 2022).

16.    Through the imposition of these fees, Defendant has made substantial revenue to the tune of tens of millions of dollars, seeking to turn its customers' financial struggles into revenue.

## I.    DEFENDANT ASSESSES OVERDRAFT FEES ON DEBIT CARD TRANSACTIONS THAT WERE AUTHORIZED ON SUFFICIENT FUNDS.

17.    Plaintiff brings this action challenging Defendant's practice of charging Overdraft Fees on what are referred to in this complaint as "Authorize Positive, Settle Negative Transactions," or "APSN Transactions."

18.    Defendant's practice is as follows: the moment debit card transactions are authorized on an account with positive funds to cover the transaction, Defendant immediately

reduces consumers' checking accounts for the amount of the purchase, sets aside funds in the checking account to cover that transaction, and adjusts the consumer's displayed "available balance" to reflect that subtracted amount. As a result, customers' accounts will always have sufficient funds available to cover these transactions because Defendant has already held the funds for payment.

19.     However, Defendant still assesses crippling Overdraft Fees on many of these transactions and misrepresents its practices in the Contract.

20.     Despite putting aside sufficient available funds for debit card transactions at the time those transactions are authorized, Defendant later assesses Overdraft Fees on those same transactions when they settle days later into a negative balance. These types of transactions are APSN Transactions.

21.     Defendant maintains a running account balance, tracking funds consumers have for immediate use. This running account balance is adjusted, in real-time, to account for debit card transactions at the precise instance they are made. When a customer makes a purchase with a debit card, Defendant holds the funds needed to pay the transaction, subtracting the dollar amount of the transaction from the customer's available balance. Such funds are not available for any other use by the account holder and are specifically reserved for a given debit card transaction.

22.     Indeed, the entire purpose of the immediate debit and hold of positive funds is to ensure that there are enough funds in the account to pay the transaction when it settles:

> When a consumer uses a debit card to make a purchase, a hold may be placed on funds in the consumer's account to ensure that the consumer has sufficient funds in the account when the transaction is presented for settlement. This is commonly referred to as a "debit hold." During the time the debit hold remains in place, which may be up to three days after authorization, those funds may be unavailable for the consumer's use for other transactions.

Federal Reserve Board, Office of Thrift Supervision, and National Credit Union Administration, Unfair or Deceptive Acts or Practices, 74 FR 5498 (Jan. 29, 2009).

23.    That means when any subsequent, intervening transactions are initiated on a checking account, they are compared against an account balance that has already been reduced to account for pending debit card transactions. Therefore, many subsequent transactions incur Overdraft Fees due to the unavailability of the funds held for earlier debit card transactions.

24.    Still, despite always reserving sufficient available funds to cover the transactions and keeping the held funds off-limits for other transactions, Defendant improperly charges Overdraft Fees on APSN Transactions.

25.    The Consumer Financial Protection Bureau ("CFPB") has expressed concern with this very issue, flatly calling the practice "unfair" and/or "deceptive" when:

> [A] financial institution authorized an electronic transaction, which reduced a customer's available balance but did not result in an overdraft at the time of authorization; settlement of a subsequent unrelated transaction that further lowered the customer's available balance and pushed the account into overdraft status; and when the original electronic transaction was later presented for settlement, because of the intervening transaction and overdraft fee, the electronic transaction also posted as an overdraft and an additional overdraft fee was charged. Because such fees caused harm to consumers, one or more supervised entities were found to have acted unfairly when they charged fees in the manner described above. Consumers likely had no reason to anticipate this practice, which was not appropriately disclosed. They therefore could not reasonably avoid incurring the overdraft fees charged. Consistent with the deception findings summarized above, examiners found that the failure to properly disclose the practice of charging overdraft fees in these circumstances was deceptive.
>
> At one or more institutions, examiners found deceptive practices relating to the disclosure of overdraft processing logic for electronic transactions. Examiners noted that these disclosures created a misimpression that the institutions would not charge an overdraft fee with respect to an electronic transaction if the authorization of the transaction did not push the customer's available balance into overdraft status. But the institutions assessed overdraft fees for electronic transactions in a manner inconsistent with the overall net impression created by the disclosures. Examiners therefore concluded that the disclosures were misleading or likely to mislead, and because such misimpressions could be material to a reasonable consumer's decision-making and actions, examiners found the practice to be

deceptive. Furthermore, because consumers were substantially injured or likely to be so injured by overdraft fees assessed contrary to the overall net impression created by the disclosures (in a manner not outweighed by countervailing benefits to consumers or competition), and because consumers could not reasonably avoid the fees (given the misimpressions created by the disclosures), the practice of assessing the fees under these circumstances was found to be unfair.

Consumer Financial Protection Bureau, "Supervisory Highlights" (Winter 2015).

26.     There is no justification for these practices, other than to maximize Defendant's Overdraft Fee revenue. APSN Transactions only exist because intervening transactions supposedly reduce an account balance. But Defendant is free to protect its interests and either reject those intervening transactions or charge Overdraft Fees on those intervening transactions—and it does the latter to the tune of millions of dollars each year.

27.     But Defendant was not content with these millions in Overdraft Fees. Instead, it sought millions more in Overdraft Fees on APSN Transactions.

28.     Besides being deceptive, unfair, and unconscionable, these practices breach contract promises made in Defendant's adhesion contracts, which fundamentally misconstrue and mislead consumers about the true nature of Defendant's processes and practices. Defendant also exploits its contractual discretion by implementing these practices to gouge its customers.

### i.     Mechanics of a Debit Card Transaction

29.     A debit card transaction occurs in two parts. First, authorization for the purchase amount is instantaneously obtained by the merchant from Defendant. When a customer physically or virtually "swipes" their debit card, the credit card terminal connects, via an intermediary, to Defendant, which verifies that the customer's account is valid and that sufficient available funds exist to cover the transaction amount.

