**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**DANVILLE DIVISION**

| | |
|---|---|
| DONNA BURTON, on behalf of herself and all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> URW COMMUNITY FEDERAL CREDIT UNION, <br><br> Defendant. | Case No. 4:25-cv-00033-TTC-CKM |

**DEFENDANT'S BRIEF IN SUPPORT OF ITS MOTION TO**
**DISMISS PLAINTIFF'S CLASS ACTION COMPLAINT**

Defendant URW Community Federal Credit Union ("URW"), by and through its undersigned counsel, hereby submits this brief in support of its motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).

**INTRODUCTION**

This case is one of hundreds of putative class actions nationwide which seek damages for consumers who admittedly spend more money than they had in their respective accounts:

> ***Some personal responsibility seems to be lacking***—"never mind that I didn't have the funds in my account to pay for an item/goods that I received and agreed to timely pay for, I shouldn't get more than one NSF fee" appears to be a cliff note version of the Plaintiffs' Complaint… ***NSF fees are designed to offset some of the bank's costs but also to incentivize the customer to have enough money to cover the claim***.

*Fenton v. Tri-County Bank & Trust Co*., No. 67C01-2010-PL-607, 2020 WL 8673276, *1 (Ind. Cir. Dec. 29, 2020) *vacated by settlement* (March 2, 2021) (emphasis added). A New Mexico federal court shared a similar sentiment in another case involving overdraft fees:

> At first blush, the Complaint appears to allege garden-variety breach of contract claims… credit unions are now being forced to defend membership agreements and overdraft fee disclosures from technical accounting arguments, ***even though the consumers incurring the penalties literally appear to be spending more money than they actually have***… this Motion is Defendant's attempt to neutralize an attack on its own overdraft practices.

*Rader v. Sandia Lab'y Fed. Credit Union*, No. CV 20-559 JAP/JHR, 2021 WL 1533664, at *1 (D.N.M. Apr. 19, 2021).

Similar to these consumers, Burton spent more money than she had in her checking account with URW Community Federal Credit Union ("URW"). As an agreed-upon consequence of her actions, Burton was assessed overdraft ("OD") fees. Despite her own overspending, and obtaining the benefit of that overspending, Burton nonetheless seeks to further benefit to the detriment of URW and its other members by claiming that URW violated the terms of the parties' agreement. URW did not violate the terms of the agreement by following its disclosed fee practices, and therefore, each of Burton's claims fail as a matter of law.

APSN Claim

Plaintiff's first claim challenges URW's assessment of overdraft fees, but this claim fails. Imagine the following scenario which has happened to us all in different contexts: you give your butcher a personal check at the time you have a positive balance in your account. Your butcher holds onto the check for a month and then submits it for payment, at which time you have a negative balance in the account. After you get a fee for the bounced check, instead of being angry at the butcher for not immediately submitting your check, you decide to sue your credit union or bank for processing the check and assessing a fee when it was presented by the butcher.

That is precisely what Plaintiff is doing here by suing URW—albeit it involves a debit card rather than a check. Plaintiff alleges that URW breached the Parties' contract by assessing

2

overdraft fees on debit card transactions that had sufficient available funds when the debit card was swiped, but were later submitted by the merchant's bank to the credit union for payment after the available balance had been drawn negative (referred to here as "Authorize Positive Settle Negative" or "APSN"). Plaintiff's APSN theory is predicated on its claim that members of the credit union are not informed that transactions are not immediately submitted for payment at the time of the swipe of the debit card.

Plaintiff's APSN claim, however, must be dismissed because it is contradicted by the plain terms of the Membership Agreement. URW never promised to determine overdrafts for debit card transactions at authorization. Rather, the Parties' contract is clear that an overdraft fee will be assessed if there is an insufficient balance at the time a transaction is ***presented*** for payment by the merchant and ***paid by the credit union***, or put differently, when it is ***charged to the account***, which occurs at the time of settlement or posting:

- "If a check or other transfer or payment order is ***presented against insufficient available funds in an account***, we will require a service charge. If there are sufficient available funds to ***pay*** some but not all checks or items drawn or presented against the account, ***we may pay or allow withdrawals*** for those checks, transfer or payment orders for which there are sufficient funds in any order we choose, according to applicable law and the terms of the MSA…"

- "Your available balance is generally equal to the actual balance, less the amount of any holds placed on recent deposits, holds placed for other reasons, and holds for pending transactions (such as debit card purchases) we have ***authorized but have not yet posted to the account***. If an item ***presented for payment*** against the account exceeds the available balance, we will treat it as presented against insufficient funds even if the actual balance exceeds the amount of the item (please see Provision 6.k)…"

- "In general, we pay checks and other transactions in the order they are ***presented to us, regardless of when you issued or authorized them***… Debit card transactions are processed when transmitted to us, which may occur immediately or up to several days later. ***You understand that the merchant or its processor (and not us) determines when the transaction will be transmitted to us***. When a merchant obtains authorization for a debit card transaction, we place a temporary hold against the funds in the account for the amount of the authorized transaction. In some cases,

3

such as restaurants, gas stations, or car rental transactions, there may be a hold for an initially authorized amount, but the transaction is submitted at a different amount. You should be certain there are sufficient funds in your available balance **at all times to pay checks or transactions**, or they will be handled according to the overdraft and insufficient funds terms of the MSA, or paid under one of our check overdraft services if applicable…"

(emphasis added). Thus, there is no ambiguity in this contract: URW charged fees exactly how it said it would and exactly according to what Plaintiff agreed to. Because URW was fully within its contractual rights to impose the fees at issue, Plaintiff's first claim must be dismissed with prejudice.

REG E Claim

Second, Plaintiff alleges that URW violates the Electronic Fund Transfer Act ("EFTA"), 15 U.S.C. ¶ 1693 *et seq.* and Regulation E 12 C.F.R. § 1005, *et seq.* because it does not accurately describe its overdraft practices in the opt-in disclosure required to obtain consent for certain overdraft protections ("Opt-In Form"). Plaintiff alleges that URW's Opt-In Form should contain information on available balance mythology and whether URW determines overdrafts at authorization (i.e. debit hold) or settlement (collectively "Balance and Debit Hold Information"). A review of the relevant federal statutes, along with the government's detailed creation of the opt-in document used by URW, in which it specifically excluded the language Plaintiff now claims should be included, demonstrates that these claims are barred.

