CLERK'S OFFICE U.S. DISTRICT COURT AT
ROANOKE, VA
FILED

3/20/2026
LAURA A. AUSTIN, CLERK
BY: s/C. Kemp
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

| | | |
|---|---|---|
| DONNA BURTON, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 4:25-cv-00033 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| URW COMMUNITY FEDERAL | ) | By:    Hon. Thomas T. Cullen |
| CREDIT UNION, | ) |         United States District Judge |
| | ) | |
| Defendant. | ) | |

Plaintiff Donna Burton ("Burton") filed this purported class action on June 25, 2025, joining the growing list of banking consumers nationwide who take issue with allegedly unfair overdraft fees. In this action, Burton alleges breach of contract and violation of a federal consumer-protection regulation against Defendant URW Community Federal Credit Union ("URW") in Danville, Virginia. She claims that, because URW utilizes misleading and ambiguous contractual promises and representations, its members were not properly informed of its overdraft policy and, thus, incurred overdraft fees without their affirmative consent. This matter is now before the court on URW's motion to dismiss. (Def.'s Mot. Dismiss [ECF No. 6].) Because Burton has plausibly alleged that URW's contractual language is misleading and deficient, the court will deny the motion.

## I.    STATEMENT OF FACTS AND PROCEDURAL BACKGROUND

To understand Plaintiff's claims, the court must first provide a brief overview of the mechanics of modern consumer banking.

### A.  Debit cards, overdraft fees, and APSN transactions

The core of this action concerns ATM and debit-card transactions and the assessment of overdraft fees. "[D]ebit card transactions typically happen in two distinct phases." *Va. is for Movers, LLC v. Apple Fed. Credit Union*, 720 F. Supp. 3d 427, 433 (E.D. Va. 2024). First, when the customer swipes her card at an ATM or during one-time, point-of-sale ("POS") debit-card purchases, the transaction is transmitted from the merchant's terminal to the financial institution, which authorizes or declines the sale. *Id.* (*See also* Compl. ¶¶ 29, 30 [ECF No. 1].) This first phase is therefore known as the authorization phase, because the financial institution confirms sufficient funds in the customer's account and "guarantees that either it or the customer will eventually pay." *Va. is for Movers*, 720 F. Supp. 3d at 433. But actual payment does not occur until the second phase, or settlement, when the authorized funds are transmitted from the credit union to the merchant, at the merchant's request. *Id.* The financial institution only has discretion to accept or decline a payment at the authorization phase. (*Id.* ¶ 32.)

To track funds in a customer's account, credit unions may use the *ledger-* (or "actual") balance method or, alternatively, the *available-*balance method. "The ledger[-]balance method considers only settled transactions; the available[-]balance method considers both settled transactions and authorized but not-yet-settled transactions, as well as deposits placed on hold that have not yet cleared." *Tims v. LGE Cmty. Credit Union*, 935 F.3d 1228, 1235 (11th Cir. 2019). If a consumer's balance falls into a deficit under either the ledger- or available-balance method, financial institutions may assess an overdraft fee. *Id.* An overdraft fee is when "a financial institution assesses a fee or charge on a consumer's account held by the institution

for paying a transaction . . . when the consumer has insufficient funds or unavailable funds in the account."[1] 12 C.F.R. § 1005.17.

Burton alleges that URW uses the available-balance method to assess overdraft fees. (Compl. ¶ 18.) Under the available-balance method, consumers may experience "authorize positive, settle negative" ("APSN") transactions. (*Id.* ¶ 20.) That is, a consumer may swipe her debit card or make an ATM withdrawal on Day 1. If the consumer's account has a positive balance and the financial institution authorizes those charges,[2] it sets aside the funds with a "debit hold" to ensure sufficient funds to pay the transaction when it clears. (*Id.* ¶ 18.) Settlement of that transaction, however, may take several days. *Va. is for Movers*, 720 F. Supp. 3d at 434. If the consumer makes additional, intervening transactions before the Day 1 transaction has settled (or if other purchases authorized before the Day 1 transaction are settled) and brings the account balance to a deficit, then the consumer may incur overdraft fees on those intervening transactions. *Id.* (*See also* Compl. ¶ 26 (alleging that URW charges overdraft fees on intervening transactions or rejects them at the authorization stage).) If the account balance is still negative by the time the Day 1 transaction settles, the transaction "settles negative," even though it was authorized on a positive account and funds were debited for the transaction. (*Id.* ¶ 20.) Because the transaction settles into a deficit, the financial institution may charge an additional overdraft fee on this APSN transaction. (*Id.*) *See also Va.*

---

[1] Historically, financial institutions extended overdraft protection (and charged resultant fees) only on checks. *See Tims*, 935 F.3d at 1235. With the advent of online banking, many financial institutions, including URW, extended overdraft protection to ATM withdrawals and debit-card transactions. *Id.*

[2] A financial institution, like URW, may also choose to decline the purchase if the consumer did not authorize the transaction (*i.e.*, the transaction appears fraudulent) or the consumer has an outstanding, unpaid debt on their account. (*See* Compl. ¶ 36.)

*is for Movers*, 720 F. Supp. 3d at 434. Burton alleges that URW charges overdraft fees on APSN transactions, which is the crux of her complaint. (Compl. ¶¶ 26–27.)

