**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**DANVILLE DIVISION**

DONNA BURTON, on behalf of herself and
all others similarly situated,

　　　　　Plaintiff,

　　　v.

URW COMMUNITY FEDERAL CREDIT
UNION,

　　　　　Defendant.

Case No. 4:25CV00033

**DEFENDANT'S ANSWER AND AFFIRMATIVE DEFENSES**
**TO PLAINTIFF'S CLASS ACTION COMPLAINT**

Defendant, URW Community Federal Credit Union ("Defendant"), by its attorneys Gordon
Rees Scully Mansukhani, LLP, submits its Answer and Affirmative Defenses to the Class Action
Complaint of Plaintiff Donna Burton ("Plaintiff"), as follows:

**INTRODUCTION**

1.　　　This case concerns Defendant's unlawful business practice of assessing $25
overdraft fees ("OD Fees") on (1) debit card transactions authorized on sufficient funds and (2)
ATM and one-time debit card transactions.

**ANSWER:**　　The allegations in Paragraph 1 contain legal conclusions to which no answer is
required. To the extent a response is required, Defendant denies the allegations.

2.　　　These practices breach promises made in Defendant's adhesion contract, which
includes the Contract (attached hereto as **Ex. A**) and the Overdraft Services and Fees Notice
(attached hereto as **Ex. B**) (collectively, the "Contract").

**ANSWER:**　　Defendant denies the allegations in Paragraph 2.

1

3.     Plaintiff and other Defendant customers have been injured by Defendant's improper fee maximization practices. Plaintiff, individually, and on behalf of the classes of individuals preliminarily defined below, brings claims for Defendant's breach of contract, including breach for the duty of good faith and fair dealing, and violations of the Electronic Fund Transfers Act (Regulation E) 12 C.F.R. § 1005 et seq. (authority derived from 15 U.S.C. § 1693 et seq.)).

**ANSWER:**    Defendant denies the allegations in Paragraph 3.

## PARTIES

4.     Plaintiff is a citizen of Virginia and a resident of Danville, Virginia. Plaintiff has had a checking account with Defendant at all times hereto.

**ANSWER:**    Defendant admits that Plaintiff has a checking account with it. Defendant lacks sufficient knowledge and information to either admit or deny the remaining allegations in Paragraph 4 and accordingly denies the same.

5.     Defendant URW Community Federal Credit Union is a credit union with more than $225 million in assets. Defendant maintains its headquarters and principal place of business in this District in Danville, VA. Defendant is engaged in the business of providing retail banking services to consumers, including Plaintiff and members of this Classes, in this District.

**ANSWER:**    Defendant admits that it is headquartered in Danville, Virginia. Defendant denies the remaining allegations in Paragraph 5.

## JURISDICTION AND VENUE

6.     This Court has original jurisdiction under 28 U.S.C. §§ 1331 because this case involves a federal question as Plaintiff alleges violations of the Electronic Fund Transfers Act (Regulation E) 12 C.F.R. § 1005 *et seq.* (authority derived from 15 U.S.C. § 1693 *et seq.*)).

**ANSWER:**    The allegations in Paragraph 6 contain legal conclusions to which no answer is required. To the extent a response is required, Defendant denies the allegations.

7.      Furthermore, this Court has supplemental jurisdiction over Plaintiff's claim for breach of contract, including breach of the duty of good faith and fair dealing, because it is so related to Plaintiff's claim for violations of the Electronic Fund Transfers Act (Regulation E) that it forms part of the same case or controversy under Article III of the United States Constitution.

**ANSWER:**    The allegations in Paragraph 7 contain legal conclusions to which no answer is required. To the extent a response is required, Defendant denies the allegations.

8.      This Court has personal jurisdiction over the Defendant because it resides in, regularly conducts and/or solicits business in, engages in other persistent courses of conduct in, and/or derives substantial revenue from products and/or services provided to persons in this District and in Virginia.

**ANSWER:**    Defendant admits that it conducts business in the state of Virginia. The remaining allegations in Paragraph 8 contain legal conclusions to which no answer is required. To the extent a response is required, Defendant denies the allegations.

9.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District—where Defendant maintains its headquarters and where Plaintiff conducts banking business with Defendant.

**ANSWER:**    The allegations in Paragraph 9 contain legal conclusions to which no answer is required. To the extent a response is required, Defendant denies the allegations.

### BACKGROUND FACTS

10.     Overdraft fees and insufficient funds fees ("NSF Fees") are among the primary fee generators for financial institutions. In 2021, the largest financial institutions in America charged customers almost $11 billion in overdraft fees. Customers who carried an average balance of less than $350 paid 84 percent of these fees. *Why Poverty Persists in America*, N.Y. TIMES (Mar. 9, 2023), https://tinyurl.com/26jcrfcm.

**ANSWER:**    Defendant lacks sufficient knowledge and information to either admit or deny the allegations in Paragraph 10 and accordingly denies the same.

11.    Unfortunately, the customers who are assessed these fees are the most vulnerable customers. Younger, lower-income, and non-white accountholders are among those who were more likely to be assessed overdraft fees. *Overdrawn: Consumer Experiences with Overdraft*, PEW CHARITABLE TRUSTS 8 (June 2014), https://bit.ly/3ksKD0I.

**ANSWER:**    Defendant lacks sufficient knowledge and information to either admit or deny the allegations in Paragraph 11 and accordingly denies the same.

12.    Because of this, industry leaders like Capital One and Citi stopped assessing OD and NSF Fees entirely. *See* Hugh Son, *Capital One to Drop Overdraft Fees for All Retail Banking Customers*, NBC NEWS (Dec. 1, 2021), https://nbcnews.to/3DKSu2R; *Banking with No Overdraft Fees*, CAPITAL ONE, https://tinyurl.com/4x7ffjvf (last accessed July 10, 2023); Matt Egan, *Citi is the First Mega Bank to Kill Overdraft Fees*, CNN BUS. (Feb. 24, 2022), https://tinyurl.com/48859b3x. Smaller institutions have followed suit and likewise stopped charging OD and NSF Fees. *See, e.g.*, *You Should Never Pay Overdraft Fees Again*, ALLIANT CREDIT UNION, https://tinyurl.com/2h9fasas (last accessed July 24, 2023); *No Overdraft Fees. More Overdraft Coverage*, ALLY BANK, https://www.ally.com/overdraft/ (last accessed July 24, 2023).

**ANSWER:**    Defendant lacks sufficient knowledge and information to either admit or deny the allegations in Paragraph 12 and accordingly denies the same.

13.    Federal regulators have also taken action. For example, the Consumer Financial Protection Bureau ("CFPB") ordered Regions Bank to pay $141 million to reimburse consumerfor OD Fees on debit card transactions authorized on sufficient funds, noting such fees result from "counter-intuitive, complex processes" and finding them to be "unfair" and "abusive" in violation

of federal law. Consent Order, *In the Matter of: Regions Bank*, No. 2022-CFPB-0008 ¶¶ 4, 32, 34, 38 (Sept. 28, 2022) (Dkt. 1), https://bit.ly/3vGDdyx.

**ANSWER:**    Defendant lacks sufficient knowledge and information to either admit or deny the allegations in Paragraph 13 and accordingly denies the same.

14.    The Federal Reserve has likewise found that OD Fees on debit card transactions authorized on sufficient funds is an "unfair or deceptive" in violation of federal law and advised financial institutions to "[r]efrain from assessing unfair overdraft fees on POS transactions when they post to consumers' accounts with insufficient available funds after having authorized those transactions based on sufficient available funds." *Consumer Compliance Supervision Bulletin: Highlights of Current Issues in Federal Reserve Board Consumer Compliance Supervision*, Fed. Reserve Bd. 12, 13 (July 2018), https://tinyurl.com/44dvnd65.

**ANSWER:**    Defendant admits that the allegations in Paragraph 14 accurately quote an excerpt from the cited material. Defendant denies the remaining allegations in Paragraph 14.

15.    In line with this industry trend, the New York Attorney General recently asked other industry leading banks to end the assessment of all OD Fees by the summer of 2022. *NY Attorney General asks banks to end overdraft fees*, Elizabeth Dilts Marshall, Reuters (April 6, 2022).

**ANSWER:**    Defendant lacks sufficient knowledge and information to either admit or deny the allegations in Paragraph 15 and accordingly denies the same.

16.    Through the imposition of these fees, Defendant has made substantial revenue to the tune of tens of millions of dollars, seeking to turn its customers' financial struggles into revenue.

**ANSWER:**    Defendant denies the allegations in Paragraph 16.

**I. DEFENDANT ASSESSES OVERDRAFT FEES ON DEBIT CARD TRANSACTIONS THAT WERE AUTHORIZED ON SUFFICIENT FUNDS.**

17.     Plaintiff brings this action challenging Defendant's practice of charging Overdraft Fees on what are referred to in this complaint as "Authorize Positive, Settle Negative Transactions," or "APSN Transactions."

**ANSWER:**    The allegations in Paragraph 17 contain legal conclusions to which no answer is required. To the extent a response is required, Defendant denies the allegations.

18.     Defendant's practice is as follows: the moment debit card transactions are authorized on an account with positive funds to cover the transaction, Defendant immediately reduces consumers' checking accounts for the amount of the purchase, sets aside funds in the checking account to cover that transaction, and adjusts the consumer's displayed "available balance" to reflect that subtracted amount. As a result, customers' accounts will always have sufficient funds available to cover these transactions because Defendant has already held the funds for payment.

**ANSWER:**    Defendant denies the allegations in Paragraph 18.

19.     However, Defendant still assesses crippling Overdraft Fees on many of these transactions and misrepresents its practices in the Contract.

**ANSWER:**    Defendant admits that it charges overdraft fees when a transaction is paid despite insufficient funds. Defendant denies the remaining allegations in Paragraph 19.

20.     Despite putting aside sufficient available funds for debit card transactions at the time those transactions are authorized, Defendant later assesses Overdraft Fees on those same transactions when they settle days later into a negative balance. These types of transactions are APSN Transactions.