30.     At this step, if the transaction is approved, Defendant immediately decrements the funds in a consumer's account and holds funds in the amount of the transaction but does not yet transfer the funds to the merchant.

31.     Sometime thereafter, the funds are actually transferred from the customer's account to the merchant's account.

32.     Defendant (like all banks and credit unions) decides whether to "pay" debit card transactions at authorization. For debit card transactions, that moment of decision can only occur at the point of sale, when the transaction is authorized or declined. It is at that point—and only that point—that Defendant may choose to either pay the transaction or to decline it. When the time comes to actually transfer funds for the transaction to the merchant, it is too late for the bank to deny payment—the bank has no discretion and must pay the charge. This "must pay" rule applies industry wide and requires that, once a financial institution authorizes a debit card transaction, it "must pay" it when the merchant later makes a demand, regardless of other account activity. See Electronic Fund Transfers, 74 Fed. Reg. 59033-01, 59046 (Nov. 17, 2009).

33.     There is no change—no impact whatsoever—to the available funds in an account when transfer step occurs.

### ii.     Defendant's Opt-In Form and Contract

34.     The Opt-In Form states:

An overdraft occurs when you do not have enough money in your account to cover either a check or electronic fund transfer transaction (such as with your debit card), but we elect to pay it anyway.

Ex. B.

You must have sufficient funds available in your account…to withdraw funds from your account. If a check, draft item or other transfer or payment order is presented against insufficient funds in your account, you will be charged a fee…

Ex. A at 8; *see also id.* at 11 ("If the funds in your checking account are not sufficient to pay checks, drafts or other items presented and drawn on your account, those checks, drafts and items will be covered by our overdraft procedures and any overdraft service or agreement you have with us.").

35.     In breach of these promises, Defendant assess OD Fees when Plaintiff had "sufficient funds available" when she presented her debit card for payment of her debit card transaction. In other words, she had "enough money in your account to cover" her debit card transaction.

36.     Defendant links payment to authorization ***seven times***, indicating that transactions are paid, and therefore overdrafts are determined, at authorization:

We do ***authorize and pay*** overdrafts for the following types of transactions:

- Checks and other transactions made using your checking account number

- Automatic bill payments

We do not ***authorize and pay*** overdrafts for the following types of transactions unless you ask us to (see below):

- ATM Transactions

- Everyday debit card transactions

We pay overdrafts at our discretion, which means we do not guarantee that we will always ***authorize and pay*** any type of transaction (which generally will occur because you have not authorized a transaction, exceeded the overdraft limit, or have an outstanding balance that has not been repaid).
If we do not ***authorize and pay*** an overdraft, your transaction will be declined
…

To ***authorize and pay*** overdrafts on your ATM and everyday debit card transactions

If you also want us to ***authorize and pay*** overdrafts on ATM and everyday debit card transactions, call…

…

I request and ***authorize you to pay*** overdrafts on my ATM and everyday debit card transactions drawn on my account(s).

Ex. B (emphasis removed and added).

37.     For APSN Transactions, which are immediately deducted from a positive account balance and held aside for payment of that same transaction, there are always sufficient funds to cover those transactions—yet Defendant assesses Overdraft Fees on them anyway.

38.     The above promises indicate that transactions are only overdraft transactions when they are authorized and approved into a negative account balance. Of course, that is not true for APSN Transactions.

39.     In fact, Defendant actually authorizes transactions on positive funds, sets those funds aside on hold, then fails to use those same funds to post those same transactions. Instead, it uses a secret posting process described below.

40.     All of the above representations and contractual promises are untrue. Defendant charges fees even when sufficient funds exist to cover transactions that are authorized into a positive balance. No express language in any document states that Defendant may impose fees on any APSN Transactions.

41.     The Contract also misconstrues Defendant's true debit card processing and overdraft practices.

42.     First, and most fundamentally, Defendant charges Overdraft Fees on debit card transactions for which there are sufficient funds available to cover throughout their lifecycle.

43.     Defendant's practice of charging Overdraft Fees even when sufficient available funds exist to cover a transaction violates its contractual promise not to do so. This discrepancy between Defendant's actual practice and the Contract causes consumers like Plaintiff to incur more Overdraft Fees than they should.

44.     Next, sufficient funds for APSN Transactions are actually debited from the account immediately, consistent with standard industry practice.

45.     Because these withdrawals take place upon initiation, the funds cannot be re-debited later. But that is what Defendant does when it re-debits the account during a secret batch posting process.

46.     Defendant's actual practice is to assay the same debit card transaction twice to determine if it overdraws an account—both at the time a transaction of authorization and later at the time of settlement.

47.     At the time of settlement, however, an available balance does not change at all for these transactions previously authorized into positive funds. As such, Defendant cannot then charge an Overdraft Fee on that transaction because the available balance has not been rendered insufficient due to the pseudo-event of settlement.

48.     Upon information and belief, something more is going on: at the moment a debit card transaction is getting ready to settle, Defendant releases the hold placed on funds for the transaction for a split second, putting money back into the account, then re-debits the same transaction a second time.

49.     This secret step allows Defendant to charge Overdraft Fees on transactions that never should have gotten them—transactions that were authorized into sufficient funds, and for which Defendant specifically set aside money to pay.

50.     In sum, there is a huge gap between Defendant's practices as described in the Contract and Defendant's actual practices.

51.     Banks and credit unions like Defendant that employ this abusive practice require their accountholders to expressly agree to it—something Defendant here never did.

52.    Indeed, recognizing the complexity of the settlement process for APSN Transactions and the fact that a fee in such circumstances is counterintuitive to accountholders, other banks and credit unions require their accountholders to agree to be assessed Overdraft Fees on APSN Transactions.