The Opt-In Form at issue in this case was created by the Board of Governors of the Federal Reserve system in 2009. The procedures used in the creation of the Form was exhaustive. It included the Board utilizing the consumer testing firm, Macro International, Inc., to use a scientific approach that involved four rounds of testing sample opt-in forms, and modifying the forms according to their findings. The opt-in forms used in the first three rounds of testing by Macro did contain Balance and Debt Hold information. This is the information Plaintiff now claims must in

4

in the opt in forms to comply with Reg E. Macro however decided to remove this information "from the notice in Round 4 because of concerns regarding information overload." The purpose of the A-9 Form was not to provide a complete explanation of the program but a brief description for consumers to make informed decisions about using the service. In November 2009, after receiving over 20,000 comments in response to the proposed rules, the Board issued its final rules, which included the creation of the Model Form A-9 and codified it in Reg E, which did not include Balance and Debit Hold Information. URW uses this form.

Along with the creation of the Model Form A-9 to be used by credit unions, the Regulations included two more provisions relevant to this Motion. First, it was paramount that the form used by credit unions be substantially similar to what the Board had created. Thus, 12 C.F.R. § 1005.17(d) mandated that the "content and form" of the Opt-In Form be substantially similar to Model Form A-9 and "may not contain any information not specified in or otherwise permitted by the paragraph." Second, the Regulations created a safe harbor provision, stating that credit unions would be shielded from liability, if they used the model clause issued by the Bureau or Board.

Over the years, there has been consideration and rejection by regulators of adding the language to Model Form A-9 that Plaintiff's claim should be included. In 2017, the Consumer Financial Protection Bureau ("CFPB") contemplated amending the Board's 2009 model form— but even the CFPB's proposed amended form did not contain the balance and debit hold information that Plaintiff contends must be included therein. And in 2019, the CFPB issued a Request for Information ("RFI") to consider amending the Board's 2009 model form in response to the financial institutions' request to include the balance and debit hold information in the 2009 model form—but that amendment never materialized, keeping the Board's 2009 model form in place.

This lawsuit is thus an attack on the Board of Governors of the Federal Reserve's explicit consideration and rejection of including balance and debt hold information; an attack on the findings of Macro International that found that the form being used today presented the proper balance of disclosure of relevant information for consumer to make a choice to opt in to overdraft protection; and an attack on the CFPB's continued consideration and rejection of altering the A-9 Form.

As detailed below, Plaintiff's Reg E claim thus should be dismissed for the following reasons: 1) the Federal Reserve Board ("Board") specifically rejected requiring the Opt-In Form to contain material that Plaintiff demands; 2) the Regulations in fact bar the inclusion of the material; 3) when read together with the Membership Agreement, Plaintiff was in fact well-informed; 4) the EFTA's safe-harbor bars her claim; and 5) Plaintiff cannot show causation. Accordingly, and as set forth more fully below, Plaintiff's Complaint fails to state a viable claim and it should be dismissed, with prejudice.

## STATEMENT OF FACTS

### 1. Plaintiff's Complaint.

Plaintiff filed her Class Action Complaint on June 25, 2025 setting forth two counts: (1) breach of contract; and (2) violation of the EFTA and Regulation E. Compl. ¶¶ 127-148. Plaintiff's breach of contract claim baldly alleges that URW breaches the Membership Agreement and Opt-In Form by assessing overdraft fees on APSN debit card transactions. *Id.* ¶¶ 17-18.

Plaintiff's second claim alleges that URW's Opt-In Form violates Regulation E because it does not include two pieces of information. First, Plaintiff claims that URW's form must state that it uses the "available balance" of an account to determine overdrafts, and "that balance calculation method must be disclosed and explained in the opt-in disclosure." *Id.* ¶ 89. Second, Plaintiff claims

6

that URW'S "Opt-In Form… does not explain whether overdrafts are determined at authorization or settlement." *Id.* ¶ 103.

Plaintiff is a URW member. *Id.* ¶ 4. She completed the Opt-In Form, thereby providing her affirmative consent to receive overdraft fees on ATM and one-time debit card transactions. *Id.* ¶ 112. Her claims rely on her inaccurate assertion that URW's Opt-In Form does not sufficiently describe its overdraft policy. To support her theory, Plaintiff claims that she was assessed overdraft fees on one-time debit card transactions on February 18, 2025, March 15, 2025, and March 29, 2025. *Id.* ¶ 111.

## 2.  URW, Its Membership, and the Account Documents.

Plaintiff attempts to create a false narrative comparing URW to a profit-hungry bank that aims to extract illicit fees from its members. Am. Compl. ¶¶ 74, 78, 87. However, URW is a credit union and not a bank. They are very different things. While banks are designed to earn profits to enrich their shareholders, credit unions are cooperatives—owned by their members—whose sole, mission-driven purpose is to benefit their member-owners by using income derived from their operations to pay above market interest rates on deposits and below market interest rates on loans.[1] As such, there is no small irony here that Plaintiff now seeks to bring a purported action on behalf of her fellow owners, the consequence of which, after attorney's fees and cost of class administration are paid, actually harms those other owners' interest in the cooperative.

URW's overdraft fee policies are described in and governed by its member account documents, including, among other disclosures, the "Member Service Agreement" ("Membership

---

[1] "Credit unions are nonprofit cooperatives, owned by their members and democratically controlled, that may only lend and pay dividends to their members and, as such, **are disinclined by their nature and structure to engage in the kinds of practices regarded as predatory or abusive**." NCUA Opinion Letter 04-0147, National Credit Union Administration, at 3 (Feb. 10, 2004), available at: https://www.ncua.gov/regulation-supervision/legal-opinions/2004/preemption-new-mexico-home-loan-protection-act; *see also Whittington v. Mobiloil Federal Credit Union*, No. 1:16-CV-482, 2017 WL 6988193, at *7 (E.D. Tex. 2017), *aff'd* 780 Fed. Appx. 171 (5th Cir. 2019); 49 Fed.Reg. 46552-01 (Nov. 27, 1984).

Agreement"), and a document titled "Notice of and Important Information About Overdraft Services and Charges" ("Opt-In Form") (collectively referred to herein as the "Account Documents").[2] *See* Ex. 1-2.

### A. URW Determines Overdrafts Based on a Member's Available Balance.

Like most financial institutions, URW tracks the "actual" balance and the "available" balance for each member's account. Compl. ¶ 88. The actual balance "factors in only settled transactions in calculating an account's balance." *Domann v. Summit Credit Union*, No. 18-CV-167-SLC, 2018 WL 4374076, at *1 (W.D. Wis. Sept. 13, 2018) (citation omitted). The available balance, on the other hand, is the actual balance minus funds for "electronic transactions that the institutions have authorized (and therefore are obligated to pay) but not yet settled," as well as "holds on deposits that have not yet cleared." *Id.* at *1.