### B. The EFTA and Regulation E

Because overdraft fees come "at a significant and sometimes unexpected cost to consumers," Congress enacted the Electronic Funds Transfer Act ("EFTA"), 15 U.S.C. § 1693 *et seq.*, a consumer-protection statute covering electronic fund transfers. *See Tims*, 935 F.3d at 1235, 1243 (describing the EFTA's "requirement that financial institutions disclose '[t]he terms and conditions of electronic fund transfers involving a consumer[']s account . . . in accordance with the regulations of the'" Consumer Financial Protection Bureau (first brackets in original).) Regulation E, 12 C.F.R. § 1005 *et seq.*, an implementing regulation of the EFTA, specifically concerns the disclosure of the credit union's overdraft policy and mandates an affirmative "opt-in requirement." *Id.* § 1005.17(b). Before a credit union may charge overdraft fees on ATM withdrawals or one-time debit card purchases, it must "[p]rovide[] the consumer with a notice . . . segregated from all other information . . . describing the institution's overdraft service," and, after a "reasonable opportunity . . . [o]btain[] the consumer's affirmative consent, or opt in, to the service for ATM and one-time debit card transactions[.]" *Id.* § 1005.17(b)(1). Without the consumer's affirmative consent to a separate opt-in form or agreement, the credit union "may either cover the overdraft without charging a fee or direct that the transaction be denied at the POS." *Adams v. Liberty Bank*, No. 3:20-cv-01601(MPS), 2021 WL 3726007, at *1 (D. Conn. Aug. 23, 2021). (*See also* Compl. ¶ 84 ("Regulation E expressly requires a financial institution to include all the relevant terms of its overdraft program within the four corners of the [opt-in] document." (citing 12 C.F.R. § 1005.17(b)(1)(i))).)

To accomplish these goals, the Consumer Financial Protection Bureau ("CFPB")—the federal agency that administers the EFTA and Regulation E—provides financial institutions with a model opt-in notice, Model Form A-9. *See Adams*, 2021 WL 3726007, at *2. The financial institution's opt-in notice must "be substantially similar" to Model Form A-9 in both form and content. 12 C.F.R. § 1005.17(d). Among other requirements, the credit union's notice must include "[a] brief description of the financial institution's overdraft service and the types of transactions for which a fee or charge for paying an overdraft may be imposed, including ATM and one-time debit card transactions," the fees and fee limits imposed per overdraft, and the consumer's right to opt-in or opt-out. *Id.* 1005.17(d)(1)-(5). The CFPB provides an appendix of model clauses for financial institutions to use to convey certain information about their overdraft policies. 12 C.F.R. § 1005.17, App'x A. The EFTA establishes a private cause of action for violations of the statute, including violations of Regulation E. *See Adams*, 2021 WL 3726007, at *2.

### C.  Factual Background

Burton challenges URW's practice of charging overdraft fees on APSN transactions. (*See* Compl. ¶ 20 ("Despite putting aside sufficient available funds for debit card transactions at the time those transactions are authorized, [URW] later assesses Overdraft Fees on those same transactions when they settle later into a negative balance.").) Because of URW's "deceptive, unfair, and unconscionable" overdraft policy, Burton incurred overdraft fees on one-time debit-card transactions from URW "on numerous occasions." (*Id.* ¶¶ 20, 110, 111.)

Burton alleges that URW lacks the authority to charge overdraft fees on APSN transactions because its accountholder contract ("Contract"; Def.'s Br. Supp. Mot. Dismiss

("Def.'s Br."), Ex. 1 [ECF No. 7-1]) and separate Overdraft Fee Notice (the "Opt-In Form";

*id.*, Ex. 2 [ECF No. 7-2]) are misleading and ambiguous. (*Id.* ¶ 28.) Relevant provisions of the

Contract read:

> You understand we have no obligation to honor a request to withdraw funds if you do not have 1) sufficient available funds in an account or 2) one of our overdraft services (please see "available balance" in Provision 6.i.). If a check or other transfer or payment order is presented against insufficient available funds in an account, we will require a service charge.
>
> . . . .
>
> Checks and other *transactions on* a checking account with us are paid based on your available balance, and not the actual balance. Your actual balance is the actual amount of funds in the account (based on credits and debits posted to the account at that time). . . . If an item presented for payment against the account exceeds the available balance, we will treat it as presented against insufficient funds even if the actual balance exceeds the amount of the item[.]

(Def.'s Br., Ex. 1 at 11, 13.) The separate Opt-In Form[3] states that URW has "standard

overdraft practices" and "also offer[s] an overdraft protection service." (Def.'s Br., Ex. 2

---

[3] URW argues that Burton attached older versions of the Contract and Opt-In Form to the Complaint. (Def.'s Mot. at 8 n.2.) URW points out that the older Opt-In Form (from 2013) contains different language than the more recent Opt-In Form (from 2020), which URW attaches to its motion and argues is the operative document. (*Id.*) Specifically, the older Opt-In Form describes that "[a]n overdraft occurs when you do not have enough money in your account to cover . . . a . . . transaction . . . but we elect to pay it anyway," (Compl., Ex. A), whereas the more recent Opt-In Form states that "[a]n overdraft occurs when the available balance of funds in the account you have with us is inadequate to cover a . . . transaction . . . but we elect to pay it anyway" (Def.'s Mot., Ex. 2). Burton not only fails to address this argument in her opposition brief, but also cites the "available balance of funds" language from the 2020 Form. (Pl.'s Opp'n at 9.) Therefore, the court finds that Burton has conceded this argument and will regard the 2020 Opt-In Form as the operative document, in addition to the updated versions of the Contract (Def.'s Mot., Ex. 1). *See Fowler v. Caesars Va., LLC*, No. 4:24-cv-29, 2025 WL 673654, at *6 (W.D. Va. Mar. 3, 2025) (acknowledging that a party's failure to address an issue in an opposition brief amounts to a concession on that issue); *Lattimore v. Brahmbhatt*, No. 4:21-cv-38, 2024 WL 26687, at *4 (W.D. Va. Jan. 3, 2024) (same); *Moke Am. LLC v. Am. Custom Golf Cars, Inc.*, No. 3:20-cv-400, 2022 WL 17477062, at *8 (E.D. Va. Dec. 6, 2022) (same); *cf. Garrett v. Call Fed. Credit Union*, No. 3:23-cv-678-HEH, 2024 WL 3928888, at *3 (E.D. Va. Aug. 23, 2024) (observing that plaintiff disputed that defendant's submitted version of the opt-in form was controlling and, therefore, viewing the allegations in the light most favorable to plaintiff, regarding the plaintiff's submitted version of the form as controlling).