**ANSWER:**    Defendant denies the allegations in Paragraph 20.

21.     Defendant maintains a running account balance, tracking funds consumers have for immediate use. This running account balance is adjusted, in real-time, to account for debit card transactions at the precise instance they are made. When a customer makes a purchase with a debit

6

card, Defendant holds the funds needed to pay the transaction, subtracting the dollar amount of the

transaction from the customer's available balance. Such funds are not available for any other use

by the account holder and are specifically reserved for a given debit card transaction.

**ANSWER:**    Defendant denies the allegations in Paragraph 21.

22.    Indeed, the entire purpose of the immediate debit and hold of positive funds is to

ensure that there are enough funds in the account to pay the transaction when it settles:

> When a consumer uses a debit card to make a purchase, a hold may be placed on funds in the consumer's account to ensure that the consumer has sufficient funds in the account when the transaction is presented for settlement. This is commonly referred to as a "debit hold." During the time the debit hold remains in place, which may be up to three days after authorization, those funds may be unavailable for the consumer's use for other transactions.

Federal Reserve Board, Office of Thrift Supervision, and National Credit Union Administration,

Unfair or Deceptive Acts or Practices, 74 FR 5498 (Jan. 29, 2009).

**ANSWER:**    Defendant admits that the allegations in Paragraph 22 accurately quote an excerpt from the cited material. Defendant denies the remaining allegations in Paragraph 22.

23.    That means when any subsequent, intervening transactions are initiated on a

checking account, they are compared against an account balance that has already been reduced to

account for pending debit card transactions. Therefore, many subsequent transactions incur

Overdraft Fees due to the unavailability of the funds held for earlier debit card transactions.

**ANSWER:**    Defendant denies the allegations in Paragraph 23.

24.    Still, despite always reserving sufficient available funds to cover the transactions

and keeping the held funds off-limits for other transactions, Defendant improperly charges

Overdraft Fees on APSN Transactions.

**ANSWER:**    Defendant denies the allegations in Paragraph 24.

25.     The Consumer Financial Protection Bureau ("CFPB") has expressed concern with

this very issue, flatly calling the practice "unfair" and/or "deceptive" when:

> [A] financial institution authorized an electronic transaction, which reduced a customer's available balance but did not result in an overdraft at the time of authorization; settlement of a subsequent unrelated transaction that further lowered the customer's available balance and pushed the account into overdraft status; and when the original electronic transaction was later presented for settlement, because of the intervening transaction and overdraft fee, the electronic transaction also posted as an overdraft and an additional overdraft fee was charged. Because such fees caused harm to consumers, one or more supervised entities were found to have acted unfairly when they charged fees in the manner described above. Consumers likely had no reason to anticipate this practice, which was not appropriately disclosed. They therefore could not reasonably avoid incurring the overdraft fees charged. Consistent with the deception findings summarized above, examiners found that the failure to properly disclose the practice of charging overdraft fees in these circumstances was deceptive.
>
> At one or more institutions, examiners found deceptive practices relating to the disclosure of overdraft processing logic for electronic transactions. Examiners noted that these disclosures created a misimpression that the institutions would not charge an overdraft fee with respect to an electronic transaction if the authorization of the transaction did not push the customer's available balance into overdraft status. But the institutions assessed overdraft fees for electronic transactions in a manner inconsistent with the overall net impression created by the disclosures. Examiners therefore concluded that the disclosures were misleading or likely to mislead, and because such misimpressions could be material to a reasonable consumer's decision-making and actions, examiners found the practice to be deceptive. Furthermore, because consumers were substantially injured or likely to be so injured by overdraft fees assessed contrary to the overall net impression created by the disclosures (in a manner not outweighed by countervailing benefits to consumers or competition), and because consumers could not reasonably avoid the fees (given the misimpressions created by the disclosures), the practice of assessing the fees under these circumstances was found to be unfair.

Consumer Financial Protection Bureau, "Supervisory Highlights" (Winter 2015).

**ANSWER:**     Defendant admits that the allegations in Paragraph 25 accurately quote an excerpt from the cited material. Defendant denies the remaining allegations in Paragraph 25.

26.     There is no justification for these practices, other than to maximize Defendant's

Overdraft Fee revenue. APSN Transactions only exist because intervening transactions supposedly

reduce an account balance. But Defendant is free to protect its interests and either reject those

intervening transactions or charge Overdraft Fees on those intervening transactions—and it does the latter to the tune of millions of dollars each year.

**ANSWER:**    Defendant denies the allegations in Paragraph 26.

27.    But Defendant was not content with these millions in Overdraft Fees. Instead, it sought millions more in Overdraft Fees on APSN Transactions.

**ANSWER:**    Defendant denies the allegations in Paragraph 27.

28.    Besides being deceptive, unfair, and unconscionable, these practices breach contract promises made in Defendant's adhesion contracts, which fundamentally misconstrue and mislead consumers about the true nature of Defendant's processes and practices. Defendant also exploits its contractual discretion by implementing these practices to gouge its customers.

**ANSWER:**    Defendant denies the allegations in Paragraph 28.

   **i.    Mechanics of a Debit Card Transaction**

29.    A debit card transaction occurs in two parts. First, authorization for the purchase amount is instantaneously obtained by the merchant from Defendant. When a customer physically or virtually "swipes" their debit card, the credit card terminal connects, via an intermediary, to Defendant, which verifies that the customer's account is valid and that sufficient available funds exist to cover the transaction amount.

**ANSWER:**    Defendant admits that authorization occurs for certain debit card transactions. Defendant denies the remaining allegations in Paragraph 29.

30.    At this step, if the transaction is approved, Defendant immediately decrements the funds in a consumer's account and holds funds in the amount of the transaction but does not yet transfer the funds to the merchant.

**ANSWER:**    Defendant denies the allegations in Paragraph 30.

31.    Sometime thereafter, the funds are actually transferred from the customer's account to the merchant's account.

**ANSWER:**    Defendant admits that, for certain debit card transactions, the funds are transferred to the merchant when the merchant presents the item for payment sometime after the initial authorization. Defendant denies the remaining allegations in Paragraph 31.

32.    Defendant (like all banks and credit unions) decides whether to "pay" debit card transactions at authorization. For debit card transactions, that moment of decision can only occur at the point of sale, when the transaction is authorized or declined. It is at that point—and only that point—that Defendant may choose to either pay the transaction or to decline it. When the time comes to actually transfer funds for the transaction to the merchant, it is too late for the bank to deny payment—the bank has no discretion and must pay the charge. This "must pay" rule applies industry wide and requires that, once a financial institution authorizes a debit card transaction, it "must pay" it when the merchant later makes a demand, regardless of other account activity. See Electronic Fund Transfers, 74 Fed. Reg. 59033-01, 59046 (Nov. 17, 2009).

**ANSWER:**    Defendant admits that authorization occurs for certain debit card transactions and Defendant may decline a debit card transaction under certain circumstances, including if there are insufficient available funds. To the extent the remaining allegations contain facts related to Defendant, Defendant denies the allegations in Paragraph 32.

33.    There is no change—no impact whatsoever—to the available funds in an account when transfer step occurs.

**ANSWER:**    Defendant denies the allegations in Paragraph 33.

### ii.    Defendant's Opt-In Form and Contract

34.    The Opt-In Form states:

An overdraft occurs when you do not have enough money in your account to cover either a check or electronic fund transfer transaction (such as with your debit card), but we elect to pay it anyway.

Ex. B.

> You must have sufficient funds available in your account...to withdraw funds from your account. If a check, draft item or other transfer or payment order is presented against insufficient funds in your account, you will be charged a fee...

Ex. A at 8; *see also id.* at 11 ("If the funds in your checking account are not sufficient to pay checks, drafts or other items presented and drawn on your account, those checks, drafts and items will be covered by our overdraft procedures and any overdraft service or agreement you have with us.").

**ANSWER:**    Defendant admits that the allegations in Paragraph 34 accurately quote excerpts from Exhibits A and B to the Complaint. Defendant denies the remaining allegations in Paragraph 34.

35.    In breach of these promises, Defendant assess OD Fees when Plaintiff had "sufficient funds available" when she presented her debit card for payment of her debit card transaction. In other words, she had "enough money in your account to cover" her debit card transaction.

**ANSWER:**    Defendant denies the allegations in Paragraph 35.

36.    Defendant links payment to authorization *seven times*, indicating that transactions are paid, and therefore overdrafts are determined, at authorization:

We do *authorize and pay* overdrafts for the following types of transactions:

- Checks and other transactions made using your checking account number

- Automatic bill payments

We do not *authorize and pay* overdrafts for the following types of transactions unless you ask us to (see below):

- ATM Transactions

- Everyday debit card transactions

> We pay overdrafts at our discretion, which means we do not guarantee that we will always ***authorize and pay*** any type of transaction (which generally will occur because you have not authorized a transaction, exceeded the overdraft limit, or have an outstanding balance that has not been repaid).
> If we do not ***authorize and pay*** an overdraft, your transaction will be declined
> ...
>
> To ***authorize and pay*** overdrafts on your ATM and everyday debit card transactions
>
> If you also want us to ***authorize and pay*** overdrafts on ATM and everyday debit card transactions, call...
>
> ...
>
> I request and ***authorize you to pay*** overdrafts on my ATM and everyday debit card transactions drawn on my account(s).

Ex. B (emphasis removed and added).

**ANSWER:**   Defendant admits that the allegations in Paragraph 36 accurately quote an excerpt from Exhibit B to the Complaint. Defendant denies the remaining allegations in Paragraph 36.

37.   For APSN Transactions, which are immediately deducted from a positive account balance and held aside for payment of that same transaction, there are always sufficient funds to cover those transactions—yet Defendant assesses Overdraft Fees on them anyway.

**ANSWER:**   Defendant denies the allegations in Paragraph 37.

38.   The above promises indicate that transactions are only overdraft transactions when they are authorized and approved into a negative account balance. Of course, that is not true for APSN Transactions.