53.    Defendant and its accountholders make no such agreement. The Contract thus misleads and deceives account holders.

### iii.    Reasonable Consumers Understand Debit Card Transactions Are Debited Immediately

54.    Defendant's assessment of Overdraft Fees on transactions that have not overdrawn an account is inconsistent with immediate withdrawal of funds for debit card transactions. This is because if funds are immediately debited, they cannot be depleted by intervening, subsequent transactions. If funds are immediately debited, they are necessarily applied to the debit card transactions for which they are debited.

55.    Defendant was and is aware that this is precisely how its accountholders reasonably understand debit card transactions work.

56.    Defendant knows that consumers prefer debit cards for these very reasons. Consumer research shows that consumers prefer debit cards as budgeting devices because they don't allow debt like credit cards as the money comes directly out of the checking account.

57.    Consumer Action, a national nonprofit consumer education and advocacy organization, advises consumers determining whether they should use a debit card that "[t]here is no grace period on debit card purchases the way there is on credit card purchases; the money is immediately deducted from your checking account. Also, when you use a debit card you lose the one or two days of 'float' time that a check usually takes to clear." *What Do I Need To Know About Using A Debit Card?*, ConsumerAction (Jan. 14, 2019), https://bit.ly/3v5YL62.

58.     This understanding is a large part of the reason that debit cards have risen in popularity. The number of terminals that accept debit cards in the United States has increased by approximately 1.4 million in the last five years, and with that increasing ubiquity, consumers have viewed debit cards (along with credit cards) "as a more convenient option than refilling their wallets with cash from an ATM." Maria LaMagna, *Debit Cards Gaining on Case for Smallest Purchases*, MarketWatch (Mar. 23, 2016), https://on.mktw.net/3kV2zCH.

59.     Not only have consumers increasingly substituted debit cards for cash, but they believe that a debit card purchase is the functional equivalent to a cash purchase, with the swipe of a card equating to handing over cash, permanently and irreversibly.

60.     Accordingly, "[o]ne of the most salient themes [in complaints to the CFPB] . . . is the difficulty avoiding overdrafts even when consumers believed they would. Often, this was related to bank practices that make it difficult for consumers to know balance availability, transaction timing, or whether or not overdraft transactions would be paid or declined." Rebecca Borne et al., *Broken Banking: How Overdraft Fees Harm Consumers and Discourage Responsible Bank Products*, Center for Responsible Lending 8 (May 2016), https://bit.ly/3v7SvL1.

61.    In fact, consumers' leading complaints involved extensive confusion over the available balance and the time of posting debits and credits:



Figure 3: Top Overdraft Consumer Complaint Issues, by Percentage of Total Complaints

*Id.*

62.    Consumers are particularly confused by financial institutions' fee practices when "based on their actual review of their available balance, often including any 'pending' transactions, [customers] believed funds were available for transactions they made, but they later learned the transactions had triggered overdraft fees." *Id.* at 9.

63.    Ultimately, unclear and misleading fee representations like those in Defendant's account documents mean that consumers like Plaintiff "who are carefully trying to avoid overdraft, and often believe they will avoid it . . . end up being hit by fees nonetheless." *Id.*

64.    The Federal Deposit Insurance Corporation ("FDIC") has specifically noted that financial institutions may effectively mitigate this wide-spread confusion regarding overdraft practices by "ensuring that any transaction authorized against a positive available balance does not incur an overdraft fee, even if the transaction later settles against a negative available balance." *Consumer Compliance Supervisory Highlights*, FDIC 3 (June 2019), https://bit.ly/3t2ybsY.

65.     Despite this recommendation, Defendant continues to assess Overdraft Fees on transactions that are authorized on sufficient funds.

66.     Defendant was aware of the consumer perception that debit card transactions reduce an account balance at a specified time—namely, the time and order the transactions are actually initiated—and the Contract only supports this perception.

67.     Defendant was also aware of consumers' confusion regarding Overdraft Fees but nevertheless failed to make its customers agree to these practices.

### iv.     Plaintiff Was Assessed an Overdraft Fee on Debit Card Transactions Previously Authorized on Sufficient Funds

68.     For example, on March 15, 2025 and again on March 29, 2025, Plaintiff was assessed Overdraft Fees on transactions previously authorized on sufficient funds.

69.     Because Defendant had previously held the funds to cover these transactions, Plaintiff's account always had sufficient funds to "cover" the transactions and should not have been assessed these fees.

70.     The improper fees charged by Defendant were also not errors by Defendant, but rather were intentional charges made by Defendant as part of its standard processing of transactions.

71.     Plaintiff therefore had no duty to report the fees as errors because they were not errors, but were part of the systematic and intentional assessment of fees according to Defendant standard practices.

72.     Moreover, any such reporting would have been futile as Defendant's own contract admits that Defendant made a decision to charge the fees.

## II.     DEFENDANT VIOLATES THE EFTA AND REGULATION E.

**A. Regulation E Introduces Rules to Protect Consumers from Predatory Overdraft Fees**

73.     The EFTA, 15 USC 1693 *et seq*., is intended to protect individual consumers engaging in electronic fund transfers ("EFTs"). EFT services include transfers through automated teller machines ("ATMs"), point-of-sale terminals, automated clearinghouse systems, telephone bill-payment plans in which periodic or recurring transfers are contemplated, and remote banking programs. Prior to December 2011, the Federal Reserve Board was responsible for implementing the EFTA.