As URW explains in the Membership Agreement:

> **d. 1) Account Withdrawal Limitations.** You understand we have no obligation to honor a request to withdraw funds if you do not have 1) sufficient available funds in an account or 2) one of our overdraft services… If a check or other transfer or payment order is presented against insufficient available funds in an account, we will require a service charge. If there are sufficient available funds to pay some but not all checks or items drawn or presented against the account, we may pay or allow withdrawals for those checks, transfer or payment orders for which there are sufficient funds in any order we choose, according to applicable law and the terms of the MSA…

---

[2] Plaintiff attaches outdated versions of the Membership Agreement and Opt-In Form to her Complaint. The Membership Agreement and Opt-In Form governing Plaintiff's account that were in effect at the time of the alleged fees are attached hereto as Exhibits 1 and 2, respectively. The Court may consider the contents of the Account Documents without converting the motion into a motion for summary judgment because they are incorporated by reference and integral to the Complaint. *Gasner v. Cnty. of Dinwiddie*, 162 F.R.D. 280 (E.D. Va. 1995). Further, because the Opt-In Form is not a standalone document and instead must be read in conjunction with the Membership Agreement, this Court may consider the entirety of the Membership Agreement as the document is attached to the Complaint. *Lossia v. Flagstar Bancorp, Inc.*, 895 F.3d 423, 429 (6th Cir. 2018; *Tims v. LGE Cmmty. Credit Union*, 935 F.3d 1228, 1238, n.5 (11th Cir. 2019) (construing opt-in form and account agreement together); *Rader v. Sandia Lab'y Fed. Credit Union*, No. CV 20-559 JAP/JHR, 2021 WL 1533664, at *4 (D.N.M. Apr. 19, 2021) (same); *Domann v. Summit Credit Union*, No. 18-CV-167-SLC, 2018 WL 4374076, at *6-7 (W.D. Wisc. Sept. 13, 2018) (same); *Chambers v. NASA Federal Credit Union*, 222 F. Supp. 3d 1, 11 (D.D.C. 2016).

**i. Determination of Available Balance to Pay Items**

Checks and other transactions on a checking account with us are paid based on your available balance, and not the actual balance. Your actual balance is the actual amount of funds in the account (based on credits and debits posted to the account at that time). Your available balance is generally equal to the actual balance, less the amount of any holds placed on recent deposits, holds placed for other reasons, and holds for pending transactions (such as debit card purchases) we have authorized but have not yet posted to the account. If an item presented for payment against the account exceeds the available balance, we will treat it as presented against insufficient funds even if the actual balance exceeds the amount of the item (please see Provision 6.k)…

Ex. 1, p. 11, 13. Essentially, the "available balance" is the amount of money a member has "available" to spend at any given time. The Membership Agreement also contains the Opt-In Form to opt in to overdraft coverage for ATM and one-time debit card transactions. *Id.* p. 28; Ex. 2.

**B. URW Determines Overdrafts on One-Time Debit Card Transactions at Presentment.**

As alleged in Plaintiff's Complaint, one-time swipe debit card transactions take place in at least two steps. Compl. ¶¶ 29-31. These are debit card transactions where the member does not use a PIN, and the merchant may request a signature. They do not include recurring transactions such as monthly subscription fees. The first step occurs when a member swipes her debit card to make a purchase with a merchant. Id. The merchant's card reader transmits a request for pre-authorization to URW through a network (VISA, MasterCard, etc.). *Id.* Assuming certain conditions are met, URW will authorize the transaction. *Id.*

As explained in the Membership Agreement, when URW authorizes a swipe debit card transaction, it may put an "authorization hold" on the account for the amount requested by the merchant:

In general, we pay checks and other transactions in the order they are presented to us, regardless of when you issued or authorized them… Debit card transactions are processed when transmitted to us, which may occur immediately or up to several days later. You understand that the merchant or its processor (and not us) determines when the transaction will be transmitted to us. When a merchant obtains authorization for a debit card transaction, we place a temporary hold against the

9

funds in the account for the amount of the authorized transaction. In some cases, such as restaurants, gas stations, or car rental transactions, there may be a hold for an initially authorized amount, but the transaction is submitted at a different amount. You should be certain there are sufficient funds in your available balance at all times to pay checks or transactions, or they will be handled according to the overdraft and insufficient funds terms of the MSA, or paid under one of our check overdraft services if applicable…

Ex. 1, p. 13.

The crucial point here is that the merchant does not actually get paid, nor does it even request payment at the time of pre-authorization. Compl. ¶ 31. During step one, URW does not actually transfer any funds from the member's account to the merchant's account because the merchant has not yet requested payment—that is, it has not yet "posted" the transaction to URW for processing actual payment. The merchant's actual request for payment does not happen until step two, which may occur days later, when the merchant's financial institution finally requests that URW process the swipe debit card transaction. Ex. 1, p. 13.

The Membership Agreement provides in plain and ordinary terms that URW will determine whether a debit card transaction is subject to an overdraft fee during step two at the time the item is posted to the member's account and processed by URW, not at the time of authorization in step one. The Membership Agreement defines URW's payment as the act that creates the overdraft: "[t]he date we use to determine the number of transactions is the date a transaction is posted to (**actually credited to or debited from**) an account, rather than the date you conducted the transaction." Ex. 1, p. 11 (emphasis added). The Membership Agreement further states, "If an item **presented for payment** against the account exceeds the available balance, we will treat it as presented against insufficient funds." *Id.*, p. 13. Thus, it is the "posting" that results in an overdraft, not the pre-authorization. Transactions which are authorized when there are sufficient available

10

funds but are posted on a later date when the available balance is insufficient are referred to as "Authorize Positive, Settle Negative" ("APSN") transactions.

**3.   In Accordance With Regulation E, URW Offers Overdraft Protection for ATM and One-Time Debit Card Transactions Upon a Members' Affirmative Consent.**

Regulation E prohibits the imposition of overdraft fees on ATM and one-time debit card transactions unless the financial institution, "[p]rovides the consumer with a notice in writing… segregated from all other information, describing the institution's overdraft service" and obtains the consumer's affirmative consent for such overdraft coverage through the completion of an opt-in form. 12 C.F.R. § 1005.17(b)(1). Importantly, financial institutions are not left to their own devices when obtaining the consumer's consent and drafting the Regulation E opt-in notice; Regulation E dictates the "[c]ontent and format" of the mandatory notice. 12 C.F.R. § 1005.17(d). The financial institution must provide a notice and opt-in form that substantially conforms with CFPB Model Form A-9 and otherwise accurately describes its overdraft practices, that is "segregated from all other information describing the institution's overdraft service." 12 C.F.R. § 1005.17(b)(1)(i); *Tims v. LGE Cmmty. Credit Union*, 935 F.3d 1228, 1242 (11th Cir. 2019). In addition, the disclosure must include a "brief description" of the financial institution's overdraft protection service, the dollar amount of any overdraft fees for ATM and one-time debit card transactions, the maximum number of daily overdraft fees that can be assessed, and an explanation of the "opt-in" requirement. 12 C.F.R. § 1005.17(d).