(emphasis omitted).) The Opt-In Form defines an overdraft and explains URW's "standard

overdraft practices" as follows:

> An overdraft occurs when the available balance of funds in the account you have with us is inadequate to cover a check or electronic transaction (such as with your debit card or through an ATM), but we elect to pay it anyway.
>
> . . . .
>
> We do authorize and pay overdrafts for the following types of transactions:
>
> - Checks and other transactions made using your checking account number
> - Automatic bill payments
>
> We do not authorize and pay overdrafts for the following types of transactions unless you ask us to . . . :
>
> - ATM transactions
> - Everyday debit card transactions
>
> We pay overdrafts at our discretion, which means we do not guarantee that we will always authorize and pay any type of transaction (which generally will occur because you have not authorized a transaction, exceeded the overdraft limit, or have an outstanding balance that has not been repaid).
>
> If we do not authorize and pay an overdraft, your transaction will be declined.

(*Id.* (emphasis omitted).) The Opt-In Form further notifies consumers that URW assesses a

$25 fee per overdraft, and that there is no limit on the number of fees URW may charge. (*Id.*)

On the whole, URW uses the same model clauses provided by Regulation E, with a few

exceptions.[4]

---

[4] Burton alleges that URW's Opt-In Form includes a "lengthy parenthetical explaining the circumstances in which URW 'generally' will decline to authorize and pay an overdraft, such as when 'you have not authorized a transaction, exceeded the overdraft limit, or have an outstanding balance that has not been repaid,' which is not found in Model Form A-9 and that "URW modified the definition of 'overdraft' to state, for example, that overdrafts are based on the 'available balance.'" (Pl.'s Opp'n at 24.)

Burton specifically alleges that URW's Opt-In Form is misleading, ambiguous, and omits crucial information about how and when overdraft fees are assessed and, specifically, that APSN transactions can incur overdraft fees. (*Id.* ¶¶ 17–28.) For example, by "link[ing] payment to authorization seven times," URW's Opt-In Form allegedly misleads consumers to believe that overdraft fees are charged at authorization, not settlement.[5] (Compl. ¶¶ 36, 40 (emphasis removed).) She alleges that URW, like other financial institutions, must disclose and transparently explain in their Opt-In Form when overdraft fees are calculated and which balance calculation—the ledger- or available-balance method—is used to assess those fees. (*Id.* ¶ 89.) But she contends that URW omits this critical information while also "fail[ing] to explain how [it] determines whether there is 'enough money' in the account to pay a transaction." (*Id.* ¶ 103.)  As a result, "[n]o express language in any document states that [URW] may impose fees on any APSN [t]ransactions." (*Id.* ¶¶ 38, 40 ("[URW] indicate[s] that transactions are only overdraft transactions when they are authorized and approved into a negative account balance.").)

Burton also alleges that URW further misleads consumers by using "a secret batch posting process" to effect these APSN transactions and invoke its overdraft policy:

> [URW] actually authorizes transactions on positive funds, sets those funds aside on hold, then fails to use those same funds to post those same transactions. Instead, it uses a secret posting process . . . . [A]t the moment a debit card transaction is getting ready to settle, [URW] releases the hold placed on funds for the transaction for a split second, putting money back into the account, then re-debits the same transaction a second time. This

---

[5] Burton contends that charging consumers at settlement for APSN transactions is especially "counterintuitive," because most debit-card users believe that payments—and, if applicable, overdraft fees—are made at the authorization stage. (Compl. ¶¶ 52–67.) She alleges that other financial institutions have recognized the complexity of APSN transactions and thus "require their accountholders to agree to be assessed "overdraft fees on APSN transactions." (*Id.* ¶ 52 (cleaned up).)

> secret step allows [URW] to charge [o]verdraft [f]ees on transactions that never should have gotten them—transactions that were authorized into sufficient funds, and for which [URW] specifically set aside money to pay.

(*Id.* ¶¶ 39, 48–49.)

In addition to the Opt-In Form's insufficient notice, Burton alleges that the Contract is deceptive. URW provides that it will not assess overdraft fees on sufficient funds in the account. (*Id.* ¶ 43.) But it allegedly does so on APSN transactions, which were authorized on sufficient funds. (*Id.*) Burton thus alleges that URW violates its Contract and lacks the authority to charge overdraft fees on APSN transactions. (*Id.*) In essence, Burton's Complaint is premised on "a huge gap between [URW's] practices as described in the Contract and [URW's] actual practices." (*Id.* ¶ 50.)

Burton filed her putative class-action complaint[6] on June 25, 2025, alleging (1) breach of contract and (2) violations of Regulation E, based on her allegations of URW's misleading and ambiguous language in the Contract and Opt-In Form describing its overdraft policy. (*See* Compl. ¶¶ 127–48.) On August 11, 2025, URW filed a motion to dismiss all claims against it. The matter has been fully briefed,[7] and it is now ripe for disposition.

---

[6] Burton sues on behalf of two classes. She asserts Count I, the breach of contract claim, on behalf of herself and the "APSN Class," who are consumers who were assessed an overdraft fee on a debit-card APSN transaction. (Compl. ¶ 116.) She asserts Count II, the violation of Regulation E claim, on behalf of herself and the "Reg E Class," who are consumers who "opted into overdraft protection for one-time debit card transactions and ATM transactions with [URW] and were assessed overdraft fees on these transactions." (*Id.*)

[7] The court dispenses with oral argument on the motion because it would not aid the court in deciding the primarily legal issues raised by URW's motion.

## II.    STANDARD OF REVIEW

Motions to dismiss under Rule 12(b)(6) test the legal sufficiency of a complaint. *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). To survive a Rule 12(b)(6) motion, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when the plaintiff's allegations "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* While a complaint does not need "detailed factual allegations," complaints merely offering "labels and conclusions," "naked assertion[s] devoid of 'further factual enhancement,'" or "a formulaic recitation of the elements of a cause of action will not do." *Id.* (alteration in original) (internal quotation marks omitted) (quoting *Twombly*, 550 U.S. at 555, 557). When evaluating the sufficiency of a complaint, the court is obligated to consider the factual allegations asserted in the complaint as well as any exhibits attached thereto. *See Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016) (citing Fed. R. Civ. P. 10(c)).