**ANSWER:**   Defendant denies the allegations in Paragraph 38.

39.   In fact, Defendant actually authorizes transactions on positive funds, sets those funds aside on hold, then fails to use those same funds to post those same transactions. Instead, it uses a secret posting process described below.

**ANSWER:**   Defendant denies the allegations in Paragraph 39.

40.    All of the above representations and contractual promises are untrue. Defendant charges fees even when sufficient funds exist to cover transactions that are authorized into a positive balance. No express language in any document states that Defendant may impose fees on any APSN Transactions.

**ANSWER:**    Defendant denies the allegations in Paragraph 40.

41.    The Contract also misconstrues Defendant's true debit card processing and overdraft practices.

**ANSWER:**    Defendant denies the allegations in Paragraph 41.

42.    First, and most fundamentally, Defendant charges Overdraft Fees on debit card transactions for which there are sufficient funds available to cover throughout their lifecycle.

**ANSWER:**    Defendant denies the allegations in Paragraph 42.

43.    Defendant's practice of charging Overdraft Fees even when sufficient available funds exist to cover a transaction violates its contractual promise not to do so. This discrepancy between Defendant's actual practice and the Contract causes consumers like Plaintiff to incur more Overdraft Fees than they should.

**ANSWER:**    Defendant denies the allegations in Paragraph 43.

44.    Next, sufficient funds for APSN Transactions are actually debited from the account immediately, consistent with standard industry practice.

**ANSWER:**    Defendant denies the allegations in Paragraph 44.

45.    Because these withdrawals take place upon initiation, the funds cannot be re-debited later. But that is what Defendant does when it re-debits the account during a secret batch posting process.

**ANSWER:**    Defendant denies the allegations in Paragraph 45.

46.    Defendant's actual practice is to assay the same debit card transaction twice to determine if it overdraws an account—both at the time a transaction of authorization and later at the time of settlement.

**ANSWER:**    Defendant denies the allegations in Paragraph 46.

47.    At the time of settlement, however, an available balance does not change at all for these transactions previously authorized into positive funds. As such, Defendant cannot then charge an Overdraft Fee on that transaction because the available balance has not been rendered insufficient due to the pseudo-event of settlement.

**ANSWER:**    Defendant denies the allegations in Paragraph 47.

48.    Upon information and belief, something more is going on: at the moment a debit card transaction is getting ready to settle, Defendant releases the hold placed on funds for the transaction for a split second, putting money back into the account, then re-debits the same transaction a second time.

**ANSWER:**    Defendant denies the allegations in Paragraph 48.

49.    This secret step allows Defendant to charge Overdraft Fees on transactions that never should have gotten them—transactions that were authorized into sufficient funds, and for which Defendant specifically set aside money to pay.

**ANSWER:**    Defendant denies the allegations in Paragraph 49.

50.    In sum, there is a huge gap between Defendant's practices as described in the Contract and Defendant's actual practices.

**ANSWER:**    Defendant denies the allegations in Paragraph 50.

51.    Banks and credit unions like Defendant that employ this abusive practice require their accountholders to expressly agree to it—something Defendant here never did.

**ANSWER:**    Defendant denies that it engages in any "abusive practice" as alleged. Defendant lacks sufficient knowledge and information to either admit or deny the allegations in Paragraph 51 regarding "Banks and credit unions like Defendant" and accordingly denies the same. Defendant denies the remaining allegations in Paragraph 51.

52.    Indeed, recognizing the complexity of the settlement process for APSN Transactions and the fact that a fee in such circumstances is counterintuitive to accountholders, other banks and credit unions require their accountholders to agree to be assessed Overdraft Fees on APSN Transactions.

**ANSWER:**    Defendant lacks sufficient knowledge and information to either admit or deny the allegations in Paragraph 52 regarding "other banks and credit unions" and accordingly denies the same. Defendant denies the remaining allegations in Paragraph 52.

53.    Defendant and its accountholders make no such agreement. The Contract thus misleads and deceives account holders.

**ANSWER:**    Defendant denies the allegations in Paragraph 53.

### iii.    Reasonable Consumers Understand Debit Card Transactions Are Debited Immediately

54.    Defendant's assessment of Overdraft Fees on transactions that have not overdrawn an account is inconsistent with immediate withdrawal of funds for debit card transactions. This is because if funds are immediately debited, they cannot be depleted by intervening, subsequent transactions. If funds are immediately debited, they are necessarily applied to the debit card transactions for which they are debited.

**ANSWER:**    Defendant denies the allegations in Paragraph 54.

55.    Defendant was and is aware that this is precisely how its accountholders reasonably understand debit card transactions work.

**ANSWER:**    Defendant denies the allegations in Paragraph 55.

56.    Defendant knows that consumers prefer debit cards for these very reasons. Consumer research shows that consumers prefer debit cards as budgeting devices because they don't allow debt like credit cards as the money comes directly out of the checking account.

**ANSWER:**    Defendant denies the allegations in Paragraph 56.

57.    Consumer Action, a national nonprofit consumer education and advocacy organization, advises consumers determining whether they should use a debit card that "[t]here is no grace period on debit card purchases the way there is on credit card purchases; the money is immediately deducted from your checking account. Also, when you use a debit card you lose the one or two days of 'float' time that a check usually takes to clear." *What Do I Need To Know About Using A Debit Card?*, ConsumerAction (Jan. 14, 2019), https://bit.ly/3v5YL62.

**ANSWER:**    Defendant admits that the allegations in Paragraph 57 accurately quote an excerpt from the cited material. Defendant denies the remaining allegations in Paragraph 57.

58.    This understanding is a large part of the reason that debit cards have risen in popularity. The number of terminals that accept debit cards in the United States has increased by approximately 1.4 million in the last five years, and with that increasing ubiquity, consumers have viewed debit cards (along with credit cards) "as a more convenient option than refilling their wallets with cash from an ATM." Maria LaMagna, *Debit Cards Gaining on Case for Smallest Purchases*, MarketWatch (Mar. 23, 2016), https://on.mktw.net/3kV2zCH.

**ANSWER:**    Defendant admits that the allegations in Paragraph 58 accurately quote an excerpt from the cited material. Defendant denies the remaining allegations in Paragraph 58.

59.    Not only have consumers increasingly substituted debit cards for cash, but they believe that a debit card purchase is the functional equivalent to a cash purchase, with the swipe of a card equating to handing over cash, permanently and irreversibly.

**ANSWER:**    Defendant lacks sufficient knowledge and information to either admit or deny the allegations in Paragraph 59 and accordingly denies the same.

60.    Accordingly, "[o]ne of the most salient themes [in complaints to the CFPB] . . . is the difficulty avoiding overdrafts even when consumers believed they would. Often, this was related to bank practices that make it difficult for consumers to know balance availability, transaction timing, or whether or not overdraft transactions would be paid or declined." Rebecca Borne et al., *Broken Banking: How Overdraft Fees Harm Consumers and Discourage Responsible Bank Products*, Center for Responsible Lending 8 (May 2016), https://bit.ly/3v7SvL1.

**ANSWER:**    Defendant admits that the allegations in Paragraph 60 accurately quote an excerpt from the cited material. Defendant denies the remaining allegations in Paragraph 60.

61.    In fact, consumers' leading complaints involved extensive confusion over the available    balance    and    the    time    of    posting    debits    and    credits:



Figure 3: Top Overdraft Consumer Complaint Issues, by Percentage of Total Complaints

*Id.*

**ANSWER:**    Defendant admits that the allegations in Paragraph 61 accurately quote an excerpt from the cited material. Defendant denies the remaining allegations in Paragraph 61.

17

62.     Consumers are particularly confused by financial institutions' fee practices when "based on their actual review of their available balance, often including any 'pending' transactions, [customers] believed funds were available for transactions they made, but they later learned the transactions had triggered overdraft fees." Id. at 9.

**ANSWER:**     Defendant admits that the allegations in Paragraph 62 accurately quote an excerpt from the cited material. Defendant denies the remaining allegations in Paragraph 62.

63.     Ultimately, unclear and misleading fee representations like those in Defendant's account documents mean that consumers like Plaintiff "who are carefully trying to avoid overdraft, and often believe they will avoid it . . . end up being hit by fees nonetheless." *Id.*

**ANSWER:**     Defendant admits that the allegations in Paragraph 63 accurately quote an excerpt from the cited material. Defendant denies the remaining allegations in Paragraph 63.

64.     The Federal Deposit Insurance Corporation ("FDIC") has specifically noted that financial institutions may effectively mitigate this wide-spread confusion regarding overdraft practices by "ensuring that any transaction authorized against a positive available balance does not incur an overdraft fee, even if the transaction later settles against a negative available balance." *Consumer Compliance Supervisory Highlights*, FDIC 3 (June 2019), https://bit.ly/3t2ybsY.

**ANSWER:**     Defendant admits that the allegations in Paragraph 64 accurately quote an excerpt from the cited material. Defendant denies the remaining allegations in Paragraph 64.

65.     Despite this recommendation, Defendant continues to assess Overdraft Fees on transactions that are authorized on sufficient funds.

**ANSWER:**     Defendant denies the allegations in Paragraph 65.

66.     Defendant was aware of the consumer perception that debit card transactions reduce an account balance at a specified time—namely, the time and order the transactions are actually initiated—and the Contract only supports this perception.

18

**ANSWER:**    Defendant denies the allegations in Paragraph 66.

67.    Defendant was also aware of consumers' confusion regarding Overdraft Fees but nevertheless failed to make its customers agree to these practices.

**ANSWER:**    Defendant denies the allegations in Paragraph 67.

### iv.    Plaintiff Was Assessed an Overdraft Fee on Debit Card Transactions Previously Authorized on Sufficient Funds

68.    For example, on March 15, 2025 and again on March 29, 2025, Plaintiff was assessed Overdraft Fees on transactions previously authorized on sufficient funds.

**ANSWER:**    Defendant admits that Plaintiff's account was charged a fee for a transaction that overdrew her account on March 15, 2025 and March 29, 2025. Defendant denies the remaining allegations in Paragraph 68.