74.     The Federal Reserve, having regulatory oversight over financial institutions, recognized that financial institutions had a strong incentive to adopt overdraft programs without giving consumers a choice, since overdraft fees are collected on a nearly risk-free basis. Historically, banks could not decide on overdrafts until after the transaction occurred. Because this entailed a certain amount of risk, financial institutions usually imposed a fee to process the transaction as an overdraft. But as debit card and ATM use rose in popularity, both the number of transactions and the timing of their execution changed. There were more low dollar debit card transactions because debit card use was so convenient, and financial institutions now could either accept or reject transactions at the point of sale. As a result, by simply authorizing these low dollar transactions into overdraft, banks could collect large fees on low dollar transactions that were almost always quickly repaid. It was a low risk, high reward for the financial institutions while customers suffered the costly effects.

75.     And more, these overdraft programs were usually not disclosed to customers, or if so, they were hidden in the middle of a lengthy, boilerplate account agreement. Unlike enrollment in other programs, the customer would be enrolled simply on the word of the banker.

76. The Federal Reserve also noted that "improvements in the disclosures provided to consumers could aid them in understanding the costs associated with overdrawing their accounts and promote better account management." 69 Fed. Reg. 31761 (June 7, 2004).

77. Recognizing that banks and credit unions had strong incentives to adopt these punitive overdraft programs, in 2009, the Federal Reserve Board amended Regulation E to require financial institutions to obtain affirmative consent (or so-called "opt in") from accountholders before the institution could assess OD Fees on ATM and non-recurring "point of sale" debit card transactions. Specifically, Regulation E requires financial institutions to provide consumers with accurate disclosures in understandable language separate from all other information that they could review before they affirmatively consented to enrollment in an overdraft program covering one-time debit card and ATM transactions. Only after a consumer opts-in is the financial institution allowed to assess overdraft fees on these transactions. If a consumer chooses not to opt-in to the financial institution's overdraft service for one-time debit card and ATM transactions, then the financial institution is prohibited from assessing an overdraft fee in connection with any such transaction, regardless of whether payment of the transaction would create an overdraft.

78. Given the state of overdraft programs prior to Regulation E, it is easy to understand why the Federal Reserve was concerned about protecting consumers from financial institutions unilaterally imposing high fees. Banks and credit unions in this scenario had significant advantages over consumers when it came to imposing overdraft policies. By defaulting to charging fees for point-of-sale transactions, banks and credit unions created for themselves a virtual no-lose scenario—advance small amounts of money for a small period of time, then charge a large fee that is unrelated to the amount of money advanced on behalf of the customer, resulting in a APR of thousands of percent interest, all with almost no risk as only a very small percentage of the

17

overdraft customers failed to repay the overdraft. Moreover, prior to Regulation E, consumers were often automatically enrolled in these punitive overdraft programs.

79.    In July 2011, rulemaking authority under EFTA generally transferred from the Federal Reserve Board to the Consumer Financial Protection Bureau ("CFPB") pursuant to the Dodd-Frank Wall Street Reform and Consumer Protection Act. The CFPB restated Regulation E at 12 C.F.R. Part 1005 in December 2011.

80.    Like the Federal Reserve, the CFPB recognized that overdraft programs had a series of problems. The most pressing problem was that overdraft services were costly and damaging to accountholders. The CFPB estimated that the banking industry had collected anywhere from $12.6 to $32 billion in consumer NSF and overdraft fees in 2011, depending on what assumptions the analyst used in calculating the percentage of reported fee income should be attributed to overdrafts. The CFPB also noted that there were numerous "variations in overdraft-related practices and policies," all of which could "affect when a transaction might overdraw a consumer's account and whether or not the consumer would be charged a fee."

**B.  Regulation E's Opt-in Requirement**

81.    In response to these issues, the Federal Reserve and CFPB promulgated and restated Regulation E, which requires financial institutions like Defendant to obtain informed consent, by way of a written document that, segregated from all other information, fully and accurately describes the financial institution's overdraft services in an easily understandable way. If an accountholder does not opt-in to the financial institution's overdraft program, the financial institution must either cover the overdraft without charging a fee or simply decline payment of the transaction at the point of sale. In either scenario, the institution may not charge a fee against the

accountholder's account because the accountholder has not consented to participate in the overdraft program.

82.    Regulation E also provides that the opt-in disclosure agreement must satisfy certain requirements to be valid. The agreement must be a stand-alone document "segregated from" other forms, disclosures, or contracts provided by the financial institution. The notice must also accurately disclose to the account holder the institution's overdraft charge policies. The accountholder's choices must be presented in a "clear and readily understandable manner." 12 C.F.R. § 205.4(a)(1).

83.    The financial institution must ultimately establish that the accountholder has opted-in to overdraft coverage either through a written agreement, or through a confirmation letter to the customer confirming opt-in if the opt-in has taken place by telephone or computer after being provided a compliant opt-in disclosure.

84.    Financial institutions are not permitted to circumvent Regulation E's disclosure requirements by reference to reliance on other account agreements, disclosures, or marketing materials. Rather, Regulation E expressly requires a financial institution to include all the relevant terms of its overdraft program within the four corners of the document, creating a separate agreement with accountholders regarding overdraft policies that is "segregated from" the other lengthy and convoluted documents that collectively set the terms o members' accounts. 12 C.F.R. § 1005.17(b)(1)(i).

85.    Regulation E provides a private cause of action for a financial institution's failure to abide by its disclosure requirements. Plaintiff thus seeks restitution of improperly charged OD Fees in violation of Regulation E.

86.    Moreover, because Regulation E's requirements are incorporated into the EFTA by way of Section 905(a), 15 U.S.C. § 1693c(a), any violation of Regulation E also violates the EFTA, which is privately enforceable under Section 916, 15 U.S.C. § 1693m.