To implement Regulation E, URW's Opt-In Form is a near-verbatim copy of Model Form A-9. Ex. 2. However, there is a significant difference which completely negates Plaintiff's claims. The language in URW's Opt-In Form states: "An ***overdraft*** occurs when ***the available balance of funds in the account you have with us is inadequate to cover a check or electronic transaction***

(such as with your debit card or through an ATM), but we elect to pay it anyway." *Compare id.* (emphasis added) with 12 C.F.R. Pt. 1005, App. A.

The EFTA, which encompasses Regulation E, authorizes the CFPB to enforce EFTA and Regulation E against any institution subject to its requirements. In addition, the EFTA creates a private right of action to enforce the requirements. 15 U.S.C. § 1693m. However, the EFTA includes a safe harbor provision that protects financial institutions from liability for "(1) any act done or omitted in good faith in conformity with any rule, regulation, or interpretation thereof by the Bureau or Board," or "(2) any failure to make disclosure in proper form if a financial institution utilized an appropriate model clause issued by the Bureau or Board." 15 U.S.C. § 1693m(d). The Board specifically intended for Model Form A-9 to be used by institutions to "satisfy their disclosure obligations." 74 Fed. Reg. 59033-01, 59,035 (Nov. 17, 2009); *see also id.* at 59,036 ("[T]he final rule adopts a revised model form that institutions may use to satisfy the notice requirement."); *id.* at 59,051 ("[T]he Board sought to reduce the burden on small entities, where possible, by adopting a model form that can be used to ease compliance with the final rule."); *id.* at 59,052 ("To ease the burden of compliance a model form that institutions may use is available in [Model Form A-9].").

**<u>LEGAL STANDARD</u>**

To withstand a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim has "facial plausibility" when the plaintiff pleads "factual content" that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although a plaintiff's allegations are generally taken as true, neither "labels and conclusions" nor "naked assertions" devoid of "further factual enhancement" will suffice. *Id.* (citation omitted). Thus, dismissal for

12

failure to state a claim under Rule 12(b)(6) is proper "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558.

In addition to Plaintiff's factual allegations, "when a plaintiff fails to introduce a pertinent document as part of his complaint, the defendant may attach the document to a motion to dismiss the complaint and the Court may consider the same without converting the motion to one for summary judgment." *Gasner v. Cnty. of Dinwiddie*, 162 F.R.D. 280, 281 (E.D. Va. 1995) (citation omitted).

<strong><u>ARGUMENT</u></strong>

**1.  <u>Plaintiff's Breach of Contract Claim Fails as a Matter of Law.</u>**

Plaintiff fails to state a cause of action. Under Virginia law, the elements of a breach of contract are: (1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation. *Filak v. George*, 267 Va. 612, 619, 594 S.E.2d 610, 619 (2004) (citation omitted). There is no dispute that a contract exists between URW and Plaintiff, but Plaintiff's claims fall short because she has failed to identify an express promise that URW breached. As discussed in detail below, the plain and unambiguous terms of the Membership Agreement fatally undermine Plaintiff's theories of liability for a breach of contract, and therefore her breach of contract claims fail as a matter of law.

It is worth nothing that Plaintiff attempts to conjure a supposed breach of contract claim, but ultimately seeks to punish URW for its lawful imposition of fees when she repeatedly failed to adequately monitor her own spending. *See e.g., Brown v. Dept. of Commerce Federal Credit Union*, No. 2021 CA 000554 B, 2021 WL 9476637 *4 (D.C.Super. Nov. 12, 2021) ("whether a customer is liable for overdraft fees for an authorized transaction is wholly dependent on the customer's own decisions"); *Brown v. Dept. of Commerce Federal Credit Union*, No. 2021 CA

13

000554 B, 2022 WL 4387503 (D.C.Super. Jan. 19, 2022) (correcting errors in previous court order

dismissing complaint); *White v. Bank OZK*, No. 46CV-20-152-2, 2021 WL 6098351, at *1 (Ark.

Cir. Sep. 08, 2021) ("To avoid fees being assessed, account holders should have funds sufficient

to cover the amounts they authorize"). Accordingly, this Court should not condone Plaintiff's lack

of financial responsibility, especially in light of the contractual provisions negating its claims, and

should dismiss Plaintiff's claims in their entirety.

**A. Plaintiff's premise that URW must determine whether there is an overdraft only at the time of authorization is false and directly contrary to the unambiguous terms of the Membership Agreement.**

Plaintiff's invented "APSN" theory necessarily relies on the false premise that URW

allegedly promised in the Membership Agreement to determine whether there was an overdraft

only at the time the debit card transaction was swiped and when it was pre-authorized. However,

no such promise exists, and Plaintiff's Complaint fails entirely to point to any language in the

Membership Agreement supporting her theory.

To the contrary, the Membership Agreement *repeatedly* provides in plain and ordinary

terms that URW will determine whether a debit card transaction is subject to an overdraft fee at

the time the merchant requests the item be paid and the credit union pays from the account:

> **d. 1) Account Withdrawal Limitations.** You understand we have no obligation to honor a *request to withdraw funds* if you do not have 1) sufficient available funds in an account or 2) one of our overdraft services… If a check or other transfer or payment order is *presented against insufficient available funds in an account*, we will require a service charge. If there are sufficient available funds to pay some but not all checks or items drawn or presented against the account, *we may pay or allow withdrawals* for those checks, transfer or payment orders for which there are sufficient funds in any order we choose, according to applicable law and the terms of the MSA…

> **i. Determination of Available Balance to Pay Items**
> Checks and other transactions on a checking account with us are paid based on your available balance, and not the actual balance. Your actual balance is the actual amount of funds in the account (based on credits and debits posted to the account at that time). Your available balance is generally equal to the actual balance, less

the amount of any holds placed on recent deposits, holds placed for other reasons, and holds for pending transactions (such as debit card purchases) we have *authorized but have not yet posted to the account*. If an item presented for payment against the account exceeds the available balance, we will treat it as presented against insufficient funds even if the actual balance exceeds the amount of the item (please see Provision 6.k)…

**j. The Order in which Checks and Other Items are Paid**
In general, we pay checks and other transactions in the order they are *presented to us, regardless of when you issued or authorized them*… Debit card transactions are processed when transmitted to us, which may occur immediately or up to several days later. *You understand that the merchant or its processor (and not us) determines when the transaction will be transmitted to us*. When a merchant obtains authorization for a debit card transaction, we place a temporary hold against the funds in the account for the amount of the authorized transaction. In some cases, such as restaurants, gas stations, or car rental transactions, there may be a hold for an initially authorized amount, but the transaction is submitted at a different amount. You should be certain there are sufficient funds in your available balance at all times to pay checks or transactions, or they will be handled according to the overdraft and insufficient funds terms of the MSA, or paid under one of our check overdraft services if applicable…

Ex. 1, p. 11, 13. In very simple terms, it is URW's payment of the item that "creates" the overdraft. The balance at the time of authorization or the debit card swipe is totally irrelevant to whether URW will assess an overdraft fee on a particular debit card transaction.