## III.    DISCUSSION

URW moves to dismiss Burton's breach-of-contract and Regulation E claims. As the Regulation E claim is the basis for this court's jurisdiction, it addresses that claim first.

### A.  Regulation E violation

Burton alleges that URW's Opt-In Form does not describe its actual overdraft policies because it omits information about "how or when [it] determines overdrafts," thereby

violating Regulation E.[8] (Compl. ¶¶ 103–104.) She contends that the Opt-in Form lacks clear information about whether it determines overdraft fees at authorization or settlement and that URW charges overdraft fees on APSN transactions. (*Id.* ¶¶ 17–28.) In response, URW argues that Burton's Regulation E claim should be dismissed for five reasons:

> (1) the Federal Reserve Board ("Board") specifically rejected requiring the Opt-In Form to contain material that Plaintiff demands; (2) the Regulations in fact bar the inclusion of the material; (3) when read together with the Membership Agreement, Plaintiff was in fact well-informed; (4) the EFTA's safe-harbor bars her claims; and (5) Plaintiff cannot show causation.

(Def.'s Br. at 6 (cleaned up).) The court agrees with Burton—at least at this preliminary stage.

As discussed above, Regulation E requires financial institutions to use a standalone opt-in form to convey information to consumers about the institution's overdraft policy. 12 C.F.R. § 1005.17(b)(1). The institution's form must be "substantially similar" to Model Form A-9, and the CFPB provides an appendix of "appropriate model clauses" for institutions to use to describe the specific overdraft policy. *Id.* §§ 1005.17(d), 1005.17, App'x A. Above all, the institution's opt-in form must convey information about the overdraft policy in a "clear and readily understandable way," such that the consumer can affirmatively consent to the policy. 12 C.F.R. § 1005.4(a)(1).

Ambiguous language does not meet the requirements of Regulation E, and numerous courts have repeatedly identified scenarios in which an institution's opt-in form does not pass

---

[8] Burton also alleges that URW fails to use an opt-in form that is substantially similar to Model Form A-9 because it does not "includ[e] *any* information regarding limitations on fees, such as the maximum number of fees that may be accessed [*sic*] per day or that no such limit exists." (Compl. ¶ 139.) As Burton does not develop this argument in her Complaint or Opposition Brief, and because URW's form unambiguously informs consumers that "[t]here is *no limit* on the total fees [it] can charge," the court will not consider this argument further. (Def.'s Br., Ex. 2.)

muster. *Va. is for Movers*, 720 F. Supp. 3d at 448–49. For example, courts have held that an opt-in form's language is ambiguous if it does not adequately describe to the consumer that overdrafts are assessed at settlement or that APSN transactions may incur overdraft charges. *See, e.g.*, *id.* at 449–50 (finding that a near-identical opt-in form connecting "authorize" and "pay" did not communicate whether overdraft fees were assessed at settlement or authorization and, further, omitted any language suggesting that APSN transactions incurred overdraft fees); *Garrett v. Call Fed. Credit Union*, No. 3:23-cv-678-HEH, 2024 WL 3928888, at *9 (E.D. Va. Aug. 23, 2024) (reiterating that when an opt-in form fails to convey that the financial institution assesses overdraft fees on APSN transactions, the language is, at best, ambiguous); *Hinton v. Atl. Union Bank*, No. 3:20cv651, 2020 WL 9348205, at *3 (E.D. Va. Nov. 2, 2020) (finding the "authorize and pay" phrasing ambiguous).

Here, Burton has plausibly alleged that identical language in URW's Opt-In Form is ambiguous and, hence, does not adequately describe its overdraft policy. To be sure, the Opt-In Form identifies that URW uses the available-balance method to assess overdraft fees. But that language alone does not call for dismissal of Burton's Complaint. Rather, URW's repeated disclosure that it will "authorize and pay overdrafts" on certain transactions plausibly suggests to consumers that overdraft fees are paid at authorization rather than at settlement and, consequently, on APSN transactions. *See, e.g.*, *Va. is for Movers*, 720 F. Supp. 3d at 449–50; *Garrett*, 2024 WL 3928888, at *9. At bottom, the language in the Opt-In Form lacks sufficient information about how and when overdraft fees are assessed, which, as Burton alleges, is material to a consumer's understanding that URW may charge overdraft fees on APSN transactions. (*See* Compl. ¶¶ 103–04.) Therefore, by alleging that the Opt-In Form did not

clearly describe URW's overdraft policies under Regulation E and the EFTA, Burton has stated a plausible claim that URW "was not legally permitted to assess any overdraft fees on one-time debit[-]card or ATM transactions." (Compl. ¶¶ 109, 140.)

URW's arguments to avoid this conclusion are unavailing. First, it cites a long history of the CFPB's regulatory attempts to revise the Model Form A-9, arguing that it has not only rejected the inclusion of the clarifying language Burton seeks, but completely "bar[s] the inclusion of the material." (Def.'s Br. at 6, 20–24.) This argument is a red herring. As an initial matter, Burton points out several inconsistencies in the research that, if true, would render URW's historical points irrelevant. (*See, e.g.*, Pl.'s Opp'n at 19–23 ("'[T]hat Macro removed test disclosures regarding the handling of overdrafts when the consumer is *opted out* is irrelevant to Plaintiff's claim that URW's Opt-In Form fails to adequately explain how URW assesses [overdraft fees] when the consumer is *opted in*.'").) Courts have also rejected other defendants' similar arguments because, despite the fact that the CFPB and consulting companies have attempted and failed to revise Model Form A-9, "that process does not show that the terms used in the [instant opt-in form] were clear and unambiguous." *Walbridge v. Ne. Credit Union*, 299 F. Supp. 3d 338, 346 n.7 (D.N.H. 2018).