69.    Because Defendant had previously held the funds to cover these transactions, Plaintiff's account always had sufficient funds to "cover" the transactions and should not have been assessed these fees.

**ANSWER:**    Defendant denies the allegations in Paragraph 69.

70.    The improper fees charged by Defendant were also not errors by Defendant, but rather were intentional charges made by Defendant as part of its standard processing of transactions.

**ANSWER:**    Defendant denies the allegations in Paragraph 70.

71.    Plaintiff therefore had no duty to report the fees as errors because they were not errors, but were part of the systematic and intentional assessment of fees according to Defendant standard practices.

**ANSWER:**    Defendant denies the allegations in Paragraph 71.

72.    Moreover, any such reporting would have been futile as Defendant's own contract admits that Defendant made a decision to charge the fees.

**ANSWER:**    Defendant denies the allegations in Paragraph 72.

**II.    DEFENDANT VIOLATES THE EFTA AND REGULATION E**

**A.    Regulation E Introduces Rules to Protect Consumers from Predatory Overdraft Fees**

73.    The EFTA, 15 USC 1693 et seq., is intended to protect individual consumers engaging in electronic fund transfers ("EFTs"). EFT services include transfers through automated teller machines ("ATMs"), point-of-sale terminals, automated clearinghouse systems, telephone bill-payment plans in which periodic or recurring transfers are contemplated, and remote banking programs. Prior to December 2011, the Federal Reserve Board was responsible for implementing the EFTA.

**ANSWER:**    The allegations in Paragraph 73 contain legal conclusions to which no answer is required. To the extent a response is required, Defendant denies the allegations.

74.    The Federal Reserve, having regulatory oversight over financial institutions, recognized that financial institutions had a strong incentive to adopt overdraft programs without giving consumers a choice, since overdraft fees are collected on a nearly risk-free basis. Historically, banks could not decide on overdrafts until after the transaction occurred. Because this entailed a certain amount of risk, financial institutions usually imposed a fee to process the transaction as an overdraft. But as debit card and ATM use rose in popularity, both the number of transactions and the timing of their execution changed. There were more low dollar debit card transactions because debit card use was so convenient, and financial institutions now could either accept or reject transactions at the point of sale. As a result, by simply authorizing these low dollar transactions into overdraft, banks could collect large fees on low dollar transactions that were almost always quickly repaid. It was a low risk, high reward for the financial institutions while customers suffered the costly effects.

**ANSWER:**    Defendant lacks sufficient knowledge and information to either admit or deny the allegations in Paragraph 74 and accordingly denies the same.

75.    And more, these overdraft programs were usually not disclosed to customers, or if so, they were hidden in the middle of a lengthy, boilerplate account agreement. Unlike enrollment in other programs, the customer would be enrolled simply on the word of the banker.

**ANSWER:**    Defendant lacks sufficient knowledge and information to either admit or deny the allegations in Paragraph 75 and accordingly denies the same.

76.    The Federal Reserve also noted that "improvements in the disclosures provided to consumers could aid them in understanding the costs associated with overdrawing their accounts and promote better account management." 69 Fed. Reg. 31761 (June 7, 2004).

**ANSWER:**    Defendant admits that the allegations in Paragraph 76 accurately quote an excerpt from the cited material. Defendant denies the remaining allegations in Paragraph 76.

77.    Recognizing that banks and credit unions had strong incentives to adopt these punitive overdraft programs, in 2009, the Federal Reserve Board amended Regulation E to require financial institutions to obtain affirmative consent (or so-called "opt in") from accountholders before the institution could assess OD Fees on ATM and non-recurring "point of sale" debit card transactions. Specifically, Regulation E requires financial institutions to provide consumers with accurate disclosures in understandable language separate from all other information that they could review before they affirmatively consented to enrollment in an overdraft program covering one-time debit card and ATM transactions. Only after a consumer opts-in is the financial institution allowed to assess overdraft fees on these transactions. If a consumer chooses not to opt-in to the financial institution's overdraft service for one-time debit card and ATM transactions, then the financial institution is prohibited from assessing an overdraft fee in connection with any such transaction, regardless of whether payment of the transaction would create an overdraft.

**ANSWER:**    The allegations in Paragraph 77 contain legal conclusions to which no answer is required. To the extent a response is required, Defendant denies the allegations.

78.    Given the state of overdraft programs prior to Regulation E, it is easy to understand why the Federal Reserve was concerned about protecting consumers from financial institutions unilaterally imposing high fees. Banks and credit unions in this scenario had significant advantages over consumers when it came to imposing overdraft policies. By defaulting to charging fees for point-of-sale transactions, banks and credit unions created for themselves a virtual no-lose scenario—advance small amounts of money for a small period of time, then charge a large fee that is unrelated to the amount of money advanced on behalf of the customer, resulting in a APR of thousands of percent interest, all with almost no risk as only a very small percentage of the overdraft customers failed to repay the overdraft. Moreover, prior to Regulation E, consumers were often automatically enrolled in these punitive overdraft programs.

**ANSWER:**    The allegations in Paragraph 78 contain legal conclusions to which no answer is required. To the extent a response is required, Defendant denies the allegations.

79.    In July 2011, rulemaking authority under EFTA generally transferred from the Federal Reserve Board to the Consumer Financial Protection Bureau ("CFPB") pursuant to the Dodd-Frank Wall Street Reform and Consumer Protection Act. The CFPB restated Regulation E at 12 C.F.R. Part 1005 in December 2011.

**ANSWER:**    Defendant lacks sufficient knowledge and information to either admit or deny the allegations in Paragraph 79 and accordingly denies the same.

80.    Like the Federal Reserve, the CFPB recognized that overdraft programs had a series of problems. The most pressing problem was that overdraft services were costly and damaging to accountholders. The CFPB estimated that the banking industry had collected anywhere from $12.6 to $32 billion in consumer NSF and overdraft fees in 2011, depending on what assumptions the analyst used in calculating the percentage of reported fee income should be attributed to overdrafts.

The CFPB also noted that there were numerous "variations in overdraft-related practices and policies," all of which could "affect when a transaction might overdraw a consumer's account and whether or not the consumer would be charged a fee."

**ANSWER:**    Defendant lacks sufficient knowledge and information to either admit or deny the allegations in Paragraph 80 and accordingly denies the same.

### B. Regulation E's Opt-in Requirement

81.    In response to these issues, the Federal Reserve and CFPB promulgated and restated Regulation E, which requires financial institutions like Defendant to obtain informed consent, by way of a written document that, segregated from all other information, fully and accurately describes the financial institution's overdraft services in an easily understandable way. If an accountholder does not opt-in to the financial institution's overdraft program, the financial institution must either cover the overdraft without charging a fee or simply decline payment of the transaction at the point of sale. In either scenario, the institution may not charge a fee against the accountholder's account because the accountholder has not consented to participate in the overdraft program.

**ANSWER:**    The allegations in Paragraph 81 contain legal conclusions to which no answer is required. To the extent a response is required, Defendant denies the allegations.

82.    Regulation E also provides that the opt-in disclosure agreement must satisfy certain requirements to be valid. The agreement must be a stand-alone document "segregated from" other forms, disclosures, or contracts provided by the financial institution. The notice must also accurately disclose to the account holder the institution's overdraft charge policies. The accountholder's choices must be presented in a "clear and readily understandable manner." 12 C.F.R. § 205.4(a)(1).

**ANSWER:**    The allegations in Paragraph 82 contain legal conclusions to which no answer is required. To the extent a response is required, Defendant denies the allegations.

23

83.     The financial institution must ultimately establish that the accountholder has opted-in to overdraft coverage either through a written agreement, or through a confirmation letter to the customer confirming opt-in if the opt-in has taken place by telephone or computer after being provided a compliant opt-in disclosure.

**ANSWER:**    The allegations in Paragraph 83 contain legal conclusions to which no answer is required. To the extent a response is required, Defendant denies the allegations.

84.     Financial institutions are not permitted to circumvent Regulation E's disclosure requirements by reference to reliance on other account agreements, disclosures, or marketing materials. Rather, Regulation E expressly requires a financial institution to include all the relevant terms of its overdraft program within the four corners of the document, creating a separate agreement with accountholders regarding overdraft policies that is "segregated from" the other lengthy and convoluted documents that collectively set the terms o members' accounts. 12 C.F.R. § 1005.17(b)(1)(i).

**ANSWER:**    The allegations in Paragraph 84 contain legal conclusions to which no answer is required. To the extent a response is required, Defendant denies the allegations.

85.     Regulation E provides a private cause of action for a financial institution's failure to abide by its disclosure requirements. Plaintiff thus seeks restitution of improperly charged OD Fees in violation of Regulation E.

**ANSWER:**    The allegations in Paragraph 85 contain legal conclusions to which no answer is required. To the extent a response is required, Defendant denies the allegations.

86.     Moreover, because Regulation E's requirements are incorporated into the EFTA by way of Section 905(a), 15 U.S.C. § 1693c(a), any violation of Regulation E also violates the EFTA, which is privately enforceable under Section 916, 15 U.S.C. § 1693m.

**ANSWER:**    The allegations in Paragraph 86 contain legal conclusions to which no answer is required. To the extent a response is required, Defendant denies the allegations.

**C. Overdraft Calculations**

87.    Financial institutions' fee maximization schemes went beyond these exorbitant penalty fees for the institutions' small advance of funds to cover low-dollar overdrafts. Financial institutions also began manipulating the process as to how they would consider a transaction to be an overdraft to further increase their fee revenue. Specifically, financial institutions charged OD Fees not only when the institution actually advanced money, but also when the customer had sufficient funds in their account and so the financial institutions paid the purported "overdraft" transactions with the customers' own money. That is, financial institution like Defendant unilaterally decided the account was overdrawn not based on an actual lack of funds in the account, but solely based on a calculation of the account balance that excludes money placed on hold for various reasons, including holds that exceed the amount of the customer's pending transactions.