### C. Overdraft Calculations

87.    Financial institutions' fee maximization schemes went beyond these exorbitant penalty fees for the institutions' small advance of funds to cover low-dollar overdrafts. Financial institutions also began manipulating the process as to how they would consider a transaction to be an overdraft to further increase their fee revenue. Specifically, financial institutions charged OD Fees not only when the institution actually advanced money, but also when the customer had sufficient funds in their account and so the financial institutions paid the purported "overdraft" transactions with the customers' own money. That is, financial institution like Defendant unilaterally decided the account was overdrawn not based on an actual lack of funds in the account, but solely based on a calculation of the account balance that excludes money placed on hold for various reasons, including holds that exceed the amount of the customer's pending transactions.

88.    Most banks and credit unions calculate two account balances. First, the "actual balance" reflects the actual amount of money in the customer's account at any particular time. This calculation does not account for holds on pending deposits or funds that have been earmarked for pending transactions. In contrast, the "available balance" represents the actual account balance minus amounts the financial institution has held from pending deposits and/or pending transactions that have not yet posted (and potentially never will post) to the account.

89.    While financial institutions use either the actual balance *or* the available balance to decide whether a transaction overdraws the account, per Regulation E, the terms of the overdraft program must be clearly and accurately disclosed in the opt-in form. Thus, when banks and credit

unions use the "available balance" to determine whether a transaction is considered an overdraft, that balance calculation method must be disclosed and explained in the opt-in disclosure.

90.     Indeed, the difference between the actual balance and the available balance when determining overdrafts is material to both the financial institution and its customers. Because the account's available balance is nearly always lower than the account's actual balance, financial institutions that determine overdrafts based on the available balance instead of actual balance significantly increase the number of transactions that are deemed "overdrafts" and therefore the number of OD Fees they assess.

91.     Moreover, because financial institutions like Defendant include the account's actual balance but not the available balance on the customer's period monthly statements, customers are often unable to understand why they incur OD Fees when Defendant's own account statements show that their accounts always contained sufficient funds to cover their transactions and so no overdraft occurred.

92.     In fact, in one study, researchers noted that consumers most often discover that OD Fees were levied against their accounts when they receive and review their monthly account statements. *See Overdraft America: Confusion and Concerns about Bank Practices*, PEW TRUSTS 7 (May 2012), https://tinyurl.com/3b4jh5n9.

93.     Studies have further confirmed that "[o]ne of the most salient themes within [consumer] complaints is the difficulty avoiding overdrafts even when consumers believed they would. Often, this was related to bank practices that make it difficult for consumers to know balance availability, transaction timing, or whether or not overdraft transactions would be paid or declined." Rebecca Borne et al., *Broken Banking: how OD Fees Harm Consumers and Discourage*

*Responsible Bank Products*, CNTR. FOR RESPONSIBLE LENDING 8 (May 2016),

https://bit.ly/3v7SvL1.

94.    Given these issues, financial institutions have been put on notice by regulators and

banking associations that failure to fully and accurately notify consumers that overdrafts are based

on the available balance calculation rather than the amount of funds actually in their account is an

unfair and deceptive practice.

95.    For instance, the Federal Deposit Insurance Corporation ("FDIC") stated in 2019:

> The FDIC identified issues regarding certain overdraft programs that used an available balance method to determine when overdraft fees could be assessed. Specifically, FDIC examiners observed potentially unfair or deceptive practices when institutions using an available balance method assessed more overdraft fees than were appropriate based on the consumer's actual spending or when institutions did not adequately describe how the available balance method works in connection with overdrafts.

*Consumer Compliance Supervisory Highlights*, FED. DEPOSIT INS. CORP. 2 (June 2019),

https://bit.ly/3t2ybsY. The FDIC recommended that financial institutions mitigate this risk by, *inter*

*alia*, "[p]roviding clear and conspicuous disclosures related to the possible imposition of an

overdraft fee in connection with use of the available balance method so that consumers can

understand the circumstances under which overdraft fees will be assessed and make informed

decisions to avoid the assessment of such fees." *Id*. at 3.

96.    The CFPB also criticized this practice, explaining:

> Examiners observed that in some instances, transactions that would not have resulted in an overdraft (or an overdraft fee) under a ledger-balance method did result in an overdraft (and an overdraft fee) under an available-balance method. At one or more financial institutions, examiners noted that these changes to the balance calculation method used were not disclosed at all, or were not sufficiently disclosed, resulting in customers being misled as to the circumstances under which overdraft fees would be assessed. ***Because these misleading practices could be material to a reasonable consumer's decision making and actions, they were found to be deceptive***.

*Supervisory Highlights*, CONS. FIN. PROT. BUREAU 8 (Winter 2015), https://bit.ly/3jVNHY2 (emphasis added).

97.    Put simply, under Regulation E, a financial institution may decide which balance it prefers to use when assessing OD Fees on one-time debit card and ATM transactions; however, Regulation E is also very clear that the financial institution must disclose this practice accurately, clearly, and in a way that is easily understood.

98.    Because the Regulation E opt-in disclosure must include this information in a standalone document that is "segregated from" other disclosures and agreements, the use of available balance must be stated in the opt-in disclosure agreement to conform to Regulation E and permit the assessment of OD Fees on one-time debit card and ATM transactions.

99.    Either inaccurately or failing to describe the use of available balance as part of its overdraft practice violates the plain language of Regulation E and the EFTA.

100.    Indeed, the CFPB and other regulators repeatedly have stated that it is unfair and deceptive to assess overdraft fees on transactions that did not overdraw the actual balance of the account.

### D. Defendant's Opt-In Form

*i. Defendant's Opt-In Form does not accurately explain how or when overdrafts are determined.*

101.    Defendant's Opt-In Form states:

**What You Need to Know about Us Paying Your Overdrafts and Our Overdraft Fees**

An ***overdraft*** occurs when you do not have enough money in your account to cover either a check or electronic fund transfer transaction (such as with your debit card), but we elect to pay it anyway. We can cover your overdrafts in two different ways:

    **1.** We have ***standard overdraft practices*** that come with your account. They are covered in Provision 6.j. and the Electronic Fund Transfer disclosures of the DAC Part 2.