Further, Plaintiff's argument that URW must assess overdraft fees at the time of authorization means that URW would assess an overdraft fee even if that transaction is *never* completed and never presented for payment or is presented in a lower amount. Under Plaintiff's theory, URW must impose an overdraft fee in those circumstances—*even though it never intended to and never did overdraw its account*—because the authorization amount exceeds its available balance. Similarly, under Plaintiff's theory, if a transaction brings the available balance of an account negative at authorization, but there is sufficient available balance to pay the transaction when it is actually presented for payment, the accountholder would still be required to

15

pay an overdraft fee. Both of these results are illogical, nonsensical, harm the accountholder and are contrary to the plain language of the Membership Agreement.

The United States District Court in Colorado dismissed a complaint alleging the same theory of liability that Plaintiff alleges here. *McCollam v. Sunflower Bank, N.A.*, 598 F. Supp. 3d 1104 (D. Colo. 2022). In *McCollam*, the Court reasoned that considering the entire contract, it was clear that an overdraft occurred when Sunflower Bank *paid* the overdraft. *Id.* at 1110-1111. Moreover, the Court determined that the payment order of items provision indicated that "the order of *payment* is determinative when assessing overdraft fees, not the order of *authorization*. If overdraft fees were determined at authorization, as McCollam asserts, the payment order would be irrelevant and this section would be meaningless." *Id.* at 1110 (emphasis in original). *See also Brown v. Dept. of Commerce Federal Credit Union*, No. 2021 CA 000554 B, 2021 WL 9476637 *4 (D.C.Super. Nov. 12, 2021); *Brown v. Dept. of Commerce Federal Credit Union*, No. 2021 CA 000554 B, 2022 WL 4387503 (D.C.Super. Jan. 19, 2022) (correcting errors in previous court order dismissing complaint); *Razavi v. Green State Credit Union*, No. LACV081674, 2020 WL 7379064 *7 (Iowa Dist. Dec. 7, 2020); *Choy v. Space Coast Credit Union,* No. 2019-CA-039839, 2020 WL 3039243 (Fla. Cir. Ct., May 11, 2020); *Boone v. MB Fin. Bank, N.A.*, 375 F.Supp.3d 987 (N.D. Ill. 2019); *Whittington,* 2017 WL 6988193 *7 (E.D. Tex. 2017), aff'd 780 Fed. Appx. 171 (5th Cir. 2019).

**B. The entire APSN theory is predicated on a delay by the merchant in submitting the transaction for payment, which is not under the control of URW.**

As indicated above, the entire APSN theory is predicated on a claim that members of the credit union are not informed that transactions are not immediately submitted for payment at the time of the swipe of the debit card. In her Complaint, Plaintiff in fact has an entire section titled: "Reasonable Consumers Understand Debit Card Transactions are Debited Immediately." Compl.

16

¶¶ 54-67. The Complaint alleges: "Defendant was aware of the consumer perception that debit card transactions reduce an account balance at a specified time—namely, the time and order the transactions are actually initiated…" *Id.* ¶ 66.

However, the Membership Agreement facially and plainly contradicts this allegation. Plaintiff's entire theory of liability is negated by the plain language of the Membership Agreement because it ***fully discloses*** that debit transactions are not debited immediately, but could be "posted" up to several days later at the time of posting or settlement:

> Debit card transactions are processed when transmitted to us, which may occur immediately or up to several days later. ***You understand that the merchant or its processor (and not us) determines when the transaction will be transmitted to us***.

Ex. 1, p. 13 (emphasis added). Moreover, the disclosures make clear that until transactions are posted or cleared, they are considered as "pending:" "[y]our available balance is generally equal to the actual balance, less the amount of… holds for pending transactions (such as debit card purchases) ***we have authorized but have not yet posted to the account***." *Id.* (emphasis added). These disclosures thus directly contradict any claimed understanding that transactions are debited immediately.

In summation, if the member is incurring a fee even though the transaction authorized positive, the fee was caused by the merchant's delay in presenting it for payment, and the member's other intervening authorized transactions which caused the account to become negative. As indicated above, the Membership Agreement makes clear that fees are assessed when the credit union pays the merchant's bank. Accordingly, Plaintiff's "APSN" breach of contract claim fails because there was no breach as URW only assessed overdraft fees when the merchant elected to request payment and payment was made by it just as it promised in the Membership Agreement.

**C. Plaintiff's premise that held funds are "set aside" and cannot be touched is false and directly contrary to the unambiguous terms of the Membership Agreement.**

In this final analysis, it becomes clear that authorization holds are a red-herring as applied to the APSN claim. First, an authorization hold serves a simple purpose: it prevents members from spending the same dollar twice. Without an authorization hold that reduces the available funds that can be spent, and stays on the account until the merchant seeks payment, the member could keep using her account and spending the same money over and over again.

Second, Plaintiff's self-defined "APSN" theory of liability is fatally defective for yet another reason: it rests on the unsupported and faulty premise that those funds placed under an "authorization hold" are "set aside" and cannot be touched for any purpose other than payment of the subject swipe debit card transaction that URW authorized. Compl. ¶¶ 18, 20, 37, 39, 49. However, the Membership Agreement contradicts this assertion in three ways. First, it informs members that the order in which transactions are processed may affect the amount of overdrafts the member incurs if there are not enough funds to cover all of the transactions. Ex. 1, p. 13. If, as Plaintiff contends, the hold meant money was instantly reserved for payment, then the payment order of items would be immaterial, and would have no impact on overdraft fees. Second, it demonstrates that authorization does not "reserve" funds because an accountholder's funds are immediately owed to URW to repay it for overdrafts and related fees: "you are responsible for the full repayment of any fees, charges, costs, interest, losses, liability or obligation…" Ex. 1, p. 20. Nowhere does the Membership Agreement state that held funds are unavailable for use in other transactions.