The discrete question presented is whether URW's *specific* Opt-In Form conveyed information about its *specific* overdraft policy in a "clear and readily understandable way." 12 C.F.R. § 1005.4(a)(1). To achieve clarity—contrary to URW's argument that the CFPB bars the inclusion of additional language—financial institutions *are* permitted to select appropriate model clauses and, further, to modify the language. *See Walbridge*, 299 F. Supp. 3d at 348 (rejecting defendant's argument that "it could not describe its overdraft policy differently

because that is not allowed under Regulation E"); *Smith v. Bank of Hawaii*, No. 16CV513 (JMS)(RLP), 2017 WL 3597522, at *8 (D. Haw. Apr. 13, 2017); Official Staff Interpretations, 12 C.F.R. § 205 Supp. I App'x A §§ 3 ("Financial institutions may use clauses of their own design in conjunction with the Board's model clauses. . . . Financial institutions may make alterations, substitutions, or additions in the clauses to reflect the services offered[.]"). Burton alleges that, in fact, URW modified other model clause language in its Opt-In Form, demonstrating "[t]hat URW knows it can (and must) alter the language of Model Form A-9." (Pl.'s Opp'n at 24.) Therefore, far from "attack[ing]" the CFPB's regulatory decisions, Burton has plausibly alleged that URW's Opt-In Form was deficient, given how it elected to conduct APSN transactions. (Def.'s Br. at 6.).

Moreover, URW is incorrect that Burton's Regulation E claim should be dismissed because "the plain language of the Membership Agreement" put her on notice of the overdraft policy. (*Id.* at 3–4.) Even if URW were correct that the Membership Agreement unequivocally communicated that URW assesses overdraft fees on APSN transactions—which, as the court will discuss, is a dubious proposition—Regulation E requires that the *standalone* opt-in form relay information to the customer clearly and unambiguously. 12 C.F.R. § 1005.17(b)(1)(i) (requiring that the requisite notice be "segregated from all other information"); *see also Adams*, 2021 WL 3726007, at *3–4 ("[A] faulty notice is not saved by clarifying language in other documents. . . . [U]nder Regulation E, the [Opt-In Form] must pass muster on its own."). Accepting URW's argument, then, would plainly contradict the requirements of Regulation E.

URW makes two final attempts to support its motion, arguing first that it is protected from suit by the EFTA's safe-harbor provisions and, second, that Burton's Regulation E claim

- 14 -

should be dismissed because she failed to allege causation. (*See* Def.'s Br. at 6, 27–28.) Each argument is considered in turn, and rejected.

### 1.   The EFTA's safe-harbor provisions

Under the EFTA, financial institutions may be protected from liability for "(1) any act done or omitted in good faith in conformity with any rule, regulation, or interpretation thereof by the [CFPB] or [Federal Reserve Board]," or "(2) any failure to make disclosure in proper form if a financial institution utilized an appropriate model clause issued by the [CFPB] or the Board." 15 U.S.C. § 1693m(d). Accordingly, URW argues that, by utilizing an Opt-in Form substantially similar to Model Form A-9, it is insulated from liability by the EFTA's safe-harbor provisions. (*See* Def.'s Br. at 27.)

Regarding the first provision, Burton has plausibly alleged that URW misleads consumers and uses a "secret" process to charge APSN transactions (Compl. ¶¶ 45–49), which is "enough to disqualify [URW] from using the 'good[-]faith' provision." *Adams*, 2021 WL 3726007, at *6. With respect to the second safe-harbor provision, its applicability depends on whether the provision insulates credit unions from liability from improper *modes* of disclosure, improper *substance* of the disclosure, or both. URW argues that the EFTA protects financial institutions from both, while Burton argues that the statute provides a safe harbor against claims of improper procedure for the disclosure, not deficient content. (*See* Def.'s Br. at 27; Pl.'s Opp'n at 23–24.)

Courts differ as to the scope of this second safe-harbor provision. As Burton correctly points out, some courts have held that the provisions protect only against claims that attack the procedure by which a financial institution disclosed its policies, not against "claims based

on [a] failure to make adequate disclosures." *Tims*, 935 F.3d at 1244–45; *see also Walbridge*, 299 F. Supp. 3d at 349; *Berenson v. Nat'l Fin. Servs., LLC*, 403 F. Supp. 2d 133, 151 (D. Mass. 2005). (*See* Pl.'s Opp'n at 28–30.) Others, however, have determined that the provisions also protect against claims concerning the adequacy of the disclosure's content. In *Adams v. Liberty Bank*, for example, the District of Connecticut opined that "the best reading of the word 'form' means the content of the disclosure," and thus, the safe-harbor provisions also protect financial institutions "from claims arising out of a failure to use particular 'words, phrases, and sentences' in a disclosure . . . if the bank 'utilized an appropriate model' clause[.]" 2021 WL 3726007, at *6. But the *Adams* court cautioned that

> the second safe[-]harbor provision requires more than just use of a model clause; the financial institution must use an '*appropriate* model clause.' . . . The safe[-]harbor provision thus requires that the model clause selected be 'suitable' for 'describing the institution's overdraft service' in a 'clear and readily understandable manner.' . . . Not all model clauses are 'suitable' for each institution and its policies.

*Id.* at *7. Therefore, under the line of cases that read subsection (2) of the safe-harbor provision to insulate inadequate disclosures, the financial institution's choice of "model clause must be 'appropriate' in the sense that it must provide a 'clear and readily understandable' description of the . . . overdraft service" of the financial institution. *Id.*; *see also Monroe v. Anderson Bros. Bank*, No. 4:25-cv-06007-JD, 2025 WL 3470728, at *5 (D.S.C. Dec. 3, 2025) ("[T]he safe[-]harbor applies only when a model clause 'accurately reflects' the institution's overdraft practices."); Official Staff Interpretations, 12 C.F.R. § 205 Supp. I App'x A § 3 ("The use of appropriate clauses in making disclosures will protect a financial institution from liability . . . . provided the clauses accurately reflect the institution's [electronic fund transfer] services.").