**ANSWER:**    Defendant lacks sufficient knowledge and information to either admit or deny the allegations in Paragraph 87 regarding "financial institutions like Defendant" and accordingly denies the same. Defendant denies the remaining allegations in Paragraph 87.

88.    Most banks and credit unions calculate two account balances. First, the "actual balance" reflects the actual amount of money in the customer's account at any particular time. This calculation does not account for holds on pending deposits or funds that have been earmarked for pending transactions. In contrast, the "available balance" represents the actual account balance minus amounts the financial institution has held from pending deposits and/or pending transactions that have not yet posted (and potentially never will post) to the account.

**ANSWER:**    Defendant lacks sufficient knowledge and information to either admit or deny the allegations in Paragraph 88 regarding "[m]ost banks and credit unions" and accordingly denies the same. Defendant denies the remaining allegations in Paragraph 88.

89.    While financial institutions use either the actual balance or the available balance to decide whether a transaction overdraws the account, per Regulation E, the terms of the overdraft

program must be clearly and accurately disclosed in the opt-in form. Thus, when banks and credit unions use the "available balance" to determine whether a transaction is considered an overdraft, that balance calculation method must be disclosed and explained in the opt-in disclosure.

**ANSWER:** Defendant lacks sufficient knowledge and information to either admit or deny the allegations in Paragraph 89 regarding "financial institutions" or "banks and credit unions" and accordingly denies the same. The remaining allegations in Paragraph 89 contain legal conclusions to which no answer is required. To the extent a response is required, Defendant denies the allegations.

90. Indeed, the difference between the actual balance and the available balance when determining overdrafts is material to both the financial institution and its customers. Because the account's available balance is nearly always lower than the account's actual balance, financial institutions that determine overdrafts based on the available balance instead of actual balance significantly increase the number of transactions that are deemed "overdrafts" and therefore the number of OD Fees they assess.

**ANSWER:** Defendant lacks sufficient knowledge and information to either admit or deny the allegations in Paragraph 90 regarding "financial institutions" and accordingly denies the same. The remaining allegations in Paragraph 90 contain legal conclusions to which no answer is required. To the extent a response is required, Defendant denies the allegations.

91. Moreover, because financial institutions like Defendant include the account's actual balance but not the available balance on the customer's period monthly statements, customers are often unable to understand why they incur OD Fees when Defendant's own account statements show that their accounts always contained sufficient funds to cover their transactions and so no overdraft occurred.

**ANSWER:** Defendant lacks sufficient knowledge and information to either admit or deny the allegations in Paragraph 91 regarding "financial institutions like Defendant" and accordingly denies the same. The remaining allegations in Paragraph 91 contain legal conclusions to which no answer is required. To the extent a response is required, Defendant denies the allegations.

92.    In fact, in one study, researchers noted that consumers most often discover that OD Fees were levied against their accounts when they receive and review their monthly account statements. *See Overdraft America: Confusion and Concerns about Bank Practices*, PEW TRUSTS 7 (May 2012), https://tinyurl.com/3b4jh5n9.

**ANSWER:**    Defendant lacks sufficient knowledge and information to either admit or deny the allegations in Paragraph 92 and accordingly denies the same.

93.    Studies have further confirmed that "[o]ne of the most salient themes within [consumer] complaints is the difficulty avoiding overdrafts even when consumers believed they would. Often, this was related to bank practices that make it difficult for consumers to know balance availability, transaction timing, or whether or not overdraft transactions would be paid or declined." Rebecca Borne et al., *Broken Banking: how OD Fees Harm Consumers and Discourage Responsible Bank Products*, CNTR. FOR RESPONSIBLE LENDING 8 (May 2016), https://bit.ly/3v7SvL1.

**ANSWER:**    Defendant admits that the allegations in Paragraph 93 accurately quote an excerpt from the cited material. Defendant denies the remaining allegations in Paragraph 93.

94.    Given these issues, financial institutions have been put on notice by regulators and banking associations that failure to fully and accurately notify consumers that overdrafts are based on the available balance calculation rather than the amount of funds actually in their account is an unfair and deceptive practice.

**ANSWER:**    Defendant lacks sufficient knowledge and information to either admit or deny the allegations in Paragraph 94 and accordingly denies the same.

95.    For instance, the Federal Deposit Insurance Corporation ("FDIC") stated in 2019:

> The FDIC identified issues regarding certain overdraft programs that used an available balance method to determine when overdraft fees could be assessed. Specifically, FDIC examiners observed potentially unfair or deceptive practices when institutions using an available balance method assessed more overdraft fees than were appropriate based on the consumer's actual spending or when

institutions did not adequately describe how the available balance method works in connection with overdrafts.

*Consumer Compliance Supervisory Highlights*, FED. DEPOSIT INS. CORP. 2 (June 2019), https://bit.ly/3t2ybsY. The FDIC recommended that financial institutions mitigate this risk by, *inter alia*, "[p]roviding clear and conspicuous disclosures related to the possible imposition of an overdraft fee in connection with use of the available balance method so that consumers can understand the circumstances under which overdraft fees will be assessed and make informed decisions to avoid the assessment of such fees." *Id*. at 3.

**ANSWER:**    Defendant admits that the allegations in Paragraph 95 accurately quote an excerpt from the cited material. Defendant denies the remaining allegations in Paragraph 95.

96.    The CFPB also criticized this practice, explaining:

Examiners observed that in some instances, transactions that would not have resulted in an overdraft (or an overdraft fee) under a ledger-balance method did result in an overdraft (and an overdraft fee) under an available-balance method. At one or more financial institutions, examiners noted that these changes to the balance calculation method used were not disclosed at all, or were not sufficiently disclosed, resulting in customers being misled as to the circumstances under which overdraft fees would be assessed. ***Because these misleading practices could be material to a reasonable consumer's decision making and actions, they were found to be deceptive***.
*Supervisory Highlights*, CONS. FIN. PROT. BUREAU 8 (Winter 2015), https://bit.ly/3jVNHY2 (emphasis added).

**ANSWER:**    Defendant admits that the allegations in Paragraph 96 accurately quote an excerpt from the cited material. Defendant denies the remaining allegations in Paragraph 96.

97.    Put simply, under Regulation E, a financial institution may decide which balance it prefers to use when assessing OD Fees on one-time debit card and ATM transactions; however, Regulation E is also very clear that the financial institution must disclose this practice accurately, clearly, and in a way that is easily understood.

28

**ANSWER:**    The allegations in Paragraph 97 contain legal conclusions to which no answer is required. To the extent a response is required, Defendant denies the allegations.

98.    Because the Regulation E opt-in disclosure must include this information in a standalone document that is "segregated from" other disclosures and agreements, the use of available balance must be stated in the opt-in disclosure agreement to conform to Regulation E and permit the assessment of OD Fees on one-time debit card and ATM transactions.

**ANSWER:**    The allegations in Paragraph 98 contain legal conclusions to which no answer is required. To the extent a response is required, Defendant denies the allegations.

99.    Either inaccurately or failing to describe the use of available balance as part of its overdraft practice violates the plain language of Regulation E and the EFTA.

**ANSWER:**    The allegations in Paragraph 99 contain legal conclusions to which no answer is required. To the extent a response is required, Defendant denies the allegations.

100.    Indeed, the CFPB and other regulators repeatedly have stated that it is unfair and deceptive to assess overdraft fees on transactions that did not overdraw the actual balance of the account.

**ANSWER:**    Defendant lacks sufficient knowledge and information to either admit or deny the allegations in Paragraph 100 and accordingly denies the same.

### D. Defendant's Opt-In Form

*i. Defendants' Opt-In Form does not accurately explain how or when overdrafts are determined.*

101.    Defendant's Opt-In Form states:

**What You Need to Know about Us Paying Your Overdrafts and Our Overdraft Fees**

An ***overdraft*** occurs when you do not have enough money in your account to cover either a check or electronic fund transfer transaction (such as with your debit card), but we elect to pay it anyway. We can cover your overdrafts in two different ways:
1. We have ***standard overdraft practices*** that come with your account. They are covered in Provision 6.j. and the Electronic Fund Transfer disclosures of the DAC Part 2.

2.  We also offer an ***overdraft protection service*** that draws funds from your savings account, which may be less expensive than our standard overdraft practices. To learn more, ask us about these services or our overdraft plans (or read about them in Provision 6.j. and the Electronic Fund Transfer disclosures of the DAC Part 2).

This notice explains our ***standard overdraft practices***.

**What are the standard overdraft practices that come with my account?**

We ***do*** authorize and pay overdrafts for the following types of transactions:

- Checks and other transactions made using your checking account number

- Automatic bill payments

We ***do not*** authorize and pay overdrafts for the following types of transactions unless you ask us to (see below):

- ATM transactions

- Everyday debit card transactions

We pay overdrafts at our discretion, which means we ***do not guarantee*** that we will always authorize and pay any type of transaction (which generally will occur because you have not authorized a transaction, exceeded the overdraft limit, or have an outstanding balance that has not been repaid).
If we ***do not*** authorize and pay an overdraft, your transaction will be declined.

**What fees will I be charged if you pay my overdraft(s)?**

While there is no charge to authorize us to pay your overdrafts, under our ***standard overdraft practices:***

- We will charge you a fee of up to **$25.00** each time we pay an overdraft.

- There is ***no limit*** on the total fees we can charge you for overdrawing your account (though generally they will be charged for each overdraft transaction we pay on your account).

**To authorize and pay overdrafts on your ATM and everyday debit card transactions**
If you also want us to authorize and pay overdrafts on ATM and everyday debit card transactions, call call [*sic*] 434-793-1278 or toll-free 866-879-6328, visit www.urwfcu.com or complete the form below and present it at a branch or mail it to: URW Community Federal Credit Union, 314 Lowes Drive, Danville, VA 24540.

Ex. B (emphasis in original).

**ANSWER:**    Defendant admits that the allegations in Paragraph 101 accurately quote an excerpt from Exhibit B to the Complaint. Defendant denies the remaining allegations in Paragraph 101.

102.    In the description above and elsewhere in Defendant's Opt-In Form, Defendant fails to provide a clear and unambiguous description of both the how and when its members can expect to be assessed overdraft fees.