**2.** We also offer an ***overdraft protection service*** that draws funds from your savings account, which may be less expensive than our standard overdraft practices. To learn more, ask us about these services or our overdraft plans (or read about them in Provision 6.j. and the Electronic Fund Transfer disclosures of the DAC Part 2).

This notice explains our ***standard overdraft practices***.

**What are the standard overdraft practices that come with my account?**

We ***do*** authorize and pay overdrafts for the following types of transactions:

• Checks and other transactions made using your checking account number

• Automatic bill payments

We ***do not*** authorize and pay overdrafts for the following types of transactions unless you ask us to (see below):

• ATM transactions

• Everyday debit card transactions

We pay overdrafts at our discretion, which means we ***do not guarantee*** that we will always authorize and pay any type of transaction (which generally will occur because you have not authorized a transaction, exceeded the overdraft limit, or have an outstanding balance that has not been repaid).

If we ***do not*** authorize and pay an overdraft, your transaction will be declined.

**What fees will I be charged if you pay my overdraft(s)?**

While there is no charge to authorize us to pay your overdrafts, under our ***standard overdraft practices:***

- We will charge you a fee of up to **$25.00** each time we pay an overdraft.
- There is ***no limit*** on the total fees we can charge you for overdrawing your account (though generally they will be charged for each overdraft transaction we pay on your account).

**To authorize and pay overdrafts on your ATM and everyday debit card transactions**

If you also want us to authorize and pay overdrafts on ATM and everyday debit card transactions, call call [*sic*] 434-793-1278 or toll-free 866-879-6328, visit www.urwfcu.com or complete the form below and present it at a branch or mail it to: URW Community Federal Credit Union, 314 Lowes Drive, Danville, VA 24540.

Ex. B (emphasis in original).

102.    In the description above and elsewhere in Defendant's Opt-In Form, Defendant fails to provide a clear and unambiguous description of both the how and when its members can expect to be assessed overdraft fees.

103.    Defendant's Opt-In Form does not accurately represent Defendant's actual fee practices because (1) it fails to explain how Defendant determines whether there is "enough money" in the account to pay a transaction; or (2) it does not explain whether overdrafts are determined at authorization or settlement.

104.    Defendant's failure to identify and explain its overdraft program prevents consumers from affirmatively consenting (or opting in) to the program. Rather, after reviewing, the Opt-In Form, consumers are left with no understanding as to how or when Defendant determines overdrafts.

105.    Defendant's Opt-In Form thus flouts Regulation E's purpose of "protec[ing]… individual consumers engaging in electronic fund transfers, "12 C.F.R. § 1005.1(b), and requiring Defendant to "[p]rovide[] the consumer with a notice in writing,… segregated from all other information, describing the institution's overdraft service" and "[p]rovide[] a reasonable opportunity for the consumer to affirmatively consent, or opt it, to the service." 12 C.F.R. § 1005.17(b)(1)(i)-(ii).

106.    Defendant's Opt-In Form likewise flouts the EFTA's "primary objective," which is the "provision of individual consumer rights." 15 U.S.C. § 1693(b).

*ii.   Defendant's Opt-In Form omits information required by Regulation E and the EFTA*

107.    Regulation E provides that the required opt-in notice "must be substantially similar to Model Form A-9 set forth in appendix A of this part, include *all* applicable items in this paragraph, and may not contain any information not specified in or otherwise permitted by this

paragraph." 12 C.F.R. § 1005.17(d) (emphasis added). Such requirements include, *inter alia*, "Limits on fees charged, The maximum number of overdraft fees or charges that may be assessed per day, or, if applicable, that there is no limit." 12 C.F.R. § 1005.17(d)(1)(3).

108.    In direct violation of this requirement, Defendant's Opt-In Form is not "substantially similar to Model Form A-9."

109.    Defendant's Opt-In Form does not comply with Regulation E or the EFTA's requirements to describe or provide notice of Defendant's overdraft practice. Therefore, pursuant to Regulation E and the EFTA, Defendant does not have the authority to assess an OD Fee against Plaintiff or other consumers' accounts as a result of any one-time debit card or ATM transaction. 12 C.F.R. § 1005.17(b); 15 U.S.C. § 1693(a).

### E.  Plaintiff's Experience

110.    Defendant charged Plaintiff OD Fees on one-time debit card transactions on numerous occasions.

111.    For example, Plaintiff was assessed $35.00 OD Fees on one-time debit card transactions on February 18, 2025, March 15, 2025 and March 29, 2025.

112.    Because, Defendant's Opt-in Form does not comply with Regulation E or the EFTA, Plaintiff was unable to predict these fees or affirmatively consent (or opt-in) to Defendant's overdraft program. Hence no OD Fee should have been assessed against his account for these debit card transactions.

### III.    None of These Fees Were Errors

113.    The improper fees charged by Defendant to Plaintiff's account were not errors by Defendant, but rather were intentional charges made by Defendant as part of its standard processing of transactions.

114.    Plaintiff therefore had no duty to report the fees as errors because they were not; instead, they were part of the systematic and intentional assessment of fees according to Defendant's standard practices.

115.    Moreover, any such reporting would have been futile because Defendant's own contract admits that Defendant made a decision to charge these fees.

## CLASS ALLEGATIONS

116.    Plaintiff brings this action individually and as a class action on behalf of the following proposed Classes:

> The APSN Class: All consumers who, during the applicable statute of limitations, were Defendant checking account holders and were assessed an overdraft fee on a debit card transaction that was authorized on sufficient funds and settled on negative funds in the same amount for which the debit card transaction was authorized.