Finally, the disclosures warn the member to have enough funds in the account when the transaction "clears," which explicitly negates the "set aside" theory. Members are aware that some transactions will be considered as "pending" until the item is processed and posted to the account,

at which point the item has "cleared" the account. *See* Ex. 1, p. 13 ("[y]our available balance is generally equal to the actual balance, less the amount of… holds for pending transactions."). Thus, if funds were actually set aside to pay the transaction at posting or when it clears, there would be no reason to inform the member to make sure there are sufficient funds in the account at that time it settles because under a "set aside" theory, there always would be sufficient funds available. Put differently, by specifically warning the member to have funds available at the time the transaction clears, it eliminates any claimed ambiguity by Plaintiff that fees are assessed at authorization.

In dismissing the plaintiff's claims, the Court in *McCollam* determined that "[t]here is no language in this provision that can be reasonably interpreted to require that the funds on hold be sequestered." *McCollam*, 598 F. Supp. 3d 1104 at 1113. The *McCollam* court held that "[a] hold simply reduces the account's 'available balance' by the amount of the hold until it is 'eventually [ ] adjusted to the actual amount of the purchase.'" *Id*. The hold does not "reserve" funds that may not be used for other transactions. *See also Boone*, 375 F. Supp. 3d at 993; *Hassler v. Sovereign Bank*, 644 F. Supp. 2d 509, 516 (D.N.J. 2009); *Gay v. Peoples Bank*, 2015 WL 3650090 (N.C. Super. June 10, 2015); *Parrish v. Arvest Bank*, 717 Fed. Appx. 756, 760 (10th Cir. 2017).

Thus, the terms of the Membership Agreement belie Plaintiff's suggestion that the "held" funds are reserved and untouchable and may only be used to pay the merchant for the authorized debit card transaction. Plaintiff ignores the Membership Agreement's clear and unambiguous language, but when the Membership Agreement is considered in its entirety, as it must be, Plaintiff's invented theory of contractual liability fails as a matter of law. Accordingly, its breach of contract claim must be dismissed with prejudice.

2. **Plaintiff Fails to State a Claim for Violation of Regulation E.**

   A. **The Federal Reserve Board Rejected Any Requirement to Describe the Available Balance and Overdraft Fee Practices on Debit Card Transactions in the Opt-In Form.**

      i. *When it created the model opt-in form in 2009, the Federal Reserve Board excluded unnecessary information.*

The critical statutory (and *legal*) question for the Court is *what kind of information* did the Board want in Model Form A-9 (as opposed to account agreements) in order to provide consumers with a *choice* of whether they wanted overdraft protection on ATM and one-time debit card transactions. Plaintiff alleges that URW's "Opt-In Form does not accurately represent [URW's] actual fee practices because (1) it fails to explain how [URW] determines whether there is 'enough money' in the account to pay a transaction; or (2) it does not explain whether overdrafts are determined at authorization or settlement." Compl. ¶ 103. Plaintiff's argument is based on her failure to read and consider the regulatory history of the Board's efforts and purpose in creating Model Form A-9.

By way of background, financial institutions, including banks and credit unions, have long offered overdraft services for a fee for a variety of transactions, including checks, ACH transactions, ATM withdrawals, one-time debit card transactions and reoccurring debit card transactions. The early 2000s saw the increasing use of debit cards and ATMs by consumers as a means of paying for transactions. Studies showed that some consumers were unaware that they would be charged OD fees for ATM and debit card transactions, and many presumed their transactions would be declined. *See Electronic Funds Transfers*, 74 Fed. Reg. 59033-35 (Nov. 17, 2009) (codified at 12 C.R.R pt. 205). Studies further showed that consumers wanted overdraft protection, but consumers varied widely on which transactions they wanted overdraft protection. *Id.*

In November 2009, after receiving over 20,000 comments in response to the proposed rules, the Board issued its final rules. *See* 74 Fed. Reg. 59033-35. Specifically, the Board adopted the Opt-In Rule requiring financial institutions to provide consumers with the choice to "opt-in" or affirmatively consent to an overdraft protection service but limited the choice to ATM and one-time debt card transactions. *See* 12 C.F.R. § 205.17. The Board also created Model Form A-9 and codified it in Regulation E for the purpose of allowing consumer to choose whether they wanted overdraft protection on ATM and one-time debit card transactions. *See* 12 C.F.R. pt. 1005, app. A ("A-9 Model Consent Form for Overdraft Services (§ 1005.17) (Model Form A-9); RJN, Exhibit 1 (attaching Model Form A-9).

The Board's expressed purpose in implementing Model Form A-9 was to help consumers make a "choice" of whether they wanted overdraft protection on certain transactions. *See* 74 Fed. Reg. 59,033, 59,035. In 2008, the Board was initially contemplating the opt-in requirement that involved transactions other than and including ATM and debit cards. The 2008 testing referenced by the Board involves the consumer testing that Macro International, Inc. ("Macro") published on December 8, 2008. RJN, Exhibit 2. Macro found "the majority of participants…understood what would happen if they overdrew their account through an ATM, debit card, recurring debit, or check transactions." RJN, Exhibit 2, p. iii. However, Macro found that "about half of the participants indicated that if offered the opportunity to 'partially opt out" of overdraft coverage (to opt out of coverage for ATM and debit card transactions only), they would do so." *Id.* at p. iii.

In 2009, the Board again engaged Macro "to revise and test the proposed model opt-out notices and the new proposed opt-in notice." 74 Fed. Reg. at 59,036. Marco was directed to conduct consumer testing in order to create an opt-in notice "to ensure that they communicated information to consumer effectively and clearly" when making the choice of overdraft protection.

21

RJN, Exhibit 3 p. 26. The Board also wanted a scientific approach when creating the model notices "*because* these model notices would constitute a 'safe harbor' for institutions that use them." *Id.* at p. i (emphasis added). This "safe harbor" protection was later codified in 12 U.S.C. § 1693m(d)(1)-(2).