The court finds the *Adams* court's reasoning persuasive and adopts its holding; that is, in this context, URW must have chosen appropriate model clauses that provide a clear and understandable description of its overdraft services to be shielded from Burton's claim challenging the adequacy of the Opt-In Form's language. To be sure, URW did use a set of model clauses provided by the CFPB—in fact, its Opt-In Form appears to be substantially similar to Model Form A-9. (*See* Def.'s Br., Ex. 2.) But Burton still alleges that the language of the Form did not reasonably describe its overdraft policies, such that she could not knowingly and affirmatively opt-in to URW's services. (*See* Compl. ¶ 104.) *See also Adams*, 2021 WL 3726007, at *8 ("While [defendant] did use language from the Model Form A-9, [plaintiff] plausibly alleges that use of the form, by itself, was not 'appropriate' because the language did not describe [defendant's] overdraft program in a 'clear and readily understandable' way.") This allegation is made more plausible by the Opt-In Form's omission of crucial information that URW determines overdraft fees at settlement or that APSN transactions incur fees, as described above. Therefore, because her allegations call into question whether URW used the appropriate model clauses to effectuate the purposes of Regulation and the EFTA, the safe-harbor provisions do not shield URW from Burton's claim at this early stage.

### 2. Causation

Finally, URW makes a passing reference to Burton's purported failure to allege causation, arguing that she did not specifically allege that she read the Opt-In Form, relied on the language therein, and sustained injury. (*See* Def.'s Br. at 28.) In other words, URW argues that, without these allegations, Burton cannot allege that a better explanation of the policy would have made any difference. This argument, like the others, fails.

At the threshold, the court finds URW's argument premature. In general, "a fact-intensive inquiry [into causation] is generally ill-suited for resolution at the pleading stage." *Currie v. Wells Fargo Bank, N.A.*, 950 F. Supp. 2d 788, 797 (D. Md. 2013). In any event, previous courts have rejected similar arguments about causation in Regulation E and EFTA claims. In *Monroe*, the court recognized that

> Regulation E contains no reliance requirement. The statute imposes a bright-line rule: a financial institution may not assess an overdraft fee on an ATM or one-time debit[-]card transaction unless it has first provided a compliant disclosure and obtained the consumer's affirmative consent. 12 C.F.R. § 1005. 17(b)(1). A violation occurs at the moment the fee is assessed without valid opt-in consent, regardless of whether the consumer relied on the disclosure. Plaintiff's allegations that Defendant assessed overdraft fees without securing informed consent under a compliant disclosure are, therefore, sufficient to state a claim.

*Monroe*, 2025 WL 3470728, at *5 n.2. Burton has done so here, alleging that URW's Opt-In Form, as written, precluded her ability to provide affirmative consent to the overdraft policy, yet she was assessed overdraft fees on one-time debit-card transactions.[9] (*See* Compl. ¶¶ 104, 110–12.) Therefore, her allegations are sufficient to state a claim under Regulation E.

## B. Breach-of-contract claim

Burton alleges that the Contract misrepresents URW's overdraft practices; by allegedly employing processes that differ from that Contract, Burton asserts that URW breached the Contract with its members. Specifically, Burton alleges that the Contract states that it will not

---

[9] In her Complaint, Burton alleges that she is an accountholder with URW, that she contracted for banking services using URW's Contract and Opt-In Form, and she was assessed overdraft fees on debit-card transactions. (*See* Compl. ¶¶ 4, 110–11, 128.) Therefore, even if Burton were required to allege causation, the court could reasonably infer her reliance on the Opt-In Form. *See E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 450 (4th Cir. 2011) (noting that "all reasonable inferences" are taken in the plaintiff's favor when ruling on a motion to dismiss).

charge overdraft fees on purchases made with sufficient funds; however, URW charges overdraft fees on APSN transactions—transactions that were authorized on sufficient funds—without an unambiguous explanation of how or why. (*See* Compl. ¶¶ 35, 40.) In response, URW argues that its Contract and Opt-In Form, when considered together,[10] unambiguously permit it to charge overdraft fees on APSN transactions, which is merely "an agreed-upon consequence" of Burton and similarly situated class members overspending their accounts. (Def.'s Br. at 2.) Again, the court agrees with Burton.

To state a claim for breach of contract in Virginia, a plaintiff must allege "(1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation." *Filak v. George*, 594 S.E.2d 612, 619 (Va. 2004). The first and third elements are satisfied here, as the parties do not dispute that there is a legally enforceable obligation between Burton and URW, and Burton has plausibly alleged injury—that is, that she incurred overdraft fees on APSN transactions on multiple occasions. (*See* Compl. ¶¶ 110–12; Def.'s Br. at 13 ("There is no dispute that a contract exists between URW and [Burton.]").) Therefore, the court focuses primarily on the second element: URW's alleged violation of its contractual obligations.

---

[10] URW's Contract and Opt-In Form are both relevant to the breach-of-contract claim. *See Sec'y of State for Def. v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007) ("[A court] may consider documents attached to the complaint, as well as those attached to the motion to dismiss, so long as they are integral to the complaint and authentic."); *Alexander v. Provident Life & Acc. Inc. Co.*, 153 F.3d 718, at *3 (4th Cir. 1998) (unpublished) ("In determining as a matter of law that a contract is ambiguous, we 'may determine evidence extrinsic to the contract.'" (quoting *Bailey v. Blue Cross & Blue Shield of Va.*, 67 F.3d 53, 57 (4th Cir. 1995))). While the Opt-In Form is relevant to Burton's breach-of-contract claim, the court has already determined above that the Opt-In Form is ambiguous in its description of URW's overdraft policies. Therefore, the court focuses primarily on the language of URW's Contract in this analysis.

When a plaintiff alleges ambiguity as the basis of a defendant's violation of a contractual duty, as Burton has done here, courts consider whether the language "may be understood in more than one way or when it refers to two or more things at the same time." *Robinson-Huntley v. George Washington Carver Mut. Homes Ass'n, Inc.*, 756 S.E.2s 415, 418 (Va. 2014). If a plaintiff plausibly identifies ambiguity, the contract language is interpreted against the drafter. *Res. Bankshares Corp. v. St. Paul Mercury Ins. Co.*, 407 F.3d 631, 635 (4th Cir. 2005) (applying Virginia law); *Hoffman v. Daimler Trucks N. Am., LLC*, 940 F. Supp. 2d 347, 359 (W.D. Va. 2013). "Dismissal on a motion for failure to state a claim is inappropriate prior to consideration of evidence to resolve contractual ambiguities." *Garrett*, 2024 WL 3928888, at \*6.