**ANSWER:**    Defendant denies the allegations in Paragraph 102.

103.    Defendant's Opt-In Form does not accurately represent Defendant's actual fee practices because (1) it fails to explain how Defendant determines whether there is "enough money" in the account to pay a transaction; or (2) it does not explain whether overdrafts are determined at authorization or settlement.

**ANSWER:**    Defendant denies the allegations in Paragraph 103.

104.    Defendant's failure to identify and explain its overdraft program prevents consumers from affirmatively consenting (or opting in) to the program. Rather, after reviewing, the Opt-In Form, consumers are left with no understanding as to how or when Defendant determines overdrafts.

**ANSWER:**    Defendant denies the allegations in Paragraph 104.

105.    Defendant's Opt-In Form thus flouts Regulation E's purpose of "protec[ing]... individual consumers engaging in electronic fund transfers, "12 C.F.R. § 1005.1(b), and requiring Defendant to "[p]rovide[] the consumer with a notice in writing,... segregated from all other information, describing the institution's overdraft service" and "[p]rovide[] a reasonable opportunity for the consumer to affirmatively consent, or opt it, to the service." 12 C.F.R. § 1005.17(b)(1)(i)-(ii).

**ANSWER:** Defendant admits that the allegations in Paragraph 105 accurately quote an excerpt from the cited material. Defendant denies the remaining allegations in Paragraph 105.

106. Defendant's Opt-In Form likewise flouts the EFTA's "primary objective," which is the "provision of individual consumer rights." 15 U.S.C. § 1693(b).

**ANSWER:** Defendant admits that the allegations in Paragraph 106 accurately quote an excerpt from the cited material. Defendant denies the remaining allegations in Paragraph 106.

*ii. Defendants' Opt-In Form omits information required by Regulation E and the EFTA*

107. Regulation E provides that the required opt-in notice "must be substantially similar to Model Form A-9 set forth in appendix A of this part, include *all* applicable items in this paragraph, and may not contain any information not specified in or otherwise permitted by this paragraph." 12 C.F.R. § 1005.17(d) (emphasis added). Such requirements include, inter alia, "Limits on fees charged, The maximum number of overdraft fees or charges that may be assessed per day, or, if applicable, that there is no limit." 12 C.F.R. § 1005.17(d)(1)(3).

**ANSWER:** Defendant admits that the allegations in Paragraph 107 accurately quote an excerpt from the cited material. Defendant denies the remaining allegations in Paragraph 107.

108. In direct violation of this requirement, Defendant's Opt-In Form is not "substantially similar to Model Form A-9."

**ANSWER:** Defendant denies the allegations in Paragraph 108.

109. Defendant's Opt-In Form does not comply with Regulation E or the EFTA's requirements to describe or provide notice of Defendant's overdraft practice. Therefore, pursuant to Regulation E and the EFTA, Defendant does not have the authority to assess an OD Fee against Plaintiff or other consumers' accounts as a result of any one-time debit card or ATM transaction. 12 C.F.R. § 1005.17(b); 15 U.S.C. § 1693(a).

**ANSWER:** Defendant denies the allegations in Paragraph 109.

**E. Plaintiff's Experience**

110.    Defendant charged Plaintiff OD Fees on one-time debit card transactions on numerous occasions.

**ANSWER:**    Defendant admits that Plaintiff's account was charged fees for transactions that overdrew her account. Defendant denies the remaining allegations in Paragraph 110.

111.    For example, Plaintiff was assessed $35.00 OD Fees on one-time debit card transactions on February 18, 2025, March 15, 2025 and March 29, 2025.

**ANSWER:**    Defendant admits that Plaintiff's account was charged a fee for a transaction that overdrew her account on February 18, 2025, March 15, 2025, and March 29, 2025. Defendant denies the remaining allegations in Paragraph 111.

112.    Because, Defendant's Opt-in Form does not comply with Regulation E or the EFTA, Plaintiff was unable to predict these fees or affirmatively consent (or opt-in) to Defendant's overdraft program. Hence no OD Fee should have been assessed against his account for these debit card transactions.

**ANSWER:**    Defendant denies the allegations in Paragraph 112.

**III.    None of These Fees Were Errors**

113.     The improper fees charged by Defendant to Plaintiff's account were not errors by Defendant, but rather were intentional charges made by Defendant as part of its standard processing of transactions.

**ANSWER:**    Defendant denies the allegations in Paragraph 113.

114.    Plaintiff therefore had no duty to report the fees as errors because they were not; instead, they were part of the systematic and intentional assessment of fees according to Defendant's standard practices.

**ANSWER:**    Defendant denies the allegations in Paragraph 114.

33

115.    Moreover, any such reporting would have been futile because Defendant's own contract admits that Defendant made a decision to charge these fees.

**ANSWER:**    Defendant denies the allegations in Paragraph 115.

## CLASS ALLEGATIONS

116.    Plaintiff brings this action individually and as a class action on behalf of the following proposed Classes:

> The APSN Class: All consumers who, during the applicable statute of limitations, were Defendant checking account holders and were assessed an overdraft fee on a debit card transaction that was authorized on sufficient funds and settled on negative funds in the same amount for which the debit card transaction was authorized.

> The Reg E Class: All consumers who, during the applicable statute of limitations, were opted into overdraft protection for one-time debit card transactions and ATM transactions with Defendant and were assessed overdraft fees on these transactions.

Plaintiff reserves the right to modify or amend the definition of the Classes as this litigation proceeds.

**ANSWER:**    The allegations in Paragraph 116 contain legal conclusions to which no answer is required. To the extent a response is required, Defendant denies the allegations.

117.    Excluded from the Classes are Defendant, its parents, subsidiaries, affiliates, officers and directors, any entity in which Defendant has a controlling interest, all customers who make a timely election to be excluded, governmental entities, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

**ANSWER:**    The allegations in Paragraph 117 contain legal conclusions to which no answer is required. To the extent a response is required, Defendant denies the allegations.

118.    The time period for the Classes are the number of years immediately preceding the date on which this Complaint was filed as allowed by the applicable statute of limitations, going forward into the future until such time as Defendant remedies the conduct complained of herein.

34

**ANSWER:**    The allegations in Paragraph 118 contain legal conclusions to which no answer is required. To the extent a response is required, Defendant denies the allegations.

119.    The members of the Classes are so numerous that joinder is impractical. The Classes consist of thousands of members, the identities of whom are within the exclusive knowledge of Defendant and can be readily ascertained only by resort to Defendant's records.

**ANSWER:**    The allegations in Paragraph 119 contain legal conclusions to which no answer is required. To the extent a response is required, Defendant denies the allegations.

120.    The claims of the representative Plaintiff are typical of the claims of the Classes in that the representative Plaintiff, like all members of the Classes, was charged improper fees as set forth herein. The representative Plaintiff, like all members of the Classes, has been damaged by Defendant's misconduct. Furthermore, the factual basis of Defendant's misconduct is common to all members of the Classes and represents a common thread of unlawful and unauthorized conduct resulting in injury to all members of the Classes. Plaintiff has suffered the harm alleged and have no interests antagonistic to the interests of any other members of the Classes.

**ANSWER:**    The allegations in Paragraph 120 contain legal conclusions to which no answer is required. To the extent a response is required, Defendant denies the allegations.

121.    There are numerous questions of law and fact common to the Classes and those common questions predominate over any questions affecting only individual members of the Classes.

**ANSWER:**    The allegations in Paragraph 121 contain legal conclusions to which no answer is required. To the extent a response is required, Defendant denies the allegations.

122.    Among the questions of law and fact common to the Classes include:

    a.    Whether Defendant charged OD Fees on APSN Transactions;

    b.    Whether this fee practice breached the Contract;

    c.    Whether Defendant violated Regulation E by assessing OD Fees on ATM and one-time debit card transactions;

d.  The proper method or methods by which to measure damages; and

e.  The declaratory and injunctive relief to which the Classes are entitled.

**ANSWER:**    The allegations in Paragraph 122 contain legal conclusions to which no answer is required. To the extent a response is required, Defendant denies the allegations.

123.    Plaintiff is committed to the vigorous prosecution of this action and has retained competent counsel experienced in the prosecution of class actions, particularly on behalf of consumers and against financial institutions. Accordingly, Plaintiff is an adequate representative and will fairly and adequately protect the interests of the Classes.

**ANSWER:**    The allegations in Paragraph 123 contain legal conclusions to which no answer is required. To the extent a response is required, Defendant denies the allegations.

124.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the amount of each individual class member's claim is small relative to the complexity of the litigation, no class member could afford to seek legal redress individually for the claims alleged herein. Therefore, absent a class action, the members of the Classes will continue to suffer losses and Defendant's misconduct will proceed without remedy.

**ANSWER:**    The allegations in Paragraph 124 contain legal conclusions to which no answer is required. To the extent a response is required, Defendant denies the allegations.

125.    Even if class members themselves could afford such individual litigation, the court system could not. Given the complex legal and factual issues involved, individualized litigation would significantly increase the delay and expense to all parties and to the Court. Individualized litigation would also create the potential for inconsistent or contradictory rulings. By contrast, a class action presents far fewer management difficulties, allows for the consideration of claims which might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale, and comprehensive supervision by a single court.

**ANSWER:**    The allegations in Paragraph 125 contain legal conclusions to which no answer is required. To the extent a response is required, Defendant denies the allegations.

126.    Plaintiff suffers a substantial risk of repeated injury in the future. Plaintiff, like all members of the Classes, is at risk of additional improper fees. Plaintiff and the members of the Classes are entitled to injunctive and declaratory relief as a result of the conduct complained of herein. Money damages alone could not afford adequate and complete relief, and injunctive relief is necessary to restrain Defendant from continuing to commit its unfair and illegal actions.

**ANSWER:**    The allegations in Paragraph 126 contain legal conclusions to which no answer is required. To the extent a response is required, Defendant denies the allegations.