> The Reg E Class: All consumers who, during the applicable statute of limitations, were opted into overdraft protection for one-time debit card transactions and ATM transactions with Defendant and were assessed overdraft fees on these transactions.

Plaintiff reserves the right to modify or amend the definition of the Classes as this litigation proceeds.

117.    Excluded from the Classes are Defendant, its parents, subsidiaries, affiliates, officers and directors, any entity in which Defendant has a controlling interest, all customers who make a timely election to be excluded, governmental entities, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

118.    The time period for the Classes are the number of years immediately preceding the date on which this Complaint was filed as allowed by the applicable statute of limitations, going forward into the future until such time as Defendant remedies the conduct complained of herein.

119.    The members of the Classes are so numerous that joinder is impractical. The Classes consist of thousands of members, the identities of whom are within the exclusive knowledge of Defendant and can be readily ascertained only by resort to Defendant's records.

120.    The claims of the representative Plaintiff are typical of the claims of the Classes in that the representative Plaintiff, like all members of the Classes, was charged improper fees as set forth herein. The representative Plaintiff, like all members of the Classes, has been damaged by Defendant's misconduct. Furthermore, the factual basis of Defendant's misconduct is common to all members of the Classes and represents a common thread of unlawful and unauthorized conduct resulting in injury to all members of the Classes. Plaintiff has suffered the harm alleged and have no interests antagonistic to the interests of any other members of the Classes.

121.    There are numerous questions of law and fact common to the Classes and those common questions predominate over any questions affecting only individual members of the Classes.

122.    Among the questions of law and fact common to the Classes include:

a.   Whether Defendant charged OD Fees on APSN Transactions;

b.   Whether this fee practice breached the Contract;

c.   Whether Defendant violated Regulation E by assessing OD Fees on ATM and one-time debit card transactions;

d.   The proper method or methods by which to measure damages; and

e.   The declaratory and injunctive relief to which the Classes are entitled.

123.    Plaintiff is committed to the vigorous prosecution of this action and has retained competent counsel experienced in the prosecution of class actions, particularly on behalf of consumers and against financial institutions. Accordingly, Plaintiff is an adequate representative and will fairly and adequately protect the interests of the Classes.

124.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the amount of each individual class member's claim is small relative to the complexity of the litigation, no class member could afford to seek legal redress individually for the claims alleged herein. Therefore, absent a class action, the members of the Classes will continue to suffer losses and Defendant's misconduct will proceed without remedy.

125.    Even if class members themselves could afford such individual litigation, the court system could not. Given the complex legal and factual issues involved, individualized litigation would significantly increase the delay and expense to all parties and to the Court. Individualized litigation would also create the potential for inconsistent or contradictory rulings. By contrast, a class action presents far fewer management difficulties, allows for the consideration of claims which might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale, and comprehensive supervision by a single court.

126.    Plaintiff suffers a substantial risk of repeated injury in the future. Plaintiff, like all members of the Classes, is at risk of additional improper fees. Plaintiff and the members of the Classes are entitled to injunctive and declaratory relief as a result of the conduct complained of herein. Money damages alone could not afford adequate and complete relief, and injunctive relief is necessary to restrain Defendant from continuing to commit its unfair and illegal actions.

**FIRST CLAIM FOR RELIEF**
**Breach of Contract**

*(On Behalf of Plaintiff and the APSN Class)*

127.    Plaintiff incorporates the preceding allegations by reference as if fully set forth herein.

128.    Plaintiff and Defendant have contracted for banking services, as embodied in Defendant's account documents. *See* Exs. A-B.

129.    All contracts entered by Plaintiff and the APSN Class are identical or substantively identical because Defendant's form contracts were used uniformly.

130.    Defendant has breached the express terms of its own agreements as described herein.

131.    Plaintiff and members of the APSN Class have performed all, or substantially all, of the obligations imposed on them under the agreements.

132.    Plaintiff and members of the APSN Class have sustained damages as a result of Defendant's breaches of the Contract.

### SECOND CLAIM FOR RELIEF
### Violation of Electronic Fund Transfers Act (Regulation E)
### 12 C.F.R. § 1005 et seq. (authority derived from 15 U.S.C. § 1693 *et seq.*))
### *(On Behalf of Plaintiff and the Reg E Class)*

133.    Plaintiff incorporates the preceding allegations by reference as if fully set forth herein.

134.    Defendant violated Regulation E (12 C.F.R. §§1005 *et seq.*), whose "primary objective" is "the protection of consumers" (§1005.l(b)) and which "carries out the purposes of the [Electronic Fund Transfer Act 15 U.S.C. §§1693 et seq.), the "EFTA"] (§1005. l(b)), whose express "primary objective" is also "the provision of individual consumer rights" (15 U.S.C. §1693(b)).

135.    Specifically, the charges violated what is known as the "Opt In Rule" of Regulation E (12 C.F.R. § 1005.17.) The Opt In Rule states: "a financial institution ... shall not assess a fee or charge ... pursuant to the institution's overdraft service, unless the institution: (i) [p]rovides the consumer with a notice in writing [the opt-in notice]. . . describing the institution's overdraft service" and (ii) "[p]rovides a reasonable opportunity for the consumer to affirmatively consent" to enter into the overdraft program. (*Id*.) The notice "shall be clear and readily understandable." (12 C.F.R. §205.4(a)(l).)

136.    To comply with the affirmative consent requirement, a financial institution must provide a segregated description of its overdraft practices that is accurate, non-misleading and truthful and that conforms to 12 C.F.R. § 1005.17 prior to the opt-in, and must provide its customers a reasonable opportunity to opt-in after receiving the description. The affirmative consent must be provided in a way mandated by 12 C.F.R. § 1005.17, and the financial institution must provide confirmation of the opt-in in a manner that conforms to 12 C.F.R. § 1005.17.