Macro's scientific approach involved four rounds of testing sample opt-in forms—and modifying the forms according to their findings. The opt-in forms used in the first through third rounds of testing *did* contain balance and debit hold information. Macro tested opt-in forms containing: "For example, you may have enough money in your account when we authorize a transaction, but other transactions may reduce the amount in your account before that transaction clears. If this causes an overdraft, you will be charged a fee." RJN, Exhibit 3, Appendix C: Disclosure Notices Used in Round 1 of Testing, Appendix D: Disclosure Notices Used in Round 2 of Testing, and Appendix E: Disclosure Notices Used in Round 3 of Testing. Importantly, this is the kind of information that Plaintiff speculates must be in the opt-in forms to comply with Regulation E. Compl. ¶ 103. However, Macro decided to *remove* this information "from the notice in Round 4 because of concerns regarding information overload." RJN, Exhibit 3 p. iii. After completing the fourth round of testing, Macro determined that Model Form A-9 best satisfied the Board's objectives of providing consumers a reasonable choice of whether they wanted overdraft protection on ATM and one-time debit card transactions. *See* RJN, Exhibit 3 p. 1. Model Form A-9 "was substantially more effective than earlier versions." *Id.* at p. 26. Notably, Model Form A-9 satisfied the Board's objectives because "participants who read this version had a much greater understanding of how their overdrafts would be handled and what their options were." *Id.*

The Board's rigorous approach did not end with Macro's scientific findings. The Board also requested comments from consumer advocates and industry commentators on Model Form

22

A-9 and "whether the rule should permit or require any other information to be included in the opt-in notice." *See* 74 Fed. Reg. at 59,047-49. After this extensive process, the Board adopted Model Form A-9 "with modified content and format requirements based on the comments received, consumer testing, and the Board's further consideration." *Id.* Model Form A-9 "was edited to make it shorter and clearer to consumers, including by emphasizing certain information critical to understanding the overdraft services." *Id.*

ii.    *The CFPB also rejected Plaintiff's alleged requirements in 2017.*

In 2017, the CFPB reconsidered the Model Opt-In Form and potential updates, conducting additional consumer testing. 84 Fed. Reg. at 21731-32, n.22. The 2017 analysis recognized that "opted-in consumers can be charged a fee on an authorize positive/settle negative transaction," and *assumed* banks use an available balance. RJN Ex. 4(b), 29 & n.40 (using an example: "Because their *available balance* is negative at the time the debit card transaction settles, this is an 'authorize positive/settle negative' transaction[,]" and "the consumer is likely to be charged an overdraft fee on the debit card transaction") (emphasis added). During the 2017 analysis, the CFPB proposed four new model forms—none of which contained available-balance disclosures or APSN timing, despite awareness of both issues—and ultimately did not update Model Form A-9. RJN Ex. 4(c). This consideration of the language describing the available balance and informing consumers that overdrafts are charged at settlement was therefore expressly rejected by the CFPB and the Board. Thus, Plaintiff's claims that it must be included in the opt-in form are groundless.

iii.    *Plaintiff's alleged required disclosures were again rejected in 2019.*

In 2019, the CFPB issued an RFI on potential Regulation E amendments that would have allowed financial institutions to include Balance and Debit Hold Information in the Model Form A-9. 84 Fed. Reg. 21729, 21732 (May 15, 2019). Specifically, the financial institutions expressed concern that the Model Form A-9 may not contain additional information on "overdraft and

23

balance-related calculations" (i.e. the Balance and Debit Hold Information) and wanted this information in the Model Form A-9. *Id.* If Regulation E already requires balance and debit hold information in the Model Form A-9—as Plaintiff contends—then the CFPB would have included this information in their proposed 2017 amended Form and there would be no need for the CFPB to issue the RFI in 2019. Ultimately, the CFPB never amended Model Form A-9 so the Board's Model Form A-9 remains in place today.

**B. Regulation E Specifically Does Not Allow Financial Institutions to Change the Opt-In Form.**

Given the Board's rigorous efforts in creating Model Form A-9, the Board obviously intended financial institutions to use and rely on Model Form A-9 to satisfy the EFTA and Regulation E opt-in requirements. 74 Fed. Reg. at 59,035; *see also id*. at 59,036; *id*. at 59,051; *id*. at 59,052. Because the Board intended financial institutions to rely on Model Form A-9, the Board also codified 12 C.F.R. § 1005.17(d) ruling that "the opt-in notice required by [§ 1005.17(b)(1)(i)] may not contain any information that is not specified or otherwise permitted by [§ 1005.17(d)] and must be in a form substantially similar to Model Form A-9." *See* 74 Fed. Reg. at 59,047. The Board reasoned "[c]onsumer testing indicated that emphasizing certain language shown in Model Form A-9 substantially enhanced consumer understanding, and the Board is concerned that any additional information provided not diminish that understanding." *Id.* at 59,049.

Regulation E itself makes clear that Model Form A-9 is not just a suggested *format*, but also mandates the *content* of the Notice used by credit unions be "substantial similar" to Model Form A-9. The Regulation E section that specifically discloses what should be in the Notice is titled "**Content** and format":

> (d) **Content and format**. The notice required by paragraph (b)(1)(i) of this section shall be substantially similar to Model Form A-9 set forth in appendix A of this part, include all applicable items in this paragraph, and may not contain any information not specified in or otherwise permitted by this paragraph.

24

12 C.F.R. § 1005.17(d) (emphasis provided by underline). Thus, the Opt-In form used by URW, which is the sole basis of this lawsuit, is mandated by law to be "substantially similar" to Model Form A-9, in a section describing the format and <u>content</u> of the disclosure. That Section further mandates that it "***may not*** contain ***any information*** not specified in or otherwise permitted by this paragraph." The paragraph further enumerates only six items that can be included in the notice: (1) Overdraft service, (2) Fees imposed, (3) Limits on fees charged, (4) Disclosure of opt-in right, (5) Alternative plans for covering overdrafts, and (6) Permitted modification and additional content." 12 C.F.R. § 1005.17(d)(1)-(6).

   **C. The Language of the Opt-In Form Construed Together with the Membership Agreement Specifically States that Overdraft Fees are Determined Based Upon the Account's "Available Balance" at the Time of Presentment.**

   Plaintiff's next claim that URW violates Regulation E because its Opt-In Form does not accurately describe that URW determines overdrafts at settlement rests solely on one document and ignores all other contractual documents. However, the law provides that where a transaction "is based upon more than one document executed by the parties, the documents will be construed together to determine the intent of the parties." *Daugherty v. Diment*, 238 Va. 520, 525, 385 S.E.2d 572 (1989) (citation omitted); *see also Bailey v. Hannibal & St. J.R. Co.*, 84 U.S. 96, 108, 21 L. Ed. 611 (1872) ("several writings executed between the same parties substantially at the same time and relating to the same subject-matter may be read together as forming parts of one transaction, nor is it necessary that the instruments should in terms refer to each other if in point of fact they are parts of a single transaction.") (citation omitted); *Lossia v. Flagstar Bancorp, Inc.*, 895 F.3d 423, 429 (6th Cir. 2018) ("Where one writing references another instrument for additional contract terms, the two writings should be read together") (citations omitted); *Tims*, 935 F.3d at 1238, n.5 (11th Cir. 2019) (construing opt-in form and account agreement together); *Rader v. Sandia Lab'y*

25

*Fed. Credit Union*, No. CV 20-559 JAP/JHR, 2021 WL 1533664, at *4 (D.N.M. Apr. 19, 2021) (same); *Domann*, 2018 WL 4374076, at *6-7 (same); *Chambers v. NASA Federal Credit Union*, 222 F. Supp. 3d 1, 11 (D.D.C. 2016).