Here, the ambiguity does not center on whether URW charges overdraft fees on APSN transactions; that much is undisputed.[11] (*See generally* Compl.; Def.'s Br. at 9–11.) Burton alleges, however, that URW's Contract does not unambiguously describe its process of charging overdraft fees at settlement, which is a key aspect of an APSN transaction. (*See* Compl. ¶ 36.) To the contrary, she alleges that the language of the Contract—like the Opt-in Form—suggests that URW actually determines overdrafts at authorization. (*See id.*; Pl.'s Opp'n at 5, 9–11.) As with Regulation E claims, courts have found that contractual language connecting the terms "authorization" and "pay" is ambiguous when, in actuality, overdraft fees are assessed at settlement and may constitute a basis for a breach-of-contract claim. *See, e.g.*, *Lamoureux v. Trustco Bank*, 592 F. Supp. 3d 14, 21 (N.D.N.Y. 2022) (concluding that language connecting "authorize and pay" suggested that the defendant determined overdraft

---

[11] As discussed above, while URW may authorize a consumer's transaction on sufficient funds, the transaction may not settle until days later. Because URW assesses overdraft fees at settlement, if the transaction settles into a negative account, *i.e.*, becomes an APSN transaction, URW may charge an overdraft fee on that transaction.

fees at authorization rather than at settlement); *Roberts v. Capital One, N.A.*, 719 F. App'x 33, 36 (2d Cir. 2017); *cf. Lussoro v. Ocean Fin. Fed. Credit Union*, 456 F. Supp. 3d 474, 485 (E.D.N.Y. 2020) ("The Contract does not use the terms 'authorization' or 'settlement' to help explain when an overdraft fee can be imposed, [and] it does not link the concepts of authorization or settlement to the mechanics of when an overdraft fee is assessed[.]").

Moreover, contractual language that underscores that a financial institution has discretion to pay overdrafts, without more, does not clearly convey to consumers that overdraft fees are assessed at settlement rather than at authorization. *See Roberts*, 719 F. App'x at 35–36 (reversing district court's dismissal of complaint because the bank's contract stating that it assessed overdraft fees when it "elect[s] to pay" transactions is ambiguous and could reasonably mean authorization *or* settlement, and therefore, "dismissal was improper"); *Burns v. TD Bank, N.A.*, No. 1:21-cCV-18194-KMW-AMD, 2022 WL 17547258, at *6 (D.N.J. Dec. 8, 2022) (concluding that since defendant's contract expressed its discretion to authorize or decline a transaction at the authorization phase, it "suggest[ed] that an overdraft could ostensibly occur at the authorization phase"); *Precision Roofing of N. Fla., Inc. v. CenterState Bank*, No. 3:20-cv-352-J-39JRK, 2021 WL 3036354, at *2 (M.D. Fla. Feb. 22, 2021) (holding that contract language stating that bank had discretion to honor transactions that overdrew an account and assess related fees implied overdraft assessment at authorization just as reasonably as it implied assessment at settlement).

Here, the Contract (as well as the Opt-In Form) contains several, similar examples of language that reasonably convey that overdraft fees are assessed when URW pays, allows, or declines the transaction and that URW has the discretion to pay overdraft fees. (Def.'s Br., Ex.

1, at 11, 13; *id.*, Ex. 2 (stating, *e.g.*, that if URW does not pay an overdraft, the consumer's transaction may be declined at URW's discretion; that URW may pay or allow transactions for payments on insufficient funds; that an overdraft occurs if an account has insufficient funds but URW "elect[s] to pay it anyway"; and that it "authorize[s] and pay[s] overdrafts").) Because URW's decision to accept or decline a debit card transaction is confined to the authorization stage (*see* Compl. ¶ 32), this contractual language reasonably connects URW's assessment of overdraft fees to when it decides to pay or authorize a transaction; or, put differently, the language fails to clearly convey to the consumer that overdraft fees are assessed at settlement. *See, e.g.*, *Lamoureux*, 592 F. Supp. 3d at 21. This language is ambiguous, at best, in its description of a key component of URW's overdraft policy, *i.e.*, that APSN transactions may incur overdraft fees when the initially authorized transaction settles into a negative account.[12]

The Contract and Opt-In Form provides that URW has discretion to honor transactions or withdrawals that overdraw an account; that URW does not "guarantee that [it] will always authorize and pay any type of transaction"; and that URW assesses overdrafts when it "elects to pay." All of this implies that it assesses overdraft fees at authorization—the only stage at which it may exercise discretion to accept or decline a transaction. (Def.'s Br., Ex. 2;

---

[12] Viewed in another light, URW's Contract language is misleading as to when URW assesses overdraft fees. As Burton argues, URW's Contract states that it uses the available-balance method to track a consumer's spending. (*See* Compl. ¶¶ 19–24.) During this process, URW authorizes transactions on sufficient funds, places a hold on, or "sets aside," the money to cover that transaction, and reduces the consumer's available balance by the corresponding amount (*id.*); therefore, Burton alleges that the transaction should not and cannot overdraw the account at settlement or incur overdraft fees (*id.* ¶¶ 37, 69; *see also* Pl.'s Opp'n at 9–10). But because URW assesses fees at settlement, URW does what it says it would not—assesses overdraft fees on sufficient-funds transactions. (*Id.*) These allegations constitute another plausible theory supporting Burton's breach-of-contract claim. *See, e.g.*, *Hash v. First Fin. Bancorp*, No. 1:20-cv-1321 RLM-MJD, 2021 WL 859736, at *4 (S.D. Ind. Mar. 8, 2021) ("Using the available[-]balance to determine overdrafts implies that overdrafts are determined at authorization, not settlement.").