**FIRST CLAIM FOR RELIEF**
**Breach of Contract**
*(On Behalf of Plaintiff and the APSN Class)*

127.    Plaintiff incorporates the preceding allegations by reference as if fully set forth herein.

**ANSWER:**    Defendant incorporates its prior answers to the preceding allegations by reference and re-alleges the same as full set forth herein.

128.    Plaintiff and Defendant have contracted for banking services, as embodied in Defendant's account documents. *See* Exs. A-B.

**ANSWER:**    Defendant admits that it and Plaintiff have a contract relating to Plaintiff's account with Defendant. Defendant denies the remaining allegations in Paragraph 128.

129.    All contracts entered by Plaintiff and the APSN Class are identical or substantively identical because Defendant's form contracts were used uniformly.

**ANSWER:**    Defendant denies the allegations in Paragraph 129.

130.    Defendant has breached the express terms of its own agreements as described herein.

**ANSWER:**    Defendant denies the allegations in Paragraph 130.

131.    Plaintiff and members of the APSN Class have performed all, or substantially all, of the obligations imposed on them under the agreements.

**ANSWER:**    Defendant denies the allegations in Paragraph 131.

132.    Plaintiff and members of the APSN Class have sustained damages as a result of Defendant's breaches of the Contract.

**ANSWER:**    Defendant denies the allegations in Paragraph 132.

**SECOND CLAIM FOR RELIEF**
**Violation of Electronic Fund Transfers Act (Regulation E)**
**12 C.F.R. § 1005 et seq. (authority derived from 15 U.S.C. § 1693 *et seq.*))**
*(On Behalf of Plaintiff and the Reg E Class)*

133.    Plaintiff incorporates the preceding allegations by reference as if fully set forth herein.

**ANSWER:**    Defendant incorporates its prior answers to the preceding allegations by reference and re-alleges the same as full set forth herein.

134.    Defendant violated Regulation E (12 C.F.R. §§1005 *et seq.*), whose "primary objective" is "the protection of consumers" (§1005.l(b)) and which "carries out the purposes of the [Electronic Fund Transfer Act 15 U.S.C. §§1693 et seq.), the "EFTA"] (§1005. l(b)), whose express "primary objective" is also "the provision of individual consumer rights" (15 U.S.C. §1693(b)).

**ANSWER:**    Defendant admits that the allegations in Paragraph 134 accurately quote an excerpt from the cited material. Defendant denies the remaining allegations in Paragraph 134.

135.    Specifically, the charges violated what is known as the "Opt In Rule" of Regulation E (12 C.F.R. § 1005.17.) The Opt In Rule states: "a financial institution ... shall not assess a fee or charge ... pursuant to the institution's overdraft service, unless the institution: (i) [p]rovides the consumer with a notice in writing [the opt-in notice]. . . describing the institution's overdraft service" and (ii) "[p]rovides a reasonable opportunity for the consumer to affirmatively consent"

38

to enter into the overdraft program. (*Id*.) The notice "shall be clear and readily understandable." (12 C.F.R. §205.4(a)(l).)

**ANSWER:**   Defendant admits that the allegations in Paragraph 135 accurately quote an excerpt from the cited material. Defendant denies the remaining allegations in Paragraph 135.

136.   To comply with the affirmative consent requirement, a financial institution must provide a segregated description of its overdraft practices that is accurate, non-misleading and truthful and that conforms to 12 C.F.R. § 1005.17 prior to the opt-in, and must provide its customers a reasonable opportunity to opt-in after receiving the description. The affirmative consent must be provided in a way mandated by 12 C.F.R. § 1005.17, and the financial institution must provide confirmation of the opt-in in a manner that conforms to 12 C.F.R. § 1005.17.

**ANSWER:**   The allegations in Paragraph 136 contain legal conclusions to which no answer is required. To the extend a response is required, Defendant denies the allegations.

137.   The intent and purpose of this Opt-In Form is to "assist customers in understanding how overdraft services provided by their institutions operate .... by explaining the institution's overdraft service ... in a clear and readily understandable way"-as stated in the Official Staff Commentary (74 Fed. Reg. 59033, 59035, 59037, 5940, 5948), which is "the CFPB's official interpretation of its own regulation," "warrants deference from the courts unless 'demonstrably irrational,'" and should therefore be treated as "a definitive interpretation" of Regulation E. *Strubel v. Capital One Bank (USA)*, 2016 U.S. Dist. LEXIS 41487, \*11 (S.D.N.Y. 2016) (quoting *Chase Bank USA v. McCoy*, 562 U.S. 195, 211 (2011)) (so holding for the CFPB's Official Staff Commentary for the Truth In Lending Act's Regulation Z)).

**ANSWER:**   Defendant admits that the allegations in Paragraph 137 accurately quote an excerpt from the cited material. The remaining allegations in Paragraph 137 contain legal conclusions to which no answer is required. To the extend a response is required, Defendant denies the allegations.

138.    Defendant has failed to comply with the 12 C.F.R. § 1005.17 opt-in requirements, including failing to provide its customers with a valid description of the overdraft program which meets the strictures of 12 C.F.R. § 1005.17. Defendant's opt-in method fails to satisfy 12 C.F.R. § 1005.17 because it misrepresents Defendant's overdraft practices, as discussed above.

**ANSWER:**    Defendant denies the allegations in Paragraph 138.

139.    Defendant further violates 12 C.F.R. § 1005.17(d) by failing to use an opt-in form that is "substantially similar to Model Form A-9" or including *any* information regarding limitations on fees, such as the maximum number of fees that may be accessed per day or that no such limit exists. *Compare* Exs. A-B *with* 12 C.F.R. § 1005.17(d)(3).

**ANSWER:**    Defendant denies the allegations in Paragraph 139.

140.    Because Defendant failed to use a Regulation E compliant opt-in disclosure and failed to obtain its customers' affirmative consent as required by Regulation E, Defendant was not legally permitted to assess any overdraft fees on one-time debit card or ATM transactions.

**ANSWER:**    Defendant denies the allegations in Paragraph 140.

141.    The "primary objective" of the EFTA "is the provision of individual consumer rights." 15 U.S.C. § 1693(b).

**ANSWER:**    Defendant admits that the allegations in Paragraph 141 accurately quote an excerpt from the cited material. The remaining allegations in Paragraph 141 contain legal conclusions to which no answer is required. To the extend a response is required, Defendant denies the allegations.

142.    Section 904 of the EFTA states that the CFPB "shall prescribe rules to carry out the purposes of this subchapter." 15 U.S.C. § 1693(b)(1). The CFPB has prescribed such rules in the form of Regulation E, 12 C.F.R. § 1005, *et seq*.

**ANSWER:**    Defendant admits that the allegations in Paragraph 142 accurately quote an excerpt from the cited material. The remaining allegations in Paragraph 142 contain legal conclusions to which no answer is required. To the extend a response is required, Defendant denies the allegations.

143.    The EFTA's grant of authority to the CFPB includes the authority to issue model clauses, "to facilitate compliance with the disclosure requirements of section 1693c of this title and to aid consumers in understanding the rights and responsibilities of participants in electronic fund transfers by utilizing readily understandable language." 15 U.S.C. § 1693b(b). The CFPB issues a model form as Model Form A-9.

**ANSWER:**    Defendant admits that the allegations in Paragraph 143 accurately quote an excerpt from the cited material. The remaining allegations in Paragraph 143 contain legal conclusions to which no answer is required. To the extend a response is required, Defendant denies the allegations.

144.    Section 905 of the EFTA requires that "the terms and conditions of electronic fund transfers involving a consumer's account shall be disclosed.... in accordance with regulations of the Bureau." 15 U.S.C. § 1693c(a). Such "terms and disclosures" "shall be in readily understandable language" and include information regarding "any charge for electronic fund transfers or for the right to make such transfers." 15 U.S.C. § 1693c(a)(4).

**ANSWER:**    Defendant admits that the allegations in Paragraph 144 accurately quote an excerpt from the cited material. The remaining allegations in Paragraph 144 contain legal conclusions to which no answer is required. To the extend a response is required, Defendant denies the allegations.

145.    Accordingly, in failing to use a Regulation E-compliant opt-in form, Defendant violated Section 905 of the EFTA by failing to make disclosures "in accordance with regulations of the Bureau."

**ANSWER:**    Defendant denies the allegations in Paragraph 145.

146.    Plaintiff and the members of the Reg E Class have been harmed by Defendant's practice of assessing OD fees on one-time debit card and ATM transactions when, under Regulation E and the EFTA, Defendant did not have the authority to do so.

**ANSWER:**    Defendant denies the allegations in Paragraph 146.

41

147.    As a result of violating Regulation E's prohibition against assessing overdraft fees without obtaining affirmative consent to do so, Defendant has harmed Plaintiff and the Class.

**ANSWER:**    Defendant denies the allegations in Paragraph 147.

148.    Due to Defendant's violation of Regulation E (12 C.F.R. § 1005.17), Plaintiff and members of the Reg E Class are entitled to actual and statutory damages, as well as attorneys' fees and costs of suit pursuant to 15 U.S.C.A. § 1693m.

**ANSWER:**    Defendant denies the allegations in Paragraph 148.

## AFFIRMATIVE DEFENSES

Defendant, URW Community Federal Credit Union, for its Affirmative Defenses to Plaintiff's Complaint, without prejudice to its Answers and Denials above, states as follows:

1.    As to any allegation in the Complaint not previously admitted, denied or controverted, the same is hereby denied.

2.    The Complaint and each cause of action alleged therein fail to state a claim upon which relief can be granted.

3.    Defendant alleges that the Complaint, and each and every alleged cause of action therein, or some of them, cannot be maintained on a class basis because the purported class members entered into agreement(s) to submit their claims against Defendant to binding arbitration.

4.    The rights and obligations of the parties are subject to the terms, conditions, and limitations of the agreements between the parties, and those by Plaintiff and the putative class members against Defendant in this matter, including but not limited to a waiver of claims pled as a class action.

5.    Plaintiff lacks standing to bring some or all of these claims. Further, this case is not appropriate for class certification and all class allegations should be stricken.

6.    The Complaint and each claim alleged therein are barred, in whole or in part, because Defendant acted reasonably at all times relevant to this action.

7.    The Complaint and each claim alleged therein is barred, in whole or in part, by the parol evidence rule.

8.    Plaintiff's claims, and the claims of the putative class members, may be barred, in whole or in part, by the statute of limitations and by the doctrine of laches.

9.    The claims of some putative class members are barred under the doctrine of claim-splitting because they are claims or compulsory counterclaims in proceedings in other courts of this or another state.

10.    The claims of some putative class members are barred by the doctrine of res judicata.

11.    By virtue of certain acts, errors, or omissions committed or omitted by Plaintiff, Plaintiff is estopped from claiming any damages or injury. The claims of some putative class members are barred by the doctrines of waiver, estoppel, settlement, novation, release and/or accord and satisfaction.

12.    Plaintiff and/or the putative class members have waived any and all claims they have (or at some time may have had) against Defendant.

13.    Any damages sustained were the result of Plaintiff's and/or the putative class members' own acts, errors, or omissions and, therefore, any award in favor of Plaintiff should be reduced by that proportion of fault.

14.    Defendant's acts, errors or omissions were not the actual or proximate cause of any of Plaintiff's and/or the putative class members' damages.

43

15.     Defendant is not liable for the harm alleged by Plaintiff or the putative class because such harm resulted from the acts of others constituting independent, intervening and/or superseding causes, thus relieving Defendant of any liability.

16.     The claims of some putative class members are, based on their commencement of bankruptcy proceedings as a debtor, barred by the doctrines of judicial estoppel, res judicata, waiver, laches and/or estoppel.

17.     The claims of Plaintiff and/or putative class members are subject to the right of off-setting arising from defaults on loan contracts and other breaches of those contracts.

18.     The claims of Plaintiff and/or putative class members are barred to the extent any such person failed to mitigate damages for which he/she seeks compensation. The applicable contract documents required Plaintiff and/or putative class members to examine each account statement and to report any irregularities to Defendant but they all failed to do so in a timely manner to Defendant's prejudice.

19.     Plaintiff and/or the putative class members are barred from any recovery against Defendant because Plaintiff's alleged damages are speculative.

20.     Plaintiff and/or the putative class members are barred from any recovery against Defendant under the voluntary payment doctrine.

21.     Plaintiff and/or the putative class members are barred from any recovery against Defendant under the doctrine of avoidable consequences.

22.     The Complaint and each claim alleged therein are barred, in whole or in part, because Defendant has fully performed any and all duties, promises and/or obligations which it may have owed to Plaintiff and alleged putative class members. Defendant substantially complied with all statutory and/or contractual requirements.

23.     Plaintiff and/or the putative class members are barred from any recovery against Defendant because Defendant acted in accordance with reasonable commercial standards.

24.     The claims of Plaintiff and/or putative class members are preempted by federal law or regulation, including the Truth in Savings Act.

25.     Defendant is entitled to contribution from any party found jointly and severally liable, and is entitled to indemnity and contribution as proven at trial under equitable principles.

26.     If it is determined that Plaintiff and/or the putative class members sustained any damage as alleged in the Complaint, said damage was proximately caused or contributed to by persons other than Defendant. The liability of Defendant and other responsible parties, named or unnamed, should be apportioned according to the relative degree of fault among them, if any, and the liability of Defendant should be reduced accordingly.

27.     The Complaint and each claim alleged therein are barred by the doctrine of unclean hands.

28.     The Complaint and each claim alleged therein are barred, in whole or in part, because Plaintiff would be unjustly enriched if she prevailed on her Complaint or on any of the claims purportedly set forth therein.

29.     The Complaint and each claim alleged therein are barred, in whole or in part, to the extent that any purported contract or relationship sounding in contract between the parties fails for lack of consideration.

30.     The claims in the Complaint are barred, in whole or in part, by the Statute of Frauds.

31.     Defendant is informed and believes that further investigation and discovery will reveal, and on that basis alleges, that the Complaint and each and every cause of action set forth

therein, or some of them, are unreasonable and/or were filed in bad faith and/or are frivolous and, for that reason, justify an award of attorneys' fees and costs against Plaintiff and her attorneys.

32.     Defendant alleges that any recovery on Plaintiff's Complaint, or any cause of action contained therein, may be barred because the alleged practices are not likely to deceive.

33.     Defendant is informed and believes that further investigation and discovery will reveal, and on that basis allege that Plaintiff and/or some or all, of the purported "class" claims are barred by their own breach of the duties owed.

34.     Plaintiff and/or the putative class members are barred from challenging Defendant's interpretation, application, and implementation of the terms and provisions of the contracts governing their accounts (including whether Defendant's interpretation, application, and implementation were in accordance with any obligation of good faith and fair dealing) because Plaintiff and/or the putative class members acquiesced in Defendant's interpretation, application, and implementation of the contractual terms and provisions as a course of dealing, and benefited from Defendant's interpretation, application, and implementation of the contractual terms and provisions.

35.     Defendant is informed and believes that further investigation and discovery will reveal, and on that basis alleges, that the Complaint and each cause of action set forth therein, or some of them, are barred, in whole or in part, by express or implied consent to the conduct attributed to Defendant.

36.     Plaintiff and/or the putative class members are barred from recovery, in whole or in part, because they acquiesced in the conduct complained of.

37.     At all relevant times, Defendant has complied in good faith with all applicable laws, and a reasonable interpretation of the same.

38.     Defendant alleges that the Complaint, and each and every alleged cause of action therein, or some of them, are barred because Plaintiff is not an adequate and proper representative of any group or class Plaintiff seeks to represent.

39.     Defendant alleges that the claims of the named Plaintiff are not representative of the claims of the members of the putative class, and therefore this action is not properly maintained as a class action. Defendant further alleges that neither Plaintiff nor her counsel are proper class representatives.

40.     Defendant alleges that the putative class is not so numerous that joinder of all members is impracticable; therefore, Plaintiff cannot meet the prerequisites to a class action set forth in Rule 23 of the Federal Rules of Civil Procedure.

41.     Defendant alleges that there are not questions of law or fact common to the putative class; rather, individualized questions of law and fact predominate over any semblance of common question. In addition, the proof peculiar to Plaintiff's claims and the defenses thereto will vary widely. Therefore, Plaintiff cannot meet the prerequisites to a class action set forth in Rule 23 of the Federal Rules of Civil Procedure.

42.     Defendant alleges that the claims of Plaintiff and Defendant's defense thereto are not typical of the putative claims or related defenses of the putative class as a whole, and Plaintiff is not suitable class representative. Defendant further alleges that neither Plaintiff nor her counsel are proper class representatives. Therefore, Plaintiff cannot satisfy the prerequisites to a class action set forth in Rule 23 of the Federal Rules of Civil Procedure.

43.     Defendant alleges that this case is not properly maintained as a class action because the prosecution of separate actions by individual members of the putative class would not create a

risk of inconsistent or varying adjudications or adjudications that as a practical matter would be dispositive of the interests of other members not parties to the action.

44.    Defendant alleges that this action is not properly maintained as a class action because concentrating the litigation of Plaintiff's claims, as to which individualized acts and proof will predominate, in one particular forum is not desirable.

45.    Defendant alleges that this case is not properly maintained as a class action because of the difficulties likely to be encountered in the management of a class action.

46.    Defendant alleges that this Complaint does not raise questions of a common or general interest; therefore, this case may not be properly maintained as a class action set forth in Rule 23 of the Federal Rules of Civil Procedure.

47.    Defendant reserves the right to assert additional affirmative defenses as they become known during and through the course of discovery.

## JURY DEMAND

Defendant URW Community Federal Credit Union requests trial by jury in this action.

WHEREFORE, URW Community Federal Credit Union denies that Plaintiff is entitled to any relief whatsoever, and further prays that Plaintiff's Complaint be dismissed with prejudice, with fees and costs assessed against the Plaintiff, and for any other relief this Court deems just and proper.


Dated: April 3, 2026                                    Respectfully Submitted

                                             By: */s/ Jeremy D. Camacho*
                                                 Jeremy D. Camacho (VSB No. 86765)
                                                 GORDON REES SCULLY MANSUKHANI, LLP
                                                 277 S. Washington Street, Suite 550
                                                 Alexandria, VA 22314
                                                 Tel: (571) 351-0973
                                                 jcamacho@grsm.com


48

Scott R. Sinson (*pro hac vice forthcoming*)
Jennifer N. Abdo (*pro hac vice forthcoming)*
**GORDON REES SCULLY MANSUKHANI, LLP**
1 North Wacker Drive, Suite 1600
Chicago, Illinois 60606
Tel:  (312) 261-9466
Fax:  (312) 565-6511
ssinson@grsm.com
jabdo@grsm.com

*Attorneys for Defendant,*
*URW Community Federal Credit Union*

49

## CERTIFICATE OF SERVICE

I hereby certify that on April 3, 2026 a copy of the foregoing was electronically filed with

the Clerk of the Court using the CM/ECF system, which will send notification of such to the

following:

Devon J. Munro
MUNRO BYRD, P.C.
120 Day Avenue SW, Suite 100
Roanoke, VA 24016
Tel:    (540) 283-9343
dmunro@trialsva.com

Lynn A. Toops
COHEN & MALAD, LLP
One Indiana Square, Suite 1400
Indianapolis, IN 46204
Tel:    (317) 636-6481
ltoops@cohenmalad.com

Martin F. Schubert
STRANCH, JENNINGS & GARVEY, PLLC
223 Rosa L. Parks Avenue, Suite 200
Nashville, TN 37203
Tel:    (615) 254-8801
gstranch@stranchlaw.com

Christopher D. Jennings
JENNINGS & EARLEY PLLC
500 President Clinton Avenue, Suite 110
Little Rock, Arkansas 72201
chris@jefirm.com

By: */s/ Jeremy D. Camacho*
Jeremy D. Camacho
GORDON REES SCULLY MANSUKHANI, LLP

50