137.    The intent and purpose of this Opt-In Form is to "assist customers in understanding how overdraft services provided by their institutions operate .... by explaining the institution's overdraft service ... in a clear and readily understandable way"-as stated in the Official Staff Commentary (74 Fed. Reg. 59033, 59035, 59037, 5940, 5948), which is "the CFPB's official interpretation of its own regulation," "warrants deference from the courts unless 'demonstrably irrational,'" and should therefore be treated as "a definitive interpretation" of Regulation E. *Strubel v. Capital One Bank (USA)*, 2016 U.S. Dist. LEXIS 41487, *11 (S.D.N.Y. 2016) (quoting *Chase Bank USA v. McCoy*, 562 U.S. 195, 211 (2011)) (so holding for the CFPB's Official Staff Commentary for the Truth In Lending Act's Regulation Z)).

138.    Defendant has failed to comply with the 12 C.F.R. § 1005.17 opt-in requirements, including failing to provide its customers with a valid description of the overdraft program which meets the strictures of 12 C.F.R. § 1005.17. Defendant's opt-in method fails to satisfy 12 C.F.R. § 1005.17 because it misrepresents Defendant's overdraft practices, as discussed above.

139.    Defendant further violates 12 C.F.R. § 1005.17(d) by failing to use an opt-in form that is "substantially similar to Model Form A-9" or including *any* information regarding limitations on fees, such as the maximum number of fees that may be accessed per day or that no such limit exists. *Compare* Exs. A-B *with* 12 C.F.R. § 1005.17(d)(3).

140.    Because Defendant failed to use a Regulation E compliant opt-in disclosure and failed to obtain its customers' affirmative consent as required by Regulation E, Defendant was not legally permitted to assess any overdraft fees on one-time debit card or ATM transactions.

141.    The "primary objective" of the EFTA "is the provision of individual consumer rights." 15 U.S.C. § 1693(b).

142.    Section 904 of the EFTA states that the CFPB "shall prescribe rules to carry out the purposes of this subchapter." 15 U.S.C. § 1693(b)(1). The CFPB has prescribed such rules in the form of Regulation E, 12 C.F.R. § 1005, *et seq.*

143.    The EFTA's grant of authority to the CFPB includes the authority to issue model clauses, "to facilitate compliance with the disclosure requirements of section 1693c of this title and to aid consumers in understanding the rights and responsibilities of participants in electronic fund transfers by utilizing readily understandable language." 15 U.S.C. § 1693b(b). The CFPB issues a model form as Model Form A-9.

144.    Section 905 of the EFTA requires that "the terms and conditions of electronic fund transfers involving a consumer's account shall be disclosed…. in accordance with regulations of

the Bureau." 15 U.S.C. § 1693c(a). Such "terms and disclosures" "shall be in readily understandable language" and include information regarding "any charge for electronic fund transfers or for the right to make such transfers." 15 U.S.C. § 1693c(a)(4).

145.    Accordingly, in failing to use a Regulation E-compliant opt-in form, Defendant violated Section 905 of the EFTA by failing to make disclosures "in accordance with regulations of the Bureau."

146.    Plaintiff and the members of the Reg E Class have been harmed by Defendant's practice of assessing OD fees on one-time debit card and ATM transactions when, under Regulation E and the EFTA, Defendant did not have the authority to do so.

147.    As a result of violating Regulation E's prohibition against assessing overdraft fees without obtaining affirmative consent to do so, Defendant has harmed Plaintiff and the Class.

148.    Due to Defendant's violation of Regulation E (12 C.F.R. § 1005.17), Plaintiff and members of the Reg E Class are entitled to actual and statutory damages, as well as attorneys' fees and costs of suit pursuant to 15 U.S.C.A. § 1693m.

### REQUEST FOR RELIEF

WHEREFORE, Plaintiff and members of the Classes demand a jury trial on all claims so triable and judgment as follows:

a.    Certification for this matter to proceed as a class action;

b.    Designation of Plaintiff as the Class Representative and designation of the undersigned as Class Counsel;

c.    Declaring Defendant's fee policies and practices alleged in this Complaint to be wrongful and unconscionable in light of its contractual promises;

d.    Enjoining Defendant from breaching its account documents and continuing to assess OD Fees in violation of Regulation E;

e.    Restitution of all improper fees paid to Defendant by Plaintiff and the Classes because of the wrongs alleged herein in an amount to be determined at trial;

f.    Actual damages in amount according to proof;

g.    Pre- and post-judgment interest at the maximum rate permitted by applicable law;

h.    Costs and disbursements assessed by Plaintiff in connection with this action, including reasonable attorneys' fees pursuant to applicable law; and

i.    Such other relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff, by counsel, demands trial by jury.


Dated: June 25, 2025                    Respectfully submitted,


                                        *By: /s/ Devon J. Munro*
                                        Devon J. Munro (VSB #47833)
                                        MUNRO BYRD, P.C.
                                        120 Day Avenue SW, Suite 100
                                        Roanoke, Virginia 24016
                                        Telephone: (540) 283-9343
                                        dmunro@trialsva.com

                                        Lynn A. Toops*
                                        COHENMALAD, LLP
                                        One Indiana Square, Suite 1400
                                        Indianapolis, Indiana 4204
                                        (317) 636-6481
                                        ltoops@cohenmalad.com

Martin F. Schubert*
STRANCH, JENNINGS & GARVEY, PLLC
223 Rosa L. Parks Ave. Ste. 200
(615) 254-8801
mschubert@stranchlaw.com

Christopher D. Jennings*
JENNINGS & EARLEY PLLC
500 President Clinton Avenue, Suite 110
Little Rock, Arkansas 72201
chris@jefirm.com

* Pro Hac Vice applications to be submitted

*Counsel for Plaintiff and the Proposed Class*