Here, the Account Documents must be read together. The Membership Agreement, which is the operative agreement governing Plaintiff's relationship and account with URW, could not be clearer when it states that URW will pay overdrafts "when transmitted to [URW], which may occur immediately or up to several days later." Ex. 1, p. 13. In addition, the Membership Agreement explains that "the merchant or its processor (and not [URW]) determines when the transaction will be transmitted to [URW]." *Id*.

Plaintiff unsuccessfully tries to dodge the plain terms of the Membership Agreement by claiming that URW's Opt-In Form is a "standalone" agreement. Compl. ¶ 98. This position misconstrues both the text and purpose of Regulation E. Regulation E never refers to the word "agreement," but instead describes the Opt-In Form as a "notice" or "disclosure." 12 C.F.R. §§ 1005.17(b)(1)(i), 1005.17(d)(4). As a notice, the Opt-In Form's purpose is to explain URW's overdraft protection service "in a clear and readily understandable way" so that members can make an informed decision about whether to opt-in to overdraft protection for ATM and one-time debit card transactions. 74 Fed. Reg. 59033-01, 59048.

As mandated by 12 C.F.R. § 1005.17(b)(1)(i), URW was required to issue a notice with a "brief description" of its overdraft services separately from the Membership Agreement. The reason Regulation E requires that the Opt-In Form be segregated from other account documents is to "ensure that opt-in information is not buried or obscured within other account documents and overlooked by the consumer." 74 Fed. Reg. at 59041. It is obvious that Regulation E does not require a separate, all-encompassing contract that defines every applicable term for overdraft

protection. The Opt-In Form is an add-on to that agreement that further describes URW's overdraft program. There is no reading of all applicable documents that supports Plaintiff's argument that the Opt-In Form does not adequately inform members that URW determines overdrafts at settlement of a transaction. Accordingly, the Court should dismiss Plaintiff's Regulation E claim, with prejudice.

### D. URW is Insulated From Liability.

Plaintiff's Regulation E claim fails for the additional reason that URW is shielded from liability by the EFTA's safe harbor provision. *See* 15 U.S.C. § 1693m(d). As previously detailed, the safe harbor provision provides no liability shall be imposed for "any failure to make disclosure in proper form if a financial institutions utilized an appropriate model clause issued by the Bureau or Board." 15 U.S.C. § 1693m(d)(2).

Federal courts have held that a financial institution's use of an opt-in form that is "almost identical to Model Form A-9" is enough to insulate the financial institution from Regulation E liability under § 1693m(d)(2). *See e.g.*, *Tilley v. Mountain Am. Fed Credit Union*, No. 217CV01120JNPBCW, 2018 WL 4600655, at *4-5 (D. Utah Sept. 25, 2018); *Rader,* 2021 WL 1533664, at *13-14. "[I]f a financial institution uses model language provided by the Bureau [in Model Form A-9] to make a disclosure, it is shielded from liability claims that the disclosure is deficient." *Tilley*, 2018 WL 4600655, at *4-5.

Accepting Plaintiff's position that URW's Opt-In Form does not describe its fee practices would mean that the Board spent considerable effort crafting the model form only to render a defective product—which, of course, financial institutions are obliged to use and, by Plaintiff's theory, expose themselves to liability under Regulation E. This illogical result must be rejected, and Plaintiff's claim must be dismissed with prejudice.

27

### E. Plaintiff Cannot Show Causation Under the EFTA.

Aside from the other defenses, to state an EFTA claim, Plaintiff must show "actual damage sustained by such consumer as a result of such failure" to comply with the EFTA. 15 U.S.C. § 1693m(a)(1). This requires her to plead facts plausibly showing that despite explanations of Balance and Debit Hold Information in the Agreement, she was injured by the failure to have detailed explanations contained on the Opt-In Form. She cannot do so for several reasons. First, she does not allege that she ever read the Opt-In Form, so she cannot have relied on any expectation based on that document. Second, although she claims that she was "unable to predict these fees," she pleads no facts that support such a conclusory allegation. She does not plead any facts showing that any lack of disclosure caused her to incur a fee she was not expecting. Plaintiff requested overdraft coverage and URW did nothing to cause her to incur any unexpected fees.

### CONCLUSION

For the foregoing reasons, URW Community Federal Credit Union respectfully requests that this Court grant its Motion and dismiss Plaintiff's Class Action Complaint with prejudice, and for such further relief as this Court deems just and proper.

Dated:  August 11, 2025                          Respectfully submitted,

By: */s/ Jeremy D. Camacho*                      Scott R. Sinson (*pro hac vice* forthcoming)
Jeremy D. Camacho (VSB No. 86765)                Jennifer N. Abdo (*pro hac vice* forthcoming)
GORDON REES SCULLY MANSUKHANI, LLP               GORDON REES SCULLY MANSUKHANI, LLP
277 S. Washington Street, Suite 550              1 North Wacker Drive, Suite 1600
Alexandria, VA  22314                            Chicago, Illinois 60606
Tel: (571) 351-0973                              Tel: (312) 261-9466
Fax: (202) 800-2999                              Fax: (312) 565-6511
jcamacho@grsm.com                                ssinson@grsm.com
                                                 jabdo@grsm.com

                                                 *Attorneys for Defendant,*
                                                 *URW Community Federal Credit Union*

28

## CERTIFICATE OF SERVICE

I hereby certify that on August 11, 2025 a copy of the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such to the following:

Devon J. Munro
MUNRO BYRD, P.C.
120 Day Avenue SW, Suite 100
Roanoke, VA 24016
Tel:  (540) 283-9343
dmunro@trialsva.com

Lynn A. Toops
COHEN & MALAD, LLP
One Indiana Square, Suite 1400
Indianapolis, IN 46204
Tel:  (317) 636-6481
ltoops@cohenmalad.com

Martin F. Schubert
STRANCH, JENNINGS & GARVEY, PLLC
223 Rosa L. Parks Avenue, Suite 200
Nashville, TN 37203
Tel:  (615) 254-8801
mschubert@stranchlaw.com

Christopher D. Jennings
JENNINGS & EARLEY PLLC
500 President Clinton Avenue, Suite 110
Little Rock, AR 72201
chris@jefirm.com


By: */s/     Jeremy D. Camacho*
Jeremy D. Camacho
GORDON REES SCULLY MANSUKHANI, LLP

29