*see also id.*, Ex. 1 at 11.) *See Roberts*, 719 F. App'x at 35–36; *Burns*, 2022 WL 17547258, at *6; *Precision Roofing*, 2021 WL 3036354, at *2. Construing the language in the Contract against URW, Burton has plausibly alleged ambiguity in the material contractual terms and, thus, dismissal of her Complaint is inappropriate at this stage. *See Garrett*, 2024 WL 3928888, at *6; *Fludd v. S. St. Bank*, 566 F. Supp. 3d 471, 488 (D.S.C. 2021) (finding that the meaning of a term in bank's contract was a material ambiguity that would need to be resolved by a factfinder beyond the motion to dismiss stage).

URW argues that its Contract unambiguously conveys to the consumer that it "will determine whether a debit[-]card transaction is subject to an overdraft fee at the time the merchant requests the item be paid." (Def.'s Br. at 14.) In support, it cites several provisions of its Contract, including:

> If a check or other transfer or payment order is *presented* against insufficient available funds in an account, we will require a service charge.
> . . . .
> Your available balance is generally equal to the actual balance, less the amount of any holds placed on recent deposits, holds placed for other reasons, and holds for pending transactions (such as debit card purchases) we have authorized but have not yet *posted* to the account. If an item *presented* for payment against the account exceeds the available balance, we will treat it as *presented* against insufficient funds even if the actual balance exceeds the amount of the item[.]
> . . . .
> In general, we pay checks and other transactions in the order they are *presented* to us, regardless of when you issued or authorized them . . . . You understand that the merchant or its processor determines when the transaction will be transmitted to us.

(Def.'s Br. at Ex. 1 at 11, 13 (emphasis added); *see also* Def.'s Reply at 4–5 [ECF No. 15].)

Insofar as URW argues that the terms "presentment" and "posted" unambiguously convey that overdraft fees are assessed at *settlement*, it misses the mark. Most courts have rejected this exact argument, holding that these terms lack a plain meaning and "can be interpreted to mean that a transaction is 'posted' and 'presented' at authorization, not . . . only at settlement." *Va. is for Movers*, 720 F. Supp. 3d at 438; *see also Roberts*, 719 F. App'x at 37 at 43; *Lussoro*, 456 F. Supp. 3d at 483. Likewise, these terms (and even the longer contractual provisions cited above) fail to give consumers a clear or commonsensical idea of when overdraft fees are assessed. To be sure, URW states that it pays transactions at the whim of the merchant, which "determines when the transaction" is transmitted,[13] but this phrase is far from defining "presented" or "posted" in this context (and, instead, introduces an inconsistent term: "transmitted"). *See BP Products N. Am., Inc. v. Stanley*, 669 F.3d 184, 190 (4th Cir. 2012) ("Under Virginia law, terms in a contract will be interpreted in light of the context in which they appear."); 11 Williston on Contracts § 32.6 (4th ed. 2025) ("Generally, a word used by the parties in one sense will be given the same meaning throughout the contract in the absence of countervailing reasons."); *Speechly Bircham, LLP v. Miller*, No. 8:10-cv-03041-AW, 2012 WL 4341574, at *5 (D. Md. Sep. 20, 2012) ("[I]t is well-established that contractual terms should be given the same meaning throughout the contract."). At bottom, the language of the Contract—and the Opt-in Form, for that matter—causes differing interpretations of what the

---

[13] URW also argues that the delay between a consumer's transaction and the time a merchant transmits the request for payment is a partial cause of the consumer's incurrence of fees on APSN transactions. (*See* Def.'s Mot. at 17 ("[I]f the member is incurring a fee even though the transaction authorized positive, the fee was caused by the merchant's delay in presenting it for payment, and the member's other intervening authorized transactions which caused the account to become negative.").) In any event, the court finds this argument largely irrelevant, because the merchant's delay between authorization and settlement does not bear on the true question at hand: whether URW ambiguously described its overdraft policy in its Contract.

agreements mean; therefore, Burton has stated a plausible claim for breach of contract based on ambiguous terms. *See Garrett*, 2024 WL 392888, at *7 (denying motion to dismiss because the plaintiff and defendant reasonably disagreed on the meaning of the terms of the agreement relating to APSN transactions, which created a factual dispute).

Because the court concludes that Burton states a claim under both Regulation E and a breach-of-contract theory, the court will deny URW's motion, consistent with the disposition of numerous federal district courts in near-identical contexts. *See, e.g.*, *Va. is for Movers*, 720 F. Supp. 3d at 450 (EFTA and breach-of-contract claims); *Jones v. Bankers Tr. Co.*, 748 F. Supp. 2d 692, 705, 707 (S.D. Iowa 2024) (EFTA and breach-of-contract claims); *Lamoureux*, 592 F. Supp. 3d at 36 (breach-of-contract claim); *Fludd*, 566 F. Supp. 3d at 490 (EFTA and breach-of-contract claims); *Lussoro*, 456 F. Supp. 3d at 48, 496 (EFTA and breach-of-contract claims); *Walker v. People's United Bank*, 305 F. Supp. 3d 365, 375–76 (D. Conn. 2018) (EFTA and breach-of-contract claims); *Walbridge*, 299 F. Supp. 3d at 346–47 (breach-of-contract claim); *Monroe*, 2025 WL 3470728, at *5–6 (EFTA claim); *Garrett*, 2024 WL 392888, at *9 (EFTA and breach-of-contract claims); *Burns*, 2022 WL 17547258, at *9 (breach-of-contract claim); *Adams*, 2021 WL 3726007, at *8 (EFTA claim); *Hash*, 2021 WL 859736, at *5–7 (breach-of-contract claim); *Precision Roofing*, 2021 WL 3036354, at *3 (breach-of-contract claim); *Hinton*, 2020 WL 9348205, at *3 (EFTA claim); *Smith*, 2017 WL 3597522, at *9 (EFTA and breach-of-contract claims).

## IV.   CONCLUSION

For the reasons discussed above, the court will deny URW's motion to dismiss.

The Clerk is directed to forward a copy of this Memorandum Opinion and accompanying Order to the parties.

**ENTERED** this 20th day of March, 2026.

*/s/ Thomas T. Cullen*